UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                                    )     No. 22 CR 158
          v.                )
                                    )     Judge Martha Pacold
CHARLES TAYLOR              )

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE**

MORRIS PASQUAL
Acting United States Attorney
For the Northern District of Illinois
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

ELIE T. ZENNER
Assistant United States Attorney

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ...................................................................... ii

I.    BACKGROUND .............................................................................. 1

II.   TAYLOR WAS LAWFULLY STOPPED AND ARRESTED ............................. 7

      A.    Officers' Initial Interaction with Defendant was Consensual ......... 7

      B.    At the Time Officers Initiated the *Terry* Stop, They Had
            Reasonable Suspicion of Criminal Activity ...................................... 9

      C.    Officers Had Reasonable Suspicion to Order Defendant Out of the
            Vehicle and Attempt to Frisk Him ................................................... 12

      D.    By the Time Officers Seized Defendant, They Had Probable Cause
            to Arrest Him ...................................................................................... 15

      E.    Regardless of Probable Cause, the Gun Should Not Be Suppressed
            Because Defendant Abandoned It ..................................................... 18

      F.    Even If Officers Did Not Have Reasonable Suspicion Based on
            Their Observation, The Gun Would Have Inevitably Been
            Discovered by Lawful Means .......................................................... 18

III.  CONCLUSION .................................................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

Cases

*Arizona v. Johnson*, 555 U.S. 323, (2009) .................................................................. 14

*California v. Hodari D.*, 499 U.S. 621 (1991) ............................................................ 15

*Illinois v. Wardlow*, 528 U.S. 119 (2000) .................................................................. 16

*Kansas v. Glover*, 140 S. Ct. 1183 (2020) .................................................................... 9

*Lipford v. City of Chi.*, No. 15-CV-6988, 2018 WL 1156242 (N.D. Ill. Mar. 5, 2018) 17

*Mucha v. Vill. of Oak Brook*, 650 F.3d 1053 (7th Cir. 2011) ..................................... 15

*Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022) ................................................ 13

*Navarette v. California*, 572 U.S. 393 (2014) ......................................................... 9, 10

*Terry v. Ohio*, 392 U.S. 1 (1968) .................................................................................. 9

*United States v. Adamson*, 441 F.3d 513 (7th Cir. 2006) ........................................... 11

*United States v. Alexander*, 573 F.3d 465 (7th Cir. 2009) .......................................... 18

*United States v. Alexander*, No. 20-CR-00822, 2023 WL 2214363 (N.D. Ill. Feb. 24, 2023) ....................................................................................................................... 13

*United States v. Arvizu*, 534 U.S. 266 (2002) ............................................................. 10

*United States v. Chavez*, 625 F. Supp. 3d 760 (N.D. Ill. 2022) ................................. 16

*United States v. Cherry*, 920 F.3d 1126 (7th Cir. 2019) ............................................ 15

*United States v. Clements*, 522 F.3d 790 (7th Cir. 2008) ......................................... 7, 8

*United States v. Davis*, 200 F.3d 1053 (7th Cir. 2000) ............................................... 14

*United States v. Govan*, 365 F. App'x 693 (7th Cir. 2010) ......................................... 11

*United States v. Griffin*, 652 F.3d 793 (7th Cir. 2011) ............................................... 15

*United States v. Harper*, 756 F. App'x 656 (7th Cir. 2019) ........................................ 18

*United States v. Hendricks*, 319 F.3d 993 (7th Cir. 2003).................................... 8, 14

*United States v. Howell*, 958 F.3d 589 (7th Cir. 2020)................................................ 10

*United States v. Jackson*, No. 20 CR 298, 2023 WL 2572427 (N.D. Ill. Mar. 20, 2023) ................................................................................................................................. 17

*United States v. Jones*, 861 F.3d 638 (7th Cir. 2017) ................................................. 19

*United States v. Lenoir*, 318 F.3d 725 (7th Cir. 2003)................................................ 16

*United States v. Lighthall*, No. 19 CR 922, 2021 WL 5446724 (N.D. Ill. Nov. 22, 2021) ............................................................................................................................. 13

*United States v. Marrocco*, 578 F.3d 627 (7th Cir. 2009) .......................................... 19

*United States v. Rivers*, 121 F.3d 1043 (7th Cir. 1997) ............................................. 14

*United States v. Rogers*, 423 F. App'x 636 (7th Cir. 2011) ........................................ 18

*United States v. Sawyer*, 224 F.3d 675 (7th Cir. 2000) .............................................. 17

*United States v. Tilmon*, 19 F.3d 1221 (7th Cir. 1994) .............................................. 14

*United States v. Williams*, 285 F. App'x 284 (7th Cir. 2008) ...................................... 8

*United States v. Wilson*, 963 F.3d 701 (7th Cir. 2020) .............................................. 17

The Court should deny defendant's motion to quash his arrest and suppress his gun. (D. 52.) On October 10, 2021, officers received a report of a suspected shoplifter at a grocery store. When officers ran the suspect's name through databases, they learned that she was involved in previous shoplifting incidents, including a retail theft involving a black Volkswagen and a man named Percy Walker. Officers noticed the same Volkswagen in the parking lot. Based on reasonable suspicion that the vehicle's occupants were involved in criminal activity, officers questioned the two occupants, Percy Walker and defendant. Both Walker and defendant responded evasively. After questioning defendant and Walker, officers observed the handle of a firearm protruding from defendant's waistband. At the same time, the suspected shoplifter informed an officer that defendant had a gun. Officers ordered defendant to exit the vehicle. He exited and immediately fled. As he fled, officers observed him drop a gun. Officers recovered the firearm and arrested defendant. Under these circumstances, it was reasonable for officers to question defendant in the vehicle and once officers observed the gun and defendant fled, they had probable cause to arrest him. Accordingly, defendant's motion should be denied.

## I.    BACKGROUND[1]

On October 10, 2021, at approximately 9:31 p.m., Evergreen Park police officers were dispatched to a Mariano's grocery store in Evergreen Park to respond to

---

[1] The government provides only those facts that are relevant for the purpose of responding to

a report of a female shoplifter wearing a dark hooded sweatshirt, dark pants, and standing about 5'4". Ex. A, Police Report at 4 ["Police Report"]. Officers arrived at the Mariano's and met with a loss prevention employee, who informed them that the suspected shoplifter was observed on video surveillance concealing several bottles of alcohol in plastic bags. *Id.* Officers then waited with the employee until the suspected shoplifter, who later identified herself as Sylyna Ficarella, exited the store. *Id.*; Ex. B, Officer Warniczek BWC 1 ["Warniczek BWC 1"] at 5:30-45. The employee positively identified Ficarella as the suspected shoplifter, and she matched the description he previously provided. Police Report at 4.

Before being asked any questions by officers, Ficarella immediately stated, "you guys want to check my stuff" and offered to provide her receipt. Warniczek BWC 1 at 5:30-45. Ficarella then quickly showed officers that she only had items in her bags for which she had paid and started to attempt to leave. *Id.* at 5:45-6:45. Officers then asked for her name, date of birth, and address, which she provided, and asked her to wait while they ran her name through law enforcement databases. *Id.* at 6:45-9:00. Central dispatch reported to the officers that Ficarella had previous contacts and arrests for retail thefts at Mariano's. Police Report at 4. Officers Warniczek and Guzman then relocated to a police vehicle to learn more details about Ficarella's

---

defendant's motion. Other facts, including evidence of defendant's prior felony convictions or defendant's knowledge of those felony convictions, are not included here.

previous incidents. *Id.* Officers learned that in a previous incident on June 17, 2021, Ficarella had been arrested for retail theft with a male subject named Percy Walker. *Id.* The report listed a 2005 black Volkswagen Jetta (the "Jetta") with Illinois license plate CT316222 as being used in the commission of the theft. *Id.*; Officer Warniczek BWC 1 at 13:00-16:00. Officers then observed the Jetta, with the matching license plate, parked with the lights on in the Mariano's parking lot. *Id.* at 16:00-16:15.

At 9:52 p.m., officers relocated to the Jetta to investigate further. *Id.* at 16:20-30. They encountered two male occupants sitting in the front seats. *Id.* Officer Warniczek asked the occupants which one of them was Percy, and the passenger stated, "who is who" and acted as if he did not know a Percy. *Id.* 16:25-35. Officers continued to ask who Percy was, inquire as to their purpose for being in the parking lot, and asked about the previous incident. *Id.* 16:35-18:00. Officer Warniczek stated that Ficarella was likely going to jail, but that Walker and defendant "could leave." *Id.* 17:42. The man in the passenger seat responded evasively and acted confused, but eventually admitted that he was Percy Walker. *Id.* at 18:00-18:20. Officers then asked the name of the driver and Walker appeared not to know. *Id.* at 18:20-30. Throughout the initial interaction, the man in the driver seat, later identified as defendant, appeared to be asleep or feigning sleep and was reclining with his hands in his lap and his t-shirt over his jeans' waistband as pictured below:

3



*Id.* 18:30-45.

Officer Warniczek asked if defendant was drunk, and the officers continued to inquire about Walker and defendant's identity. *Id.* 18:45-19:30. At 9:55 p.m., after defendant and Walker acted suspiciously and after learning Walker's identity, Officer Guzman stated that defendant was "not free to leave" because officers were "conducting an investigation." *Id.* 19:32-33. At about 9:56 p.m., defendant finally provided a temporary photo ID that identified him as Charles Taylor *Id.* at 20:00-20:10; Police Report at 4. Officer Warniczek then returned to his police vehicle to run defendant's and Walker's names through law enforcement databases. *Id.*; Officer

4

Warniczek BWC 1 at 20:45-22:30. While Officer Warniczek checked the databases, Officer Guzman remained near the Jetta and Officer Hartmann remained with Ficarella. *Id*.; Police Report at 4. At this time, Walker became increasingly agitated and abruptly exited the vehicle claiming to be a diabetic and that he needed to urinate. *Id*. Officer Guzman ordered Walker to get back in the vehicle while police investigated, and Walker stated non-verbatim, "I ain't got nothing on me, you can search me." *Id*. Officer Guzman conducted a pat-down search of Walker for officer safety, found nothing, and then Walker re-entered the vehicle. *Id*.

After running a name check in his police vehicle, Officer Warniczek exited the vehicle and walked toward Ficarella and Officer Hartmann. Officer Warniczek BWC 1 at 23:00-23:15. Officer Hartmann, whose body camera was not activated, then started walking toward the Jetta. Ex. A, Police Report at 12. At about 9:59 p.m., as Officer Hartmann approached the Jetta, when he was about 2 feet from the vehicle, he observed through the front windshield what appeared to be a gun protruding from defendant's waistband. *Id*.; Ex. C, Officer Hartmann Supp. Report at 2. Defendant had his hands in his lap near the gun. *Id*. Officer Hartmann reported his observation of the gun to Officer Guzman and over the radio. *Id*.; Police Report at 12; Officer Warniczek BWC 1 at 23:45-24:15. After Officer Hartmann reported observing the gun, Officer Guzman, whose body camera was also not functioning or activated, looked at defendant and also observed that defendant's t-shirt had risen and what

5

appeared to be a gun was now visible tucked into defendant's waistband. Police Report at 4-5.

Simultaneous with officers' observation of the gun, Ficarella became increasingly agitated and said that "she had to tell" Officer Warniczek something. Officer Warniczek BWC 1 at 23:15-45. Ficarella then stated that the driver (defendant) had a gun and "would kill" her if Officer Warniczek told him. *Id.* at 23:45-24:05. Officer Warniczek relayed this information over the radio, but Officer Hartmann did not hear it, as he was trying to radio his observation of the gun at the same time. *Id.* at 24:05-24:15. Ficarella stated multiple times, "he'll kill me." *Id.* at 24:40-24:50.

Officers Guzman and Hartmann then ordered Walker and defendant to raise their hands and eventually, to exit the Jetta. Police Report at 5. Walker complied and was detained. *Id.* At 10:00 p.m., defendant exited the vehicle, took two small steps, then turned and ran away from officers through the parking lot. *Id.* Officers Guzman, Hartmann, and Warniczek pursued defendant. *Id.* While chasing defendant, after only a few seconds, Officers Guzman and Hartmann observed defendant reach in his waistband and drop a gun on the ground. *Id.* at 5, 12. Officer Hartmann remained with the gun, while Officer Guzman continued to pursue defendant. *Id.* at 5. A few seconds later, Officers Guzman and Warniczek were able to detain defendant against a chain link fence. *Id.* at 5, 11.

6

Officers recovered the gun, a loaded Taurus PT140 semi-automatic handgun, from the parking lot after detaining defendant. Officer Hartmann's body worn camera, which activated after the chase, captures the gun at the location in the parking lot where defendant discarded it:



After relocating defendant to his police vehicle, Officer Warniczek asked defendant if he had a FOID card. Ex. D, Officer Warniczek BWC 2 at 2:45-3:05. Defendant refused to answer or provide a FOID card. *Id.*

## II.  TAYLOR WAS LAWFULLY STOPPED AND ARRESTED

### A. Officers' Initial Interaction with Defendant was Consensual

Defendant appears to argue that officers detained him as soon as they approached the Jetta. (D. 52 at ¶ 9.)  But this argument misunderstands the law and the facts in this case. A consensual encounter between an officer and a private citizen does not trigger the Fourth Amendment." *United States v. Clements*, 522 F.3d 790,

794 (7th Cir. 2008). Accordingly, "when the police walk up to someone who is sitting in a car that was already stopped (in other words, the police had nothing to do with the driver's decision to pull over and park), there is no seizure at all." *United States v. Williams*, 285 F. App'x 284, 286–87 (7th Cir. 2008).

Here, officers' initial interaction with Walker and defendant from 9:52 p.m. to 9:55 p.m. was entirely consensual. As shown on body worn camera, in the first three minutes of their interaction, Officers Warniczek and Guzman approached the Jetta and calmly asked the occupants their names and what they were doing in the parking lot. Officer Warniczek BWC at 16:20-17:40. The officers did not draw their weapons, use forceful language, touch the men, or ask them to move from their car parked in a public lot. *Id*. Officer Warniczek even stated that while Ficarella was in trouble, defendant and Walker could leave. *Id*. at 17:42. Under these circumstances, the Seventh Circuit has repeatedly held that there is no seizure or stop for purposes of the Fourth Amendment. *See, e.g.*, *Clements*, 522 F.3d at 794–95 (no seizure because defendant "voluntarily stopped his car", officers did not draw weapons, did not surround car or prevent him from driving away, and did not touch defendant or raise their voices); *United States v. Hendricks*, 319 F.3d 993, 999–1000 (7th Cir. 2003) (where a driver stops his car on his own and no other coercive activity occurs, the result is a consensual encounter).

8

As such, officers' initial interaction with defendant did not implicate the Fourth Amendment. Officers' interaction with defendant did not mature into a non-consensual stop until 9:55 p.m. when Officer Guzman stated that defendant was not free to leave. Officer Warniczek BWC at 19:32-33. But as discussed below, at that time (if not before), officers had reasonable suspicion to conduct a *Terry* stop.

### B. At the Time Officers Initiated the *Terry* Stop, They Had Reasonable Suspicion of Criminal Activity

Defendant claims that when officers initiated the *Terry* stop, they had no evidence of criminal activity because Ficarella did not have stolen merchandise on her person and officers had no evidence that defendant, Walker, or Ficarella were trespassing or committing traffic violations. (D. 52 at ¶ 17.) But contrary to defendant's argument, at the time that Officer Guzman told defendant he was not free to leave, officers did have sufficient reasonable suspicion to conduct a *Terry* stop.

"[T]he Fourth Amendment permits an officer to initiate a brief investigative . . . stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (internal marks omitted); *see generally Terry v. Ohio*, 392 U.S. 1 (1968). "The [reasonable suspicion] standard takes into account the totality of the circumstances— the whole picture." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal marks omitted). "Although a mere hunch does not create reasonable suspicion, the level of

suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

By the time Officer Guzman told defendant he was not free to leave, officers had received a credible report from a Mariano's loss prevention employee that Ficarella intended to shoplift several items. When Ficarella exited, the employee identified Ficarella, and she provided her name. Officers ran her name through databases and learned that she had a previous shoplifting arrest involving Percy Walker and a black Volkswagen Jetta. Officers located that Jetta in the parking lot and learned that Walker was inside along with defendant. Officers observed Walker and defendant act suspiciously when questioned. Both men were resistant to identify themselves, defendant feigned sleep, and Walker initially claimed not to know why he was being questioned before admitting he knew Ficarella but believed she had not been caught shoplifting.

The totality of these circumstances—a credible report of a crime, links to previous similar crimes, suspicious and evasive behavior—provided officers with a "particularized and objective basis" for suspecting defendant and/or Walker of criminal activity, namely attempting to shoplift. *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020) (reasonable suspicion existed where police responded to 911

call of suspicious activity, defendant matched description, and defendant responded suspiciously by refusing to answer questions).

Moreover, contrary to defendant's claims, (D. 52 at ¶ 17), the officers did not unnecessarily prolong the *Terry* stop. The entire *Terry* stop—from Officer Guzman stating defendant was not free to leave until Officer Hartmann's observation of the gun—lasted four minutes total. During that time (and before that time when the encounter was consensual), officers asked basic questions about Walker's and defendant's identities, their purpose for being in the parking lot, their connection to Ficarella, their sobriety, and their involvement in shoplifting. Officer Warniczek BWC 1 at 14:00-23:00. They also ran Walker, Ficarella, and defendant's names through databases to determine if they had warrants or trespass notices at Mariano's. *Id*. All these actions were reasonable and appropriate "means of investigating that was likely to confirm or dispel" officers' suspicions of criminal activity. *See United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (25-minute stop appropriate because police diligently investigated drug activity and interviewed multiple individuals about criminal activity); *United States v. Govan*, 365 F. App'x 693 (7th Cir. 2010) (15-minute stop appropriate because defendant was evasive about identity and officers reasonably ran his name through databases to determine his identity and potential involvement in a crime).

In sum, here, officers had sufficient reasonable suspicion to conduct the brief

11

4-minute stop of defendant to ask reasonable questions about his involvement in criminal activity.

### C. Officers Had Reasonable Suspicion to Order Defendant Out of the Vehicle and Attempt to Frisk Him

Defendant next argues, in a single sentence, that Officer Hartmann did not observe a gun on defendant's person. (R. 52 at ¶ 17.) This argument is without merit. Defendant failed to provide an affidavit or any other facts contradicting officers' observations. And contrary to defendant's claim, all the relevant facts corroborate officers' observation of the gun.

Officer Hartmann reported that as he walked over to the Jetta, he observed a gun protruding from defendant's waistband. Ex. A, Police Report at 12. As captured on Officer Warniczek's body worn camera, Officer Hartman walked away from Ficarella and towards the Jetta at 9:59 p.m. Officer Warniczek BWC 1 at 23:15-23:25. Then, seconds later, upon observing the gun, the audio from Officer Warniczek's camera captures Officer Hartmann stating over the radio, "this guy might have a gun." *Id.* at 24:00-24:25. Importantly, Officer Hartmann was not the only officer to observe the gun. When Officer Hartmann stated that he thought he saw a gun, Officer Guzman looked at defendant and observed that defendant's t-shirt had risen and revealed what appeared to be a gun in defendant's waistband. Police Report at 4-5. Seconds later, defendant fled, and officers observed him drop a gun that they

immediately recovered and documented on body worn camera and in photographs.

The fact that officers' observation of the gun in defendant's waistband was not captured on body worn camera does not undercut the reliability of the officers' reports. [2] Courts consistently deny suppression motions even though a particular observation was not captured on camera where, as here, officers' reports of their observations and available evidence are consistent and credible. *See, e.g.*, *United States v. Alexander*, No. 20-CR-00822, 2023 WL 2214363 (N.D. Ill. Feb. 24, 2023) (suppression motion denied where two officers provided consistent reports of traffic violation even though officers did not activate body worn camera until after violation occurred); *United States v. Lighthall*, No. 19 CR 922, 2021 WL 5446724 (N.D. Ill. Nov. 22, 2021) (suppression motion denied where dash-cam footage did not entirely capture traffic violation but generally supported officer's report).

And once Officers Hartmann and Guzman had observed the gun, they certainly had a sufficient basis to order defendant to exit the vehicle and pat him down for weapons. Indeed, during any "*Terry* stop, officers may order a driver out of his vehicle, and then proceed to pat him down for weapons 'if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Mwangangi v. Nielsen*, 48

---

[2] Defendant states that Officer Hartmann's body worn camera had a "red line" showing in the video footage. (R. 52 at ¶ 24.) The government is not familiar with defendant's "red line" reference, but the government has produced all available body worn camera footage in this case. Officer Hartmann's body worn camera did not activate until after he chased defendant.

F.4th 816 (7th Cir. 2022) (citing *Arizona v. Johnson*, 555 U.S. 323, 331, (2009)). Here, officers knew defendant and Walker were connected to potential shoplifting, defendant and Walker had acted evasively and suspiciously, and two officers had observed what appeared to be a gun in defendant's waistband. Under Seventh Circuit precedent, ordering defendant from the car for a pat-down was a justified "reasonable step[] to insure [officer] safety," and such action would have been justified even without the observation of the gun. *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003) (no 4th Amendment violation where officer observed traffic violation, had conversation with driver, driver acted suspiciously, and officer ordered driver out of car for pat-down that revealed gun); *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir. 1997) ("The Supreme Court [has] ruled that police officers may ask passengers to step out of a vehicle during a *Terry* stop.").

Further, the fact that officers drew their guns and forcefully ordered defendant out of the car did not ripen the *Terry* stop into an arrest. Under long-standing Seventh Circuit precedent, as part of a *Terry* stop*,* if a "suspect is considered dangerous," it is permissible for officers to order a suspect to leave a car, make a show of force, handcuff the suspect, and even "make him lie prone on the ground without transforming an investigatory stop into an arrest." *United States v. Tilmon*, 19 F.3d 1221, 1227-28 (7th Cir. 1994); *see also United States v. Davis*, 200 F.3d 1053, 1054 (7th Cir. 2000) (permissible *Terry* stop where officers ordered suspect from vehicle

14

and handcuffed him for officers' safety). Here, officers had reasonable suspicion that defendant and Walker were involved in criminal activity, and they had observed defendant with a gun near his hands. It was reasonable for officers to make a show of force and order defendant from the car for officer safety, and it did not transform the *Terry* stop into an arrest.

### D. By the Time Officers Seized Defendant, They Had Probable Cause to Arrest Him

Probable cause to arrest exists when "a reasonable person, knowing all of the facts and circumstances known to the officer, would believe that the individual in question has committed or is committing a crime." *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019). Probable cause requires only "a probability or substantial chance [that] criminal activity exists." *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011). Importantly, an arrest or seizure "requires *either* physical force [ ] or, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). "In the context of a show of authority, there is no seizure unless the person at whom the show of authority is directed actually submits to that authority and his freedom of movement is terminated." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011). Put differently, while a "suspect is still fleeing . . . he is not seized." *Id*. at 800.

15

Accordingly, here, defendant was not seized or arrested until officers tackled him after he fled. At that time, officers had received a credible shoplifting report, identified a suspect, and located defendant in a vehicle connected to the shoplifting. Upon questioning, defendant and Walker were evasive about providing identification and acted suspiciously. Then, despite defendant and Walker failing to state that they had any weapons in the car, officers observed a gun in defendant's waistband. This observation of the gun, along with the other suspicious behavior, likely gave officers probable cause to arrest defendant, and at minimum, provided reasonable suspicion to frisk defendant. *United States v. Chavez*, 625 F. Supp. 3d 760, 773 (N.D. Ill. 2022) ("When gun possession is paired with evasive or other suspicious conduct, probable cause can be found."); *United States v. Lenoir*, 318 F.3d 725, 729–30 (7th Cir. 2003) (officers had reasonable suspicion to stop defendant where they received report of gun, observed defendant with guns, and he acted strangely and fled).

But here there was more. Before officers could get close enough to defendant to frisk him, he immediately fled and dropped a gun. He then was caught and refused to provide a FOID card upon request. Officer Warniczek BWC 2 at 2:45-3:05. The Supreme Court has explained that "headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The Seventh Circuit likewise has held that a "reasonable officer [can] infer from

16

defendant's flight that defendant knew he was in violation of the law." *United States v. Wilson*, 963 F.3d 701, 703-04 (7th Cir. 2020).

Here, defendant's flight, coupled with the suspected criminal activity, defendant's suspicious behavior, officers' observation of the concealed gun in his waistband, officers' observation of the defendant removing the gun and dropping it, officers' recovery of the gun, and defendant's refusal to provide a FOID card was more than sufficient to give officers probable cause to believe defendant possessed the gun illegally and to arrest him. *See, e.g.*, *United States v. Jackson*, No. 20 CR 298, 2023 WL 2572427, at *2–3 (N.D. Ill. Mar. 20, 2023) (denying motion to quash arrest because probable cause existed where defendant jumped a fence in flight from officers, officers observed him appearing to conceal a gun, and officers observed him remove gun and throw it in a yard); *Lipford v. City of Chi.*, No. 15-CV-6988, 2018 WL 1156242, at *4 (N.D. Ill. Mar. 5, 2018) (officers "unquestionably possessed probable cause to believe that Plaintiff violated the FOID Card Act when he" could not produce FOID card upon request after they found gun); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000) ("Given [defendant's immediate flight from officers], as long as [officer] reasonably believed there was a substantial chance that the object [defendant] dropped was a firearm, he had probable cause to arrest.")

17

### E. Regardless of Probable Cause, the Gun Should Not Be Suppressed Because Defendant Abandoned It

Under Seventh Circuit precedent, a "person cannot have a reasonable expectation of privacy in abandoned property." *United States v. Alexander*, 573 F.3d 465, 472 (7th Cir. 2009). Thus, here, regardless of whether officers had reasonable suspicion or probable cause to seize defendant, defendant's gun should still not be suppressed because defendant dropped the gun and thus "abandoned any Fourth Amendment interest" he had in the gun. *See, e.g.*, *United States v. Rogers*, 423 F. App'x 636, 638–39 (7th Cir. 2011) (upholding denial of suppression motion because defendant "discard[ed] the gun before he was tackled" by officers*); United States v. Harper*, 756 F. App'x 656, 657 (7th Cir. 2019) (suppression motion denied where officer observed defendant toss gun because "there is no expectation of privacy in, and thus no Fourth Amendment protection for, abandoned property").

### F. Even If Officers Did Not Have Reasonable Suspicion Based on Their Observation, The Gun Would Have Inevitably Been Discovered by Lawful Means

Even if officers did not have reasonable suspicion to order defendant to exit the Jetta based on their observation of the gun (and they did), they obtained an independent legal basis for reasonable suspicion when Ficarella told them that defendant had a gun. Under the inevitable discovery doctrine, evidence will not be suppressed if the government can prove that the officers "ultimately or inevitably

18

would have ... discovered [the challenged evidence] by lawful means." *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009). To satisfy this burden, "the Government must demonstrate that two criteria are met: First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct." *Id.* at 737-38.

Here, both prongs are satisfied. As captured on body worn camera, at the exact same time that Officer Hartmann observed the gun in defendant's waistband, Ficarella informed Officer Warniczek that defendant had a gun. Officer Warniczek BWC 1 at 23:45-24:15. When she shared this information, Ficarella appeared terrified and stated that defendant would kill her. *Id.* Based on this contemporaneous and credible report that defendant had a gun and was a threat, officers would have searched defendant for guns and that search would have been based on reasonable suspicion of criminal activity. As such, the gun would have "inevitably been discovered by lawful means," and should not be suppressed. *See United States v. Jones*, 861 F.3d 638 (7th Cir. 2017), *as amended* (June 30, 2017) (inevitable discovery doctrine applies where girlfriend reported that defendant was a felon and had guns in the home, which provided an "independent legal justification for conducting a search that would have led to the discovery of the evidence.")

### III.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to suppress and quash in its entirety.


Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

BY:    s/ Elie T. Zenner
ELIE T. ZENNER
Assistant U. S. Attorney
219 S. Dearborn
Chicago, Illinois 60604
(312) 697-4032


Dated: June 29, 2023