```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4                   Plaintiff,       )  Case No. 22 CR 158
     -vs-                             )
 5                                    )  Chicago, Illinois
     CHARLES TAYLOR,                  )  November 3, 2023
 6                                    )  10:03 a.m.
                     Defendant.       )
 7
            TRANSCRIPT OF PROCEEDINGS - MOTION TO SUPPRESS
 8           BEFORE THE HONORABLE MARTHA M. PACOLD

 9   APPEARANCES:

10   For the Plaintiff:    MR. ELIE THOMAS ZENNER
                           MR. PAUL SCHIED
11                         Assistant U.S. Attorneys
                           219 S. Dearborn St.
12                         Chicago, IL 60604
                           (312) 697-4032
13                         Elie.Zenner@usdoj.gov

14   For the Defendant:    MR. JOSHUA BATEMAN KUTNICK
                           Joshua B. Kutnick, Attorney at Law
15                         900 W. Jackson Blvd, Suite 7E
                           Chicago, IL 60607
16                         (312)441-0211
                           jkutnick@gmail.com
17
     Court Reporter:
18
                  KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
19                     Official Court Reporter
                    United States District Court
20          219 South Dearborn Street, Suite 2328A
                    Chicago, Illinois  60604
21               Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov
22
             *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
23
            PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
24               TRANSCRIPT PRODUCED WITH A COMPUTER

25
```

1    (Proceedings heard in open court:)

2         THE CLERK:  22 CR 158, United States verse Charles

3    Taylor.

4         MR. ZENNER:  I believe Mr. Kutnick, the defense

10:03:09    5    counsel, just stepped outside to take a call regarding a state

6    court matter.

7         THE COURT:  Oh, okay.

8         MR. ZENNER:  Our witnesses are here, so we're ready

9    to proceed.  But I'll go check on Mr. Kutnick.

10:03:19    10        THE COURT:  Also I think they need some time to bring

11   defendant.

12        MR. ZENNER:  Oh, yeah.

13        THE COURT:  So that's okay.

14        MR. KUTNICK:  Good morning, your Honor.

10:03:52    15        THE COURT:  Good morning.

16        MR. ZENNER:  I can put my appearance on the record.

17   Elie Zenner on behalf of the United States.

18        MR. KUTNICK:  Joshua Kutnick on behalf of Charles

19   Taylor.

10:04:04    20        THE COURT:  Good morning.  We're still waiting for

21   Mr. Taylor, so it may be another couple minutes.

22        MR. KUTNICK:  Sure.

23        THE MARSHAL:  They should be coming down, your Honor.

24        THE COURT:  Okay.  Thanks.

10:04:15    25        MR. SCHIED:  Your Honor, Paul Schied for the

1    government also, putting my appearance on the record.  Thank
2    you.
3              THE COURT:  Good morning.
4         (Pause.)
5              THE COURT:  All right.  Everyone ready to proceed?
6    If you need any more time, that's fine, but whenever you're
7    ready.
8              MR. ZENNER:  The government is ready to proceed.
9              MR. KUTNICK:  We are ready to proceed, your Honor.
10             THE COURT:  Okay.  I -- I think you were going to
11   start with some short openings.
12             MR. ZENNER:  We are, your Honor.  The government, my
13   colleague, Paul Schied, will start with a brief opening.
14             THE COURT:  Okay.  Also, I'm not sure whether anyone
15   has a preference on the order of who goes first.  I guess it's
16   the defendant's motion, it's the government's case, so I don't
17   really have a preference.
18             MR. ZENNER:  Mr. Kutnick and I just conferred.  The
19   government will call the witnesses and go first in questioning
20   the witnesses, and then Mr. Kutnick will cross-examine them.
21             THE COURT:  Okay.
22             MR. KUTNICK:  I agree.  I think that's a good format.
23             THE COURT:  Sounds good.
24             MR. ZENNER:  Thank you.
25             THE COURT:  Thanks.

10:09:54
10:10:05
10:10:22
10:10:38

1    OPENING STATEMENT ON BEHALF OF THE GOVERNMENT BY MR. SCHIED

2         MR. SCHIED:  Thank you, your Honor.

3         The government will call today three Evergreen Park

4    Police Department officers, Officer Artur Warniczek, Officer

10:10:58   5    Ryan Hartmann and Officer Rigoberto Guzman.  The government

6    expects that this testimony will be consistent with the

7    reports and body-worn camera footage that has been tendered to

8    the Court and the defense during the briefing of this motion.

9    The government also plans to present portions of Officer

10:11:18  10    Warniczek's body-worn camera footage, which corroborates the

11    officers' reports and their expected testimony.

12         On October 10, 2021 these officers conducted a

13    straightforward police investigation that began with a

14    credible call of a crime in progress and concluded with the

10:11:35  15    lawful arrest of defendant Charles Taylor and the recovery of

16    a loaded Taurus .40-caliber handgun that the defendant

17    abandoned while fleeing police.

18         The investigation proceeded from one reasonable

19    investigative step to the next all justified by reasonable

10:11:50  20    suspicion and ultimately a reasonable belief that the

21    defendant had a gun that needed to be made safe.

22         Evergreen Park police officers were dispatched to a

23    call from a loss prevention employee at a Mariano's grocery

24    store of a shoplifting in progress.  After arriving, the

10:12:09  25    officers spoke to the employee who told them that he had

1    observed an at that point unidentified female hiding alcohol

2    in preparation to shoplift bottles of alcohol.

3         When the female exited the store, the Mariano's

4    employee identified her for the officers.

10:12:25  5    Before the officers could even begin questioning the

6    woman, whose name was Sylyna Ficarella, the woman asked if

7    they wanted to check her bags and voluntarily began attempting

8    to prove that she had paid for the items in her bag.

9         Officers took the reasonable investigative step of

10:12:43  10   passing Ficarella's name to dispatch, and dispatch returned

11   information that there was a prior incident at a Mariano's

12   involving Ficarella.

13        Two of the officers, Officer Warniczek and Officer

14   Guzman, went to the vehicle to read the reports from that

10:12:58  15   arrest and discovered that the prior incident had involved

16   shoplifting, that individuals named Percy Walker and Charles

17   Taylor were involved, and that a specific black Volkswagen

18   Jetta was used in that prior incident.

19        The officers quickly identified a black Jetta with

10:13:14  20   the same license plate nearby positioned with a clear view of

21   the Mariano's exit and the police officers.

22        The car was parked with its lights on and Officers

23   Warniczek and Guzman approached the car to investigate, with

24   Officer Hartmann remaining with Ficarella in front of the

10:13:32  25   Mariano's.  Officer Warniczek began a consensual conversation

opening - government

6

1    with the occupants of the Jetta.

2            Officer Warniczek asked who the occupants of the car

3    were, specifically who was Percy Walker.  The occupants acted

4    suspiciously with Walker, who was in the passenger's seat of

10:13:49  5    the vehicle, acting as if he had never heard the name Percy

6    Walker and the driver, defendant Charles Taylor, apparently

7    feigning sleep.

8            You will hear testimony that at this point in time,

9    before Walker and the defendant had confirmed their identities

10:14:02 10   and while the defendant was pretending to be asleep while in

11   the driver's seat of a car with the key in the ignition, that

12   at that point in time, the defendant's shirt was covered --

13   was covering his waistband.

14           After this initial interaction with the occupants of

10:14:18 15   the Jetta and because of the officers' mounting suspicion that

16   these individuals were involved with Ficarella's attempted

17   shoplifting, Officer Warniczek then went to run their names,

18   another reasonable investigative step.  He returned to Officer

19   Hartmann and Ficarella before and after running the names.

10:14:37 20           While Officers Hartmann and Warniczek were with

21   Ficarella, Officer Guzman stayed with Walker and the defendant

22   near the black Jetta.  Officer Hartmann observed that Walker

23   had exited the vehicle and was getting animated with Officer

24   Guzman.  Officer Guzman succeeded in getting Walker, who was

10:14:54 25   acting erratically, back in the Jetta.

1    Officer Hartmann had walked over after seeing the
2    disturbance, and as he approached the hood of the Jetta, he
3    could see the bottom of defendant's shirt was now above his
4    waistband and that a gun was protruding from the waistband.

10:15:09

5    Officer Hartmann relayed this information to Officer
6    Guzman, who looked at the defendant and also saw the gun in
7    his waistband.  The officers ordered Walker and the defendant
8    to raise their hands and then to get out of the car.

9    Walker complied and was detained.

10:15:22

10   Defendant got out of the car, but then fled.  The
11   officers gave chase and observed the defendant reach into his
12   waistband, where the officers had just seen the gun, and then
13   drop the gun as he was running away.

14   Officer Hartmann stayed with the gun while Officer

10:15:38

15   Guzman continued pursuit and eventually detained the defendant
16   with help from other officers.  Every step of the way, the
17   officers acted reasonably in conducting a consensual
18   encounter, continuing to investigate based on the
19   circumstances and the individuals' suspicious behavior, and

10:15:55

20   eventually ordering the defendant out of the car and arresting
21   him after his flight.

22   The expected testimony is corroborated by the
23   body-worn camera footage and each of the three witnesses.  The
24   facts make clear that defendant's arrest was proper, as was

10:16:07

25   the recovery of the gun that was abandoned while fleeing

opening - defendant

8

1    police.

2         THE COURT:  Thank you.

3         From the defense?

4    OPENING STATEMENT ON BEHALF OF DEFENDANT BY MR. KUTNICK

5         MR. KUTNICK:  Thank you, your Honor.

6         I agree with a lot of the things that counsel just

7    stated, your Honor, but certainly the evidence we contend is

8    going to show some differences.

9         On October 10, 2021, the officers did receive a call

10   of shoplifting in progress at the Mariano's, and they did

11   proceed to that Mariano's.  You'll hear more about it, but to

12   make a long story short, they quickly realized that no crime

13   had occurred, that nobody was going to be arrested.  They did

14   not have a warrant for her arrest, and no one was signing any

15   complaints for her.

16        They did go to run her name in the computer, which

17   revealed an incident report from four months prior, and in

18   that incident report, she was listed as shoplifting at that

19   Mariano's, and there was mention of a black Volkswagen and

20   there was mention of a person named Percy Walker, but I must

21   correct counsel in stating that there was no mention of

22   Charles Taylor in that report from four months prior the

23   evidence will show.

24        After they basically saw this report indicating the

25   black Volkswagen, Hartmann remained with Sylna, the woman,

1    while -- while Hartmann and Warniczek approached the vehicle.

2    And counsel's right, they did not see a gun.  They were

3    engaging in conversation with these individuals.  They -- the

4    government terms it as a consensual conversation, and it may

5    have been a consensual conversation from the get-go, and there

6    was even a point, you'll see, your Honor, where the officers

7    say you're free to go.

8        And then only seconds later, they're being ordered

9    out of the vehicle.  Nothing happened in those seconds that

10   would have escalated it from a situation of a consensual

11   encounter to probable cause or even reasonable suspicion for a

12   *Terry* at that point.

13       The -- when they were -- when Officers Hartmann and

14   Warniczek were standing around the car and counsel says that

15   people were acting suspiciously, well, Percy, the passenger,

16   he seems to be giving them a problem, and you'll see that,

17   your Honor.  But Taylor, he's just sitting there in the

18   driver's seat.  Yes, his eyes are closed.  Yes, he may be

19   sleeping.  But, no, you cannot see his waistband, and you

20   cannot see a gun.

21       You cannot see any bulges.  He never reaches for any

22   objects.  He never makes any furtive movements or tries to

23   conceal anything.  And then when he, both gentlemen provide

24   identification, Warniczek -- Hartmann walks back to the police

25   car to run their names.  Another officer arrives for backup,

Warniczek - direct

10

1    and next thing you know, they're ordered out of the car.

2    Nothing happens in that time that would warrant them being

3    ordered out of the car.

4         They were unable to view any weapon on his waistband,

10:19:40    5    and, your Honor, the officers were seized as soon as they

6    were -- the officers seized the defendant's vehicle as soon as

7    he was no longer free to leave.  That seizure was not lawful.

8    It was not supported by probable cause or even reasonable

9    suspicion, and mostly, finally, the officers did not have a

10:20:02    10   legal basis to order the defendant out of the car, which then,

11   according to the officers, revealed the weapon.

12        We're going to ask you to find that this search was

13   not reasonable, did not comport with the Fourth Amendment, and

14   we're going to ask you to suppress the gun.

10:20:24    15        THE COURT:  Thank you.

16        You may proceed with the evidence.

17        MR. ZENNER:  I'm going to call Officer Artur

18   Warniczek to the stand.

19        Just one moment.

10:21:11    20      (Witness sworn.)

21       ARTUR WARNICZEK, GOVERNMENT'S WITNESS, DULY SWORN,

22                    DIRECT EXAMINATION

23   BY MR. ZENNER:

24   Q.  Good morning, Officer.  Could you please state your name

10:21:23    25   for the record.

Warniczek - direct

11

1    A.   Officer Artur Warniczek, A-R-T-U-R, W-A-R-N-I-C-Z-E-K,

2    Star Number 144, Evergreen Park Police Department.

3    Q.   And where are you employed, Officer Warniczek?

4    A.   Evergreen Park Police Department.

10:21:39    5    Q.   What's your position there?

6    A.   Patrol officer.

7    Q.   What are your general duties as a patrol officer?

8    A.   To respond to general calls for safety and as regular

9    proactive patrol.

10:21:52    10   Q.   And how long have you been with the Evergreen Park Police

11   Department?

12   A.   Seven years.

13   Q.   Can you describe some of the initial training at a high

14   level that you underwent to become a police officer?

10:22:04    15   A.   Started out with two years of college for law enforcement,

16   as well as basic training academy when getting hired by

17   Evergreen Park.

18   Q.   As part of that training, did you receive training

19   specifically regarding identifying armed individuals?

10:22:25    20   A.   Yes.

21   Q.   And have you received training specifically regarding

22   recognizing firearms in public?

23   A.   Yes.

24   Q.   In the course of your position as a police officer,

10:22:37    25   approximately how many times have you recovered firearms in

Warniczek - direct

12

1    public?

2    A.  Numerous.

3    Q.  I want to turn to October 10th, 2021.

4         Were you on duty that night?

10:22:47    5    A.  Yes.

6    Q.  Were you dispatched to respond to an incident at a

7    Mariano's?

8    A.  Yes.

9    Q.  What was that call about?

10:22:54    10   A.  It was a call for a shoplifter in progress.

11   Q.  Did you respond to the Mariano's?

12   A.  Yes.

13   Q.  Were there any other officers with you that night?

14   A.  Yes.

10:23:02    15   Q.  Who was with you?

16   A.  Initial, Officer Guzman.

17   Q.  Did any other officers show up shortly after Guzman?

18   A.  Yes, Officer Hartmann.

19   Q.  What happened when you arrived at the Mariano's?

10:23:15    20   A.  I met with the loss prevention employee at the front

21   entrance of the store who advised the female offender that's

22   currently within the store concealing alcohol.

23   Q.  Did you have a body cam on the night of October 10th,

24   2021?

10:23:31    25   A.  Yes.

Warniczek - direct

13

| | |
|---|---|
| 1 | MR. ZENNER:  Your Honor, permission to play what was |
| 2 | previously submitted in the briefing as Government Exhibit B. |
| 3 | THE COURT:  You may. |
| 4 | (Video played.) |
| 10:23:51    5 | BY MR. ZENNER: |
| 6 | Q.  Do you recognize this video? |
| 7 | A.  Yes. |
| 8 | Q.  How do you recognize it? |
| 9 | A.  This is my body cam, and this is the entrance of the |
| 10:23:59   10 | Mariano's. |
| 11 | Q.  And does this exhibit contain a fair and accurate |
| 12 | recording of your body cam footage from that night? |
| 13 | A.  Yes. |
| 14 | MR. ZENNER:  I'll move to admit what had previously |
| 10:24:11   15 | been submitted as Government Exhibit B. |
| 16 | THE COURT:  Any objection? |
| 17 | MR. KUTNICK:  No objection. |
| 18 | THE COURT:  It's admitted. |
| 19 | (Government's Exhibit B was received in evidence.) |
| 10:24:19   20 | BY MR. ZENNER: |
| 21 | Q.  Does your body camera footage show the date that the |
| 22 | events are being recorded? |
| 23 | A.  Yes, in the lower left-hand corner. |
| 24 | Q.  Okay.  What date does it show in the lower left-hand |
| 10:24:32   25 | corner? |

Warniczek - direct

14

1    A.  10/10/2021.

2    Q.  What time does it show?

3    A.  It would be 9:36 and 10 seconds p.m.

4         MR. ZENNER:  I'm now going to play from about

10:24:53   5    29 seconds to about 1:40.

6         (Video played.)

7    BY MR. ZENNER:

8    Q.  As depicted on the video, what did the loss prevention

9    employee tell you when you arrived at the store?

10:26:18   10   A.  That there was a female white offender still inside the

11   store concealing alcohol, and he wants her arrested.

12        MR. ZENNER:  I'm going to move forward in the video.

13   I'm going to start playing at 2:59, and I'll play until

14   approximately 3:30.

10:26:37   15        (Video played.)

16   BY MR. ZENNER:

17   Q.  Can you identify the other two officers that are pictured

18   there on the video?

19   A.  Yes.  The officer to the left would be Officer Guzman, and

10:27:19   20   then the officer to the right wearing the mask is Officer

21   Hartmann.

22        MR. ZENNER:  Okay.  I'm going to move forward.  I'm

23   going to start playing at about 5:03, and I'll stop it at

24   5:40.

10:27:35   25        (Video played.)

Warniczek - direct

15

BY MR. ZENNER:

Q. Can you identify the woman pictured in the video?

A. Yes. That would be the offender that the loss prevention employee pointed to her as she exited saying that she is the offender.

Q. As shown on the video, what was the first thing that she said to you when she exited?

A. She voluntarily approached and asked if you want to see my bags and my receipt.

Q. Did you think that was unusual?

A. Yes.

Q. Why?

A. Because a regular person who makes a purchase doesn't voluntarily walk up wanting to show you her bags. And on top of that, she's carrying her personal bags. A regular shopper usually has plastic bags issued by the store and doesn't voluntarily produce receipts and drops down to her knees showing you her bags.

　　　　MR. ZENNER: I'm going to now play from 5:40 to 7 minutes.

　　(Video played.)

BY MR. ZENNER:

Q. As shown on the video, what happened next?

A. As she's showing us that she hasn't stolen any items, she attempts to walk off without being identified. She's anxious

Warniczek - direct

16

1  to leave.

2  Q.  Did you learn her name?

3  A.  Yes.

4  Q.  What was her name?

10:30:46  5  A.  Sylyna Ficarella.

6       MR. ZENNER:  I'm now going to play from 7 minutes to

7  10:20.

8     (Video played.)

9  BY MR. ZENNER:

10:34:19  10  Q.  As depicted in that portion of the video, what happened

11  next when you learned her name?

12  A.  Once we obtained Ms. Ficarella's name and date of birth,

13  Officer Guzman went to run a LEADS check on her through the

14  radio while I stayed talking to her.

10:34:38  15  Q.  And what did you and the other officers learn from

16  dispatch?

17  A.  I learned that she had previously been arrested in the

18  same location at the same store at Mariano's about four months

19  prior for retail theft.

10:34:50  20  Q.  Did you recognize Ms. Ficarella?

21  A.  Yes.  Before Officer Guzman even ran her name, I

22  recognized her from previous arrests and incidents involving

23  retail theft and drugs.

24  Q.  How did Ficarella appear to you when you were questioning

10:35:07  25  her?

Warniczek - direct

17

1   A.  Very anxious, nervous.

2           MR. ZENNER:  I'm now going to play from 11:20, 11:21

3   to 16:05.

4       (Video played.)

5   BY MR. ZENNER:

6   Q.  When you reviewed the previous reports involving

7   Ms. Ficarella, what did you learn?

8   A.  I -- at that time, I learned that Ficarella was previously

9   arrested for same offense, which is retail theft, at the same

10  location of Mariano's.  She was previously arrested with her

11  boyfriend named Percy, and they were arrested for retail theft

12  as well as multiple warrants, and they used a getaway vehicle,

13  which was a Volkswagen Jetta.

14  Q.  Was there any other person named in those reports?

15  A.  There was another person, which was a driver at the time

16  of that previous incident, Mr. Charles Taylor.

17  Q.  Did you learn the license plate of the Volkswagen?

18  A.  Yes.  It was attached to the report.

19  Q.  What did you do next?

20  A.  I asked Officer Guzman to look around the parking lot to

21  see if we can see that vehicle here in the parking lot again.

22  Q.  After you spotted the Jetta -- excuse me.  Did you see

23  that car in the parking lot?

24  A.  Yes.  Officer Guzman saw the vehicle, matching the same

25  exact description, bearing the same Illinois license plate.

10:40:11
10:40:27
10:40:47
10:41:00
10:41:25

Warniczek - direct

18

1  Q.  After you spotted that Jetta, what did you do?

2  A.  I got out of my squad car, and myself and Officer Guzman

3  approached the vehicle.

4           MR. ZENNER:  Okay.  I'm going to play from 16:05 to

10:41:38   5  16:28.

6       (Video played.)

7  BY MR. ZENNER:

8  Q.  What happened next as shown on the video?

9  A.  I approached from the passenger's side of the vehicle,

10:42:17  10  knowing who the occupants or I should say subjects involved in

11  a previous incident, I approached from the passenger's side,

12  and I asked which one is Percy.

13  Q.  About what time was it when you approached the vehicle as

14  shown on the time stamp in the video?

10:42:30  15  A.  At this time, this would be 21:52 hours, which is

16  9:52 p.m.

17  Q.  When you walked up, did you have your gun drawn?

18  A.  No.

19  Q.  Was anyone else with you?

10:42:41  20  A.  Yes, Officer Guzman.

21  Q.  Anyone else besides Officer Guzman?

22  A.  Not at this time.

23  Q.  Why did you want to question the occupants of the Jetta?

24  A.  Because it was -- I just -- let me backtrack.

10:42:56  25           The loss prevention employee was adamant about

Warniczek - direct

19

| | |
|---|---|
| | 1 pursuing complaints.  I went to review the report, and as I |
| | 2 reviewed the previous incident report, I learned that this |
| | 3 vehicle, the Jetta, was involved in an incident, and then I |
| | 4 observed it sitting in the parking lot. |
| 10:43:15 | 5 And I suspected the same thing is occurring again, |
| | 6 same crime, same motive, and the same getaway vehicle is in |
| | 7 this parking lot. |
| | 8 Q.  And I believe you testified as to this, but what was the |
| | 9 first question you asked the occupants? |
| 10:43:28 | 10 A.  I said, "Who is Percy?" |
| | 11 Q.  How did the front passenger respond? |
| | 12 A.  Very shocked. |
| | 13 Q.  Did he identify himself as Percy Walker? |
| | 14 A.  Not initially.  Eventually, yes. |
| 10:43:39 | 15 Q.  Was the car on when you approached? |
| | 16 A.  Yes. |
| | 17 Q.  Was the car parked or moving? |
| | 18 A.  Parked. |
| | 19 Q.  Where was it parked? |
| 10:43:49 | 20 A.  In the -- in the parking lot directly in front of |
| | 21 Mariano's, probably about 100, 150 feet away from my squad |
| | 22 car. |
| | 23 Q.  When you were standing there next to the car, could you |
| | 24 see the front of the Mariano's? |
| 10:44:06 | 25 A.  Yes. |

Warniczek - direct

20

1   Q.  Could you see Ms. Ficarella?

2   A.  Yes.

3   Q.  And how many people were in the car?

4   A.  Two.

10:44:13   5   Q.  And you testified earlier that you were standing on the

6   passenger's side, correct?

7   A.  Correct.

8   Q.  Could you observe both of the occupants of the car?

9   A.  Yes.

10:44:22  10   Q.  In what seats were they sitting?

11  A.  Percy was the passenger's seat, and Mr. Taylor was the

12  driver.

13  Q.  What kind of shirt was Mr. Taylor wearing?

14  A.  Mr. Taylor, it appears to a Bears shirt, blue in color.

10:44:42  15  Q.  At this time, was his shirt covering his waistband?

16  A.  Yes.

17  Q.  Did you observe a gun at that time?

18  A.  No.

19      MR. ZENNER:  I'm going to play from 16:28 to

10:44:52  20  17 minutes.

21     (Video played.)

22  BY MR. ZENNER:

23  Q.  As shown on the video, what were some of the first

24  questions that you asked the occupants?

10:45:32  25  A.  I was trying to identify which one of the passengers or

Warniczek - direct

21

1   which one of the occupants is Mr. Percy.  He was being evasive

2   with his answers, but you could clearly -- at one point, he

3   said that I'm not full of shit, meaning he's kind of agreeing

4   to disagree that I'm under the right suspicion of them being

10:45:58   5   involved in this incident.

6   Q.  And how would you describe Mr. Walker's behavior as you

7   asked these initial questions?

8   A.  Very evasive.

9        MR. ZENNER:  I'm now going to play from 17 minutes to

10:46:11   10   18:32.

11      (Video played.)

12   BY MR. ZENNER:

13   Q.  As depicted on the video, what happened next over the last

14   minute?

10:47:50   15   A.  Eventually, based on my suspicions and continuous

16   investigation, Mr. Percy, the passenger in this vehicle, he

17   confirmed that he is, in fact, Mr. Percy, and he was

18   questioned as to why Ficarella would be getting arrested.

19   Q.  About how many times did you have to ask Mr. Walker to

10:48:13   20   identify himself before he finally said that he was Percy

21   Walker?

22   A.  Multiple times.

23   Q.  Did the driver identify himself immediately?

24   A.  No.

10:48:23   25   Q.  What was the driver, who was later identified as the

Warniczek - direct

22

1    defendant, Charles Taylor, doing when you began questioning

2    the occupants of the car?

3    A.  To the best of my observation, I suspect that he was

4    pretending to be asleep.

10:48:37    5    Q.  Why did you say he was pretending?

6    A.  Because just the general situation, honestly, I did not

7    think he was asleep.  I saw the vehicle to be running, and

8    we're having a full conversation with Mr. Percy.

9    Q.  And during this initial questioning period, did you state

10:48:58    10    that the occupants of the vehicle were under arrest?

11    A.  Can you repeat?

12    Q.  Did you state that they were under arrest?  Did you tell

13    them they were under arrest?

14    A.  I told them that they're not under arrest.

10:49:09    15    Q.  At that point, were they free to leave?

16    A.  At that point, it was an ongoing investigation due to the

17    fact that the vehicle had direct involvement in a previous

18    incident.  I wanted to clear everybody through the system,

19    make sure that they don't have any type of warrants.

10:49:28    20    Q.  Had either of the occupants tried to leave or said they

21    wanted to leave?

22    A.  No.

23    Q.  How would you generally describe the occupants' behavior

24    during these first few minutes of questioning?

10:49:39    25    A.  Very nervous, evasive with questioning, and initially not

Warniczek - direct

23

| | | |
|---|---|---|
| | 1 | very cooperative.  Later became more cooperative because of my |
| | 2 | suspicions being true. |
| | 3 | MR. ZENNER:  I'm now going to play from 18:32 to |
| | 4 | 20:25. |
| 10:50:00 | 5 | (Video played.) |
| | 6 | BY MR. ZENNER: |
| | 7 | Q.  Did you eventually obtain the names of both occupants? |
| | 8 | A.  Yes. |
| | 9 | Q.  Who was the passenger? |
| 10:52:01 | 10 | A.  Mr. Percy. |
| | 11 | Q.  And who was the driver? |
| | 12 | A.  Charles Taylor. |
| | 13 | Q.  And you testified earlier that Percy Walker was I believe |
| | 14 | arrested in the previous retail theft incident with |
| 10:52:13 | 15 | Ms. Ficarella? |
| | 16 | A.  Yes. |
| | 17 | Q.  And you testified that Charles Taylor was also mentioned |
| | 18 | in that report? |
| | 19 | A.  Yes. |
| 10:52:20 | 20 | MR. ZENNER:  I'm now going to play 20:25 to 21:10. |
| | 21 | And for the record, I stopped it at 20:25. |
| | 22 | (Video played.) |
| | 23 | BY MR. ZENNER: |
| | 24 | Q.  What happened next as depicted in the video? |
| 10:53:17 | 25 | A.  I approached Ms. Ficarella and informed her that I know |

1  what's taking place during this incident, and I advised her

2  that she's going to be getting arrested for trespassing.

3  Q.  Did you tell Officer Hartmann to place her under arrest?

4  A.  Yes.

10:53:35    5       MR. ZENNER:  All right.  I'm going to play from 21:10

6  to 21:30.

7       (Video played.)

8  BY MR. ZENNER:

9  Q.  What did you go back to your vehicle to do after giving

10:54:04   10  Officer Hartmann that instruction?

11  A.  At this particular time, I wanted to run everybody through

12  the system, make sure they have no warrants.

13       MR. ZENNER:  I'm going to skip ahead just a little

14  bit to 23 minutes, and I'll play from -- I'll play from

10:54:30   15  23 minutes to 24 minutes.

16       (Video played.)

17  BY MR. ZENNER:

18  Q.  What happened next?

19  A.  When I approached Ms. Ficarella, told her she was being

10:55:38   20  arrested, she did not want to get arrested and tried to get

21  herself any way possible, and she told me she got information

22  for me if I'd let her go.

23  Q.  And what information did she share with you?

24  A.  She relayed to me that the driver of the vehicle has a --

10:55:54   25  has a gun.

1    Q.  How did she seem when she was giving you that information?

2    A.  She appeared scared and claiming that the driver's going

3    to kill her if I tell him.

4            MR. ZENNER:  I'm going to play from 24 minutes to

5    24:09.

6        (Video played.)

7    BY MR. ZENNER:

8    Q.  What did you do when you learned that information?

9    A.  I got on the radio, relayed it to my partners because it's

10   a safety issue.

11   Q.  And what does it mean -- I believe the video depicted you

12   saying there's a 32 in the car.  What does that mean?

13   A.  Correct.  I said there's a 32 in the car, which translates

14   from a 10 code to a weapon or a gun.

15           MR. ZENNER:  I'm now going to play from 24:09 until

16   the end of the video, which is 26:06.

17       (Video played.)

18   BY MR. ZENNER:

19   Q.  Actually I'm going to stop it at 24:15.  I apologize.  I

20   played it from 24:09 to 24:15.

21           What happened next after you -- excuse me.  After you

22   relayed that information over the radio, what happened next?

23   A.  Almost at the same exact time, Officer Hartmann, who was

24   on the driver's side of the vehicle, observed a weapon --

25           MR. KUTNICK:  Objection.

Warniczek - direct

26

|  |  |
|---|---|
| 1 | MR. ZENNER:  Your Honor, what's the basis of the |
| 2 | objection? |
| 3 | MR. KUTNICK:  How can he testify what Hartmann |
| 4 | observed?  Basis and knowledge would be the objection. |
| 10:57:39   5 | THE COURT:  Yeah, can you -- |
| 6 | MR. ZENNER:  I'm going to ask a different question. |
| 7 | THE COURT:  Okay. |
| 8 | BY MR. ZENNER: |
| 9 | Q.  Did you hear a report over the radio after you made your |
| 10:57:52  10 | report? |
| 11 | A.  Yes.  Officer Hartmann -- |
| 12 | Q.  And what was that report? |
| 13 | A.  Officer Hartmann relayed over the radio that he sees a |
| 14 | weapon in the vehicle. |
| 10:58:05  15 | MR. ZENNER:  I'm now going to play from 24:14 to the |
| 16 | end of the video. |
| 17 | (Video played.) |
| 18 | BY MR. ZENNER: |
| 19 | Q.  As shown on the video, what happened after the reports by |
| 11:00:09  20 | you and then Officer Hartmann of a gun in the vehicle? |
| 21 | A.  Both Mr. Percy and Mr. Taylor were being ordered out of |
| 22 | the vehicle, at which point in time Mr. Taylor took off |
| 23 | running. |
| 24 | Q.  Which direction did he run in relation to the Mariano's? |
| 11:00:30  25 | A.  He ran east. |

Warniczek - direct

27

1  Q.  Is that toward the Mariano's or away from Mariano's?

2  A.  Away.

3  Q.  About how far away were you from Taylor as he started to

4  run?

11:00:44   5  A.  1 to 200 feet at that time.

6  Q.  Could you see where Officer Hartmann and Officer Guzman

7  were in relation to Taylor?

8  A.  Yes.

9  Q.  How far away were they from Taylor?

11:00:58   10  A.  Directly behind him.

11  Q.  What did you do when Taylor took off running?

12  A.  I told the loss prevention -- loss prevention to stay with

13  Ficarella, and I gave chase.

14  Q.  What happened next when you gave chase?

11:01:17   15  A.  I ran past Officer Hartmann, who observed Taylor dropping

16  a weapon, and I continued past Officer Hartmann after Taylor.

17  Q.  After you continued past Officer Hartmann, what happened?

18  A.  We apprehended Taylor shortly after he tried to climb a

19  fence.

11:01:39   20  Q.  Were there lights in the parking lot at the Mariano's?

21  A.  I believe so.

22  Q.  After you detained Taylor, what happened next?

23  A.  He was placed in handcuffs and escorted back to my squad.

24       MR. ZENNER:  Okay.  Your Honor, permission to play

11:02:00   25  what's been marked as -- what was previously submitted with

1    the briefing as Government Exhibit D.

2            THE COURT:  You may.

3            MR. ZENNER:  I'm just going to play a minute -- a

4    second of this.

5        (Video played.)

6    BY MR. ZENNER:

7    Q.  Officer Warniczek, are you familiar with this video?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is the continuation of the previous video.

11   Q.  Does Government Exhibit D contain a fair and accurate

12   recording of your body-worn camera footage from that night?

13   A.  Yes.

14           MR. ZENNER:  I'll move to admit what's previously

15   been submitted as Government Exhibit D.

16           THE COURT:  Any objection?

17           MR. KUTNICK:  No objection.

18           THE COURT:  It's admitted.

19       (Government's Exhibit D was received in evidence.)

20           MR. ZENNER:  I'm going to skip ahead to about 2:22,

21   and I'll play until about 3 minutes.

22       (Video played.)

23   BY MR. ZENNER:

24   Q.  What did you ask Mr. Taylor as you were putting him in the

25   car?

1   A.  I asked him if he had a FOID card.

2   Q.  What's a FOID card?

3   A.  It's a firearms owners license.

4   Q.  Did he provide a FOID card at that time?

11:03:53   5   A.  No.

6   Q.  Did you later check with dispatch to see if he had such a

7   card?

8   A.  Yes.

9   Q.  Did dispatch give you an answer?

11:04:02   10   A.  Yes.  They said that he did not possess a FOID card.

11          MR. ZENNER:  Okay.  I have no further questions at

12   this time.

13          THE COURT:  Okay.  Cross?

14          MR. KUTNICK:  Thank you, your Honor.

11:04:16   15                    CROSS-EXAMINATION

16   BY MR. KUTNICK:

17   Q.  Good morning, Officer Warniczek.

18          You have been working for the Evergreen Park Police

19   Department for seven years as of now?

11:05:06   20   A.  Yes.

21   Q.  So back on October 10th of 2021, you had been working for

22   them for five years, correct?

23   A.  Approximately, yes.

24   Q.  Have you ever worked for any other police agency prior to

11:05:15   25   that?

Warniczek - cross

1    A.  Yes.

2    Q.  What?

3    A.  Correctional Department of Cook County.

4    Q.  What county?

11:05:19    5    A.  Cook County.

6    Q.  Cook County?

7    A.  Yes.

8    Q.  You worked in the Cook County Jail?

9    A.  Yes.

11:05:22    10    Q.  Okay.  How long did you work there?

11    A.  Almost three years.

12    Q.  Three years?  Did you have any other law enforcement

13    experience prior to that?

14    A.  No.

11:05:29    15    Q.  And you said you received two years of college where you

16    studied, what, criminal justice?

17    A.  Yes, that was my basic major.

18    Q.  Okay.  Where did you go to college?

19    A.  Moraine Valley.

11:05:47    20    Q.  Moraine Valley?

21    A.  Community College.

22    Q.  That's a two-year degree?

23    A.  Yes.

24    Q.  And that's not required to have a two-year degree to be an

11:05:55    25    Evergreen Park police officer, is it?

Warniczek - cross

31

```
           1    A.  At that time, it was -- it was a requirement, however, I
           2    don't believe that the actual law enforcement degree was
           3    required.  It was any type of two-year college.
           4    Q.  Okay.  But yours was in criminal justice, not law
11:06:11   5    enforcement, correct?
           6    A.  Correct.
           7    Q.  All right.  You also took a basic training academy course;
           8    is that right?
           9    A.  Yes.
11:06:16  10    Q.  Where was that?
          11    A.  That was at the DuPage SLEA.
          12    Q.  How long was that program?
          13    A.  I believe it was 14 or 16 weeks.
          14    Q.  16 weeks?
11:06:28  15    A.  Yes.
          16    Q.  Five days a week?
          17    A.  Correct.
          18    Q.  What year -- when did you graduate from that?
          19    A.  2017, I believe.
11:06:40  20    Q.  And you said in that training you were trained to
          21    recognize armed individuals; is that right?
          22    A.  Yes.
          23    Q.  And how many days of that 14 weeks were you trained to
          24    recognize armed individuals?
11:06:52  25    A.  I don't recall.
```

Warniczek - cross

32

1    Q.  On October 10, 2021, in the late evening hours, you

2    received a call to go to Mariano's in regard to a shoplifter,

3    correct?

4    A.  Yes.

11:07:12   5    Q.  Have you been called to that Mariano's for shoplifters

6    before?

7    A.  Yes.

8    Q.  Have you been called to that Mariano's for shoplifters on

9    many occasions?

11:07:21  10    A.  Yes.

11    Q.  When you arrived, you were there -- did you arrive with

12    Officer Guzman?

13    A.  At the same -- approximately the same time, separate

14    vehicles.

11:07:34  15    Q.  Okay.  And did Officer Hartmann also arrive in a separate

16    vehicle?

17    A.  Yes.

18    Q.  A little bit after you had arrived?

19    A.  If I remember correctly, yes.

11:07:43  20    Q.  And you met with the loss prevention employee outside of

21    the store, correct?

22    A.  Yes.

23    Q.  And that was depicted on your body-worn camera that you

24    just identified here in court today, correct?

11:07:59  25    A.  Yes.

1   Q.  And he told you that there was a female in the store that

2   he believed was engaged in shoplifting, correct?

3   A.  Yes.

4   Q.  You planned to basically stop her at the door and

11:08:14   5   determine whether or not she had been shoplifting, correct?

6   A.  Correct.

7   Q.  And if she had been shoplifting, you were going to arrest

8   her, correct?

9   A.  Not necessarily.

11:08:23   10   Q.  If she had been shoplifting, you were not going to arrest

11   her?

12   A.  There's other options, such as citations.

13   Q.  Okay.  So if she had been shoplifting, you were going to

14   take some action, correct?

11:08:36   15   A.  Correct.

16   Q.  That action could include arresting her, correct?

17   A.  Correct.

18   Q.  And if you had -- if she had not been found to be

19   shoplifting, then she would not be arrested or cited, correct?

11:08:46   20   A.  Not necessarily again.

21   Q.  Because if she could have been trespassing or something of

22   that nature, correct?

23   A.  Correct.

24   Q.  All right.  So then you waited for the individual to come

11:09:07   25   out of the store, correct?

Warniczek - cross

1    A.  Yes.

2    Q.  And she did come out of the store, correct?

3    A.  Yes.

4    Q.  And by the time she came out of the store, you were joined

5    by Officer Guzman and Officer Hartmann, correct?

6    A.  Yes.

7    Q.  All of you were wearing body-worn cameras, correct?

8    A.  Yes.

9    Q.  As a matter of fact, you when you were looking at the

10   video, you were able to actually see a red light on Officer

11   Hartmann when you were in that conversation with the young

12   lady, correct?

13   A.  Yes.

14   Q.  During that conversation, she volunteered to show you her

15   receipt, right?

16   A.  Yes.

17   Q.  And she also volunteered to show you the items that she

18   had purchased, correct?

19   A.  Yes.

20   Q.  And you determined that she had not committed the offense

21   of shoplifting; is that right?

22   A.  Correct.

23   Q.  You then wanted to determine whether or not she had

24   committed any other crime, such as criminal trespass, correct?

25   A.  Correct.

Warniczek - cross

35

1  Q.  So Officer Guzman went inside the store to determine

2  whether there was a trespass order on this individual,

3  correct?

4  A.  I am not sure.

11:10:20  5  Q.  Did some officer go inside the store to determine whether

6  or not there was a trespass order?

7  A.  Amongst other things.  It was an ongoing investigation, so

8  there's other questions that were asked as well.

9  Q.  Okay.  So her name is Sylyna, right?

11:10:34  10  A.  Correct.

11  Q.  Okay.  She was asked to provide identification, correct?

12  A.  Yes.

13  Q.  She did provide identification, correct?

14  A.  Not physical identification.  Her identifiers, yes.

11:10:44  15  Q.  She did give her name, her first and last name, right?

16  A.  Yes.

17  Q.  And date of birth?

18  A.  Yes.

19  Q.  Okay.  Pursuant to your investigation, you determined that

11:10:56  20  she was not wanted -- she had not been warned to stay away

21  from that store, correct?

22  A.  No.

23  Q.  That's not correct?

24  A.  Not correct.

11:11:05  25  Q.  She had been warned to stay away from the store?

Warniczek - cross

|   |   |
|---|---|
| 1 | A.  That was an ongoing investigation, didn't even get that |
| 2 | far.  It was still at that particular time an ongoing |
| 3 | investigation. |
| 4 | Q.  Okay.  As you sit here right now, did she have a trespass |
| 5 | order? |
| 6 | A.  I don't know. |
| 7 | Q.  Did you ever -- did you or any of your team ever attempt |
| 8 | to learn whether she had a trespass order? |
| 9 | A.  Yes. |
| 10 | Q.  Okay.  Was she placed under arrest for trespass that |
| 11 | night? |
| 12 | A.  I believe so, yes. |
| 13 | Q.  She was. |
| 14 | A.  Yes. |
| 15 | Q.  Did you place her under arrest? |
| 16 | A.  I indicated to Officer Hartmann that she's going to be |
| 17 | under arrest, yes. |
| 18 | Q.  Okay.  Do you have a copy of her -- the trespass order? |
| 19 | A.  I don't recall. |
| 20 | Q.  You do not? |
| 21 | A.  I don't remember.  I don't know if there is a copy of it |
| 22 | or not. |
| 23 | Q.  After Sylyna provided you with her name, Warniczek said |
| 24 | that he recognized her, right? |
| 25 | A.  Yes. |

11:11:19 (line 5)
11:11:26 (line 10)
11:11:32 (line 15)
11:11:45 (line 20)
11:12:03 (line 25)

Warniczek - cross

37

1  Q.  And Warniczek went back to his police car to run her name,
2  correct?
3  A.  Yes.
4  Q.  I mean, you -- right, you went to go run her name, right?
5  A.  Yes.
6  Q.  And you left -- you recognized her from before, correct?
7  A.  Yes.
8  Q.  But from that same Mariano's or from someplace else?
9  A.  From previous incidents.  I don't recall which particular
10 incident it was.  I just knew I recognized her.
11 Q.  You recognized Sylyna.
12 A.  Yes.
13 Q.  But you don't remember whether or not you recognized her
14 from a previous incident at Mariano's, correct?
15 A.  Correct.
16 Q.  It would have been some other incident, correct?
17 A.  Correct.
18 Q.  When you ran her name, you learned that she had been --
19 that there was a police report, that she had been involved in
20 a retail theft at that Mariano's four months prior, correct?
21 A.  Correct.
22 Q.  You learned that the other person involved in the retail
23 theft was a person by the name of Percy, correct?
24 A.  Yes.
25 Q.  Did you actually view the report when you were in your

11:12:22
11:12:36
11:12:48
11:13:06
11:13:17

```
 1  car, or did you just get like a flash message over your
 2  computer?
 3  A.  No, I reviewed the entire report.
 4  Q.  You saw the exact police report.
 5  A.  Correct.
 6  Q.  Okay.  Has that police report been tendered to the
 7  government?
 8  A.  I don't know.
 9  Q.  In that police report, there was a person actually named
10  Charles Taylor mentioned, correct?
11  A.  Correct.
12  Q.  He was mentioned as the driver of a black Volkswagen,
13  correct?
14  A.  Yes.
15  Q.  And he was not arrested in that incident, was he?
16  A.  No.
17  Q.  Meaning that's correct, he was not arrested in that
18  incident, correct?
19  A.  Correct.
20  Q.  Isn't it true that at 15:35 in the video that you just
21  viewed, you were having a conversation with Officer Guzman?
22  A.  Yes.
23  Q.  Inside of the police vehicle?
24  A.  Yes.
25  Q.  And you had learned that there was no trespass order,
```

11:13:27
11:13:45
11:13:51
11:13:58
11:14:19

Warniczek - cross

1   correct?

2   A.  We were determining if there was one issued or not within

3   the actual narrative of the report or if there was a field

4   contact completed based on the report or whether an arrest has

11:14:36  5   been made for an offense at that particular time.

6   Q.  After you saw the police report, you looked around the

7   parking lot, and you saw a black Volkswagen Jetta, correct?

8   A.  Officer Guzman was the one that initially saw it first.

9   Q.  He noticed it first.

11:14:58  10   A.  Correct.

11   Q.  At this time, Officer Hartmann was still over with Sylyna,

12   correct?

13   A.  Yes.

14   Q.  And they were some distance away at the front door of the

11:15:07  15   Mariano's, correct?

16   A.  Yes.

17   Q.  You and Officer Guzman were at the squad car, correct?

18   A.  Yes.

19   Q.  Guzman noticed the black Volkswagen, and then the two of

11:15:18  20   you approached the Volkswagen, correct?

21   A.  Correct.

22   Q.  After you read the police report and you saw that car, the

23   black Volkswagen, in the parking lot, you suspected that that

24   car was involved in a crime with Sylyna, correct?

11:15:54  25   A.  Yes.

Warniczek - cross

40

1  Q.  You approached the passenger's side while Officer Guzman

2  approached the driver's side, correct?

3  A.  Not right away.  We both approached from the passenger's

4  side initially.

11:16:10    5  Q.  All right.  And you started questioning the passenger,

6  correct?

7  A.  Yes.

8  Q.  He was being evasive, correct?

9  A.  Yes.

11:16:18   10  Q.  You were able to view the interior of the vehicle,

11  correct?

12  A.  Yes.

13  Q.  You were able to view both occupants of the vehicle,

14  correct?

11:16:27   15  A.  Yes.

16  Q.  You had the flashlight illuminating the interior of the

17  vehicle, correct?

18  A.  Yes.

19  Q.  You were suspicious that these individuals were committing

11:16:37   20  a crime, right?

21  A.  Not committing, but directly involved.

22  Q.  Involved in a crime.

23        So you were paying attention to what was going on in

24  the vehicle, correct?

11:16:49   25  A.  Yes.

```
           1   Q.  Your body cam was operating, right?
           2   A.  Yes.
           3   Q.  It actually captured what you were seeing through the
           4   passenger window at that time, correct?
11:16:57   5   A.  Yes.
           6   Q.  And in that video and also through your own eyes, you were
           7   able to see the driver, correct?
           8   A.  Yes.
           9   Q.  And that driver was wearing the Bears shirt, right?
11:17:07  10   A.  Yes.
          11   Q.  And you did not see any weapon at that time, correct?
          12   A.  No.
          13   Q.  That is correct, right, you did not --
          14   A.  Correct.
11:17:15  15   Q.  -- you didn't see any weapon.
          16       You did not see any bulge in the waistband of the
          17   driver at that time, did you?
          18   A.  I was focused on my passenger.
          19   Q.  Okay.  Well, you were focused on everything inside of the
11:17:27  20   vehicle, right?
          21   A.  No.  Officer Guzman was on the -- speaking with Taylor.
          22   His job is to focus on Taylor.  My job was to focus on Percy.
          23   Q.  Okay.  Well, Officer Guzman had a body-worn camera on,
          24   too, didn't he?
11:17:43  25   A.  Yes, to my knowledge.
```

1    Q.  Okay.  Are you aware of whether his body-worn camera was

2    operating at that time?

3              MR. ZENNER:  Objection.

4              THE COURT:  I guess what's the basis?

11:17:55    5              MR. ZENNER:  I'm not sure how he could be aware of

6    what another person's camera was doing.

7              THE COURT:  Okay.  Well, I guess -- I mean, but I

8    think it's okay to ask, so -- okay.

9    BY MR. KUTNICK:

11:18:14    10   Q.  All right.  Well, let me back up a little bit.

11             Did you -- was Officer Guzman in your field of view

12   as this was happening?

13   A.  No.

14   Q.  I mean, while you were talking to him in the police car,

11:18:25    15   was he in your field of view?

16   A.  Yes, but my attentions to the computer, running

17   everything, he's on my right side so I can hear him, I can

18   speak with him, he is within the view, I guess.

19   Q.  Okay.  So you saw the red light operating on his body-worn

11:18:43    20   camera, correct?

21   A.  Yes.

22   Q.  Okay.  And that means it's operating, right?

23   A.  It should be.

24   Q.  Okay.  Officer Guzman -- let's go back to the car now.

11:18:58    25   You're standing on the passenger's side, and Officer Guzman

| | | |
|---|---|---|
| | 1 | was with you.  There's a point Officer Guzman walks around to |
| | 2 | the driver's side, correct? |
| | 3 | A.  Yes. |
| | 4 | Q.  Have you worked with Guzman before? |
| 11:19:11 | 5 | A.  Yes. |
| | 6 | Q.  Is it your practice that if you or one of your fellow -- |
| | 7 | your partners that you're working with observe something and |
| | 8 | wants to call it to your attention secretly that a signal |
| | 9 | could be used? |
| 11:19:34 | 10 | A.  Usually it's voice alerted. |
| | 11 | Q.  Okay.  So if Guzman saw something unusual, he would have |
| | 12 | alerted you, correct? |
| | 13 | A.  Yes. |
| | 14 | Q.  At that time, he did not alert you, didn't see anything, |
| 11:19:48 | 15 | correct? |
| | 16 | A.  Correct. |
| | 17 | Q.  You started questioning the passenger in the vehicle, |
| | 18 | correct? |
| | 19 | A.  Yes. |
| 11:20:08 | 20 | Q.  And at first he was evasive, right? |
| | 21 | A.  Yes. |
| | 22 | Q.  But eventually, he started becoming cooperative, correct? |
| | 23 | A.  Yes. |
| | 24 | Q.  He provided you with his name? |
| 11:20:20 | 25 | A.  Yes. |

1  Q.  His date of birth?

2  A.  Yes.

3  Q.  And at that point -- you knew from, at least you read in

4  the other police report that Sylyna and Percy were boyfriend

11:20:44  5  and girlfriend, at least it said that in the report, right?

6  A.  That's -- to my recollection, yes.

7  Q.  Okay.  You told Percy at 17:44 on the video she's going to

8  jail, right?

9  A.  Yes.

11:20:55  10  Q.  What was she going to jail for?

11  A.  It was ongoing investigation.

12  Q.  She was going to jail for an ongoing investigation?

13  A.  Potentially.

14  Q.  Okay.  What was that investigation?

11:21:04  15  A.  Retail theft.

16  Q.  Well, you had just searched her person, right?

17  A.  It started out as a retail theft, but she could

18  potentially go to jail for trespass.

19  Q.  Okay.  And -- you don't -- who produced the trespass order

11:21:21  20  to you?

21  A.  Any time someone has previously been arrested within the

22  store, that's automatically a second time you enter that store

23  you could be potentially arrested for trespassing.

24  Q.  Is that pursuant to Illinois statute?

11:21:33  25  A.  If a verbal trespass warning was given, then yes.

Warniczek - cross

45

1   Q.  A verbal trespass warning.

2   A.  Yes.

3   Q.  A written is not required?

4   A.  No.

11:21:40   5   Q.  At 17:44 on the video, you said you guys can leave, right?

6   A.  I believe so.

7   Q.  They were free to leave, right?

8   A.  There was still an ongoing investigation, I did say that.

9   However, I did not identify anybody at that particular time

11:22:04   10   through the system yet.

11   Q.  So you at that time had not had any reason to detain or

12   seize that car or the individuals in that car, correct?

13   A.  I did have the right to until I properly identified all

14   the players in this incident.

11:22:21   15   Q.  Okay.  Well, the driver woke up, right?

16   A.  Yes.

17   Q.  And you asked him for his identification, correct?

18   A.  Yes.

19   Q.  And he provided you with identification, correct?

11:22:30   20   A.  Yes.

21   Q.  And you were able to identify him, right?

22   A.  Not yet.  I returned to my vehicle to do that.

23   Q.  When you returned to your vehicle, Officer Guzman remained

24   at the car, correct?

11:22:46   25   A.  I believe so.

1   Q.  Officer Hartmann was still over with Sylyna, correct?

2   A.  Yes.

3   Q.  And now you and your fellow officers detained that vehicle

4   in order to further investigate, correct?

11:23:02    5   A.  No.  It was already detained until everybody was properly

6   identified and clear of any type of warrants.

7   Q.  Okay.  When you ran Charles Taylor's name, there were no

8   warrants for his arrest, were there?

9   A.  At that particular time when I learned that information, I

11:23:20   10   was approaching Ficarella.  That information was relayed to me

11   through the radio.

12   Q.  That he had no warrants, correct?

13   A.  Correct.

14   Q.  And that Percy Walker had no warrants, correct?

11:23:30   15   A.  Correct.

16      (Counsel and defendant conferring.)

17   BY MR. KUTNICK:

18   Q.  You continued your conversation with Percy, correct?

19   A.  Not at this time.

11:23:59   20   Q.  Well, when you -- let me back up then.

21      Before you ran the names, you had learned that this

22   car and Percy had been involved in an incident four months

23   prior at this location, correct?

24   A.  Yes.

11:24:19   25   Q.  And so you determined that you were going to run their

1  names, correct?

2  A.  Correct.

3  Q.  There was nothing else about this incident that was

4  causing you to further investigate these two individuals,

5  correct?

6  A.  Negative.

7  Q.  It's not correct?

8  A.  Not correct.

9  Q.  Okay.  Besides the police report from four months earlier,

10  what was there to make you investigate these individuals?

11  A.  Well, that was my suspicion, that the vehicle was directly

12  involved in the previous incident.

13  Given the current incident taking place, I realized

14  it's the same exact incident taking place.  The same vehicle

15  is sitting in the parking lot.  I approached the vehicle to

16  determine if it is, in fact, once again the getaway vehicle

17  for a retail theft, and at this point to identify the -- the

18  occupants of that vehicle.

19  Q.  Okay.  So you had determined that Sylyna had not committed

20  retail theft, correct?

21  A.  Yes.

22  Q.  And you still had not yet determined whether or not Sylyna

23  was going to be arrested for trespass, correct?

24  A.  Correct.

25  Q.  Yet you detained this vehicle in order to further

11:24:34

11:24:41

11:24:59

11:25:16

11:25:25

Warniczek - cross

48

1    investigate its relationship to a possible crime being

2    committed by Sylyna, correct?

3    A.  Yes.

4           MR. KUTNICK:  Could I have one minute, please, your

11:25:52    5    Honor?

6           THE COURT:  Sure.

7        (Counsel and defendant conferring.)

8           MR. KUTNICK:  Thank you, your Honor.

9    BY MR. KUTNICK:

11:26:26    10   Q.  Did you then return to the vehicle, the black Volkswagen

11   vehicle?

12   A.  At which point in time?

13   Q.  After you ran the names of Charles Taylor and Percy

14   Walker.

11:26:36    15   A.  No.

16   Q.  Where did you go?

17   A.  I went to meet with Officer Hartmann and Ficarella.

18   Q.  So Hartmann was standing there with -- that's Ficarella,

19   that's Sylyna, Sylyna Ficarella?

11:26:55    20   A.  Yes.

21   Q.  He was standing with her the entire time, correct?

22   A.  Yes.

23   Q.  She was not free to go, right?

24   A.  No.

11:27:01    25   Q.  When you went over to Sylyna and Hartmann, you were able

1  to observe the two of them, correct?

2  A.  Yes.

3  Q.  You were able to actually at 21:00 -- at 21 minutes on

4  your -- on the file, on your body cam, you can actually

11:27:27  5  observe Hartmann and Sylyna, correct?

6  A.  Yes.

7  Q.  And you can observe that Hartmann's red light is on his

8  body-worn camera, correct?

9  A.  I don't recall.

11:27:40  10  Q.  You told Sylyna that you were arresting her for trespass,

11  right?

12  A.  Yes.

13  Q.  But you had not yet received any trespass order, had you?

14  A.  I don't recall.

11:27:50  15  Q.  Hartmann placed Sylyna in handcuffs, correct?

16  A.  I believe so, yes.

17  Q.  And you were present for this conversation between

18  Hartmann and Sylyna, correct?

19  A.  At that particular time, yes.

11:28:13  20  Q.  She was -- she thought she was getting arrested, right?

21  A.  Yes.

22  Q.  She was on her knees in front of the officer, correct?

23  A.  Yes.

24  Q.  She was in handcuffs, correct?

11:28:24  25  A.  Yes.

Warniczek - cross

50

         1   Q.  She was desperate to get out of there, correct?

         2   A.  I don't know.

         3   Q.  She kept repeating "I want to go," "I want to go," "I want

         4   to leave," didn't she?

11:28:34 5   A.  Yes.

         6   Q.  And then you asked her to give you information, right?

         7   A.  No.

         8   Q.  Hartmann asked her to give information, correct?

         9   A.  No.

11:28:51 10  Q.  No one asked her to give information?

         11  A.  What information?

         12  Q.  Any information to help her get out of there.

         13  A.  Nobody asked her for anything.

         14  Q.  She just volunteered that the driver has a gun.

11:29:20 15  A.  Yes.

         16  Q.  While she was on her knees, correct?

         17  A.  I believe so.

         18  Q.  And handcuffed, right?

         19  A.  Yeah.

11:29:27 20  Q.  And desperate to get out of there, correct?

         21  A.  I don't know.

         22  Q.  So that's when you, at 24 minutes, you radio 32 in the

         23  car, correct?

         24  A.  Correct.

11:29:38 25  Q.  And that's based on the information that you received from

1  Sylyna Ficarella at that time, correct?

2  A.  Yes.

3  Q.  It's not based on any observations that you made, right?

4  A.  Yes.

11:29:47  5  Q.  And you did not get any information from Officer Guzman at

6  that time who was still at the car that he had made any

7  observations, did you?

8  A.  Correct.

9        MR. KUTNICK:  One moment please, your Honor.

11:30:26  10        THE COURT:  Sure.

11      (Pause.)

12  BY MR. KUTNICK:

13  Q.  At the time that you got the information from Sylyna that

14  the driver had a gun, Hartmann -- well, first, you radioed 32,

11:31:02  15  correct?

16  A.  Correct.

17  Q.  And then Hartmann went to the car; is that right?

18  A.  No.

19  Q.  Where did he go?

11:31:07  20  A.  He was already with her -- with the car.

21  Q.  So when she made these alleged statements, it was just to

22  you, or was it to you and Hartmann?

23  A.  No, just to me.

24  Q.  Just to you.

11:31:20  25        After you radioed 32, you looked over to the car,

```
 1   correct?
 2   A.  Yes.
 3   Q.  You saw Guzman at the driver's side, correct?
 4   A.  No.
 5   Q.  You did not.
 6   A.  Guzman was now with the passenger.
 7   Q.  I said at the driver's side.  You saw -- he was now with
 8   the passenger?
 9   A.  Yes.
10   Q.  The passenger had exited the vehicle?
11   A.  No.
12   Q.  Where was Hartmann?
13   A.  At the driver's side.
14   Q.  You saw Hartmann draw his weapon, correct?
15   A.  Yes.
16   Q.  You heard Hartmann order the occupants out of the VW,
17   correct?
18   A.  Yes.
19   Q.  After Hartmann ordered the occupants out of the vehicle,
20   the driver exited the vehicle, correct?
21   A.  Yes.
22   Q.  You saw that, right?
23   A.  Yes.
24   Q.  You were far away, but you did see it happen, correct?
25   A.  Yes.
```

11:31:39
11:31:48
11:31:59
11:32:26
11:32:33

1    Q.  And the driver ran away from your position, correct?

2    A.  Yes.

3    Q.  So you never saw the driver in possession of a weapon, did

4    you?

5    A.  No.

6    Q.  You did not see the driver or Charles Taylor or both --

7    the same person, drop a weapon, did you?

8    A.  No.

9    Q.  Who placed Mr. Taylor in handcuffs?

10   A.  I did.

11   Q.  You did?

12   A.  Yes.

13   Q.  Okay.  And you took him over to the police car?

14   A.  Yes.

15   Q.  You were placing him into the police car, correct?

16   A.  Yes.

17   Q.  And you asked him whether or not he had a FOID, right?

18   A.  Yes.

19           MR. KUTNICK:  One moment, please, Judge.

20           THE COURT:  Okay.

21        (Counsel and defendant conferring.)

22           MR. KUTNICK:  Judge, thank you.  I have no further

23   questions of this witness.

24           THE COURT:  Okay, thank you.

25           Any redirect?

1  MR. ZENNER:  Very brief.  Just a few questions.

2  REDIRECT EXAMINATION

3  BY MR. ZENNER:

4  Q.  Towards the end of the incident when you went back over to

11:34:31  5  Ficarella, was she volunteering to give you information that

6  would help her out?

7  A.  Yes.

8  Q.  And did you initially say that you weren't interested in

9  the information?

11:34:42  10  A.  Yes.

11  Q.  Did she then give information about there being a gun in

12  the car?

13  A.  Yes.

14  Q.  If someone reports that there's a gun in a car, that a

11:34:52  15  person has a gun, what do you typically do as a police

16  officer?

17  A.  It becomes a very safety -- No. 1 safety issue for the

18  public as well as the officers.

19  Q.  And would you typically investigate further?

11:35:04  20  A.  Yes.

21  Q.  If someone reports that she's worried someone's going to

22  kill her, what would you typically do as a police officer?

23  A.  Take action.

24  MR. ZENNER:  Okay.  No further questions.

11:35:20  25  MR. KUTNICK:  Can I briefly ask a couple questions,

Warniczek - recross

55

1    Judge?

2            THE COURT:  Sure.

3            MR. KUTNICK:  On that matter?

4            THE COURT:  Yes.

11:35:27  5                     RECROSS EXAMINATION

6    BY MR. KUTNICK:

7    Q.  You don't -- you never saw her in the car, did you?

8    A.  No.

9    Q.  She never told you she was in the car, did she?

11:35:34  10   A.  Not that I recall.

11   Q.  She never told you that she saw a gun, did she?

12   A.  I don't recall.

13           MR. KUTNICK:  I have nothing else, Judge.

14           MR. ZENNER:  Nothing further.

11:35:52  15          THE COURT:  Okay.  Thank you, sir.  You may be

16   excused.

17           THE WITNESS:  Thank you, Judge.

18       (Witness excused.)

19           THE COURT:  Can we take a break before the next

11:36:04  20   witness?

21           MR. ZENNER:  Sure.

22           THE COURT:  Just a short break.

23       (Recess from 11:36 to 11:50 a.m.)

24           THE COURT:  All right.  Ready to resume?

11:50:50  25          MR. SCHIED:  Yes, your Honor.

Hartmann - direct

56

```
          1          MR. KUTNICK:  Yes, your Honor.
          2          THE COURT:  Okay.  The government may call its next
          3   witness.
          4          MR. SCHIED:  The government calls Officer Ryan
11:50:58  5   Hartmann.
          6          THE COURT:  Okay.  You may proceed.
          7       (Witness sworn.)
          8        RYAN HARTMANN, GOVERNMENT'S WITNESS, DULY SWORN,
          9                    DIRECT EXAMINATION
11:51:22 10   BY MR. SCHIED:
         11   Q.  Good afternoon, Officer Hartmann.  Can you please state
         12   and spell your name for the court reporter.
         13   A.  First name Ryan, R-Y-A-N.  Last name Hartmann,
         14   H-A-R-T-M-A-N-N.
11:51:34 15   Q.  Where do you work, Officer Hartmann?
         16   A.  The Evergreen Park Police Department.
         17   Q.  And how long have you worked there?
         18   A.  Approximately five years.
         19   Q.  What is your job with the Evergreen Park Police
11:51:45 20   Department?
         21   A.  Patrol officer.
         22   Q.  Could you tell us what are your general responsibilities
         23   as a patrol officer?
         24   A.  Taking incoming 911 calls that are dispatched to us and
11:51:59 25   patrolling the neighborhood.
```

1    Q.  Could you give us a brief summary of your training to be a

2    patrol officer?

3    A.  I went through a 12-week police academy as my training.

4    Q.  In your time as a police officer, have you had experience

5    with firearms?

6    A.  Yes.

7    Q.  Have you had training and experience in recognizing

8    firearms being carried by a person?

9    A.  Yes.

10   Q.  Would you say that you have seen numerous firearms on

11   people you were investigating in your career?

12   A.  Yes.

13   Q.  Officer Hartmann, were you on duty the night of

14   October 10, 2021?

15   A.  Yes.

16   Q.  Were you dispatched to respond to an incident at a

17   Mariano's grocery store?

18   A.  Yes.

19   Q.  What was that call about?

20   A.  That was reported as a shoplifting incident in progress.

21   Q.  Did you respond to the Mariano's?

22   A.  Yes.

23   Q.  Were you alone or with other officers?

24   A.  I was with other officers.

25   Q.  Who were those officers?

1    A.   Officer Guzman and Officer Warniczek.

2    Q.   What happened when you arrived at the Mariano's?

3    A.   When I arrived, I was met by the loss prevention employee,

4    Isaiah Smith, from Mariano's at the exit door.  He had

11:53:30    5    reported of a female subject he'd been watching inside the

6    store who he believed to -- who he believed was attempting to

7    shoplift and believed she would be walking out of the store

8    shortly thereafter.

9    Q.   Did the loss prevention employee say if he wanted to

11:53:51    10    pursue a complaint against the person that he suspected was

11    shoplifting?

12    A.   Yes, he did want to pursue a complaint.

13    Q.   Officer Hartmann, were you wearing a body-worn camera that

14    night?

11:54:01    15    A.   Yes.

16    Q.   At the time, did you think that your body-worn camera was

17    recording the entirety of your response to the shoplifting

18    dispatch?

19    A.   At the time, I did believe that it was recording, yes.

11:54:13    20    Q.   Did you later learn if that was the case, if it recorded

21    everything?

22    A.   I later learned that it did not record.

23    Q.   Did -- did your body-worn camera capture some of the

24    activity that night?

11:54:30    25    A.   Yes.

```
            1   Q.  But it did not record all of the activity?

            2   A.  Correct, yes.

            3   Q.  Did Officer Warniczek have a body-worn camera on

            4   October 10th?

11:54:42    5   A.  Yes.

            6         MR. SCHIED:  Your Honor, I would ask permission to

            7   play what has been previously admitted as Government's Exhibit

            8   B.

            9         THE COURT:  You may.

11:54:56   10      (Video played.)

           11   BY MR. SCHIED:

           12   Q.  Officer Hartmann, do you recognize the opening frame of

           13   that?

           14   A.  Yes.

11:55:24   15   Q.  How do you recognize it?

           16   A.  I recognize that as a footage from a body camera,

           17   body-worn camera.

           18   Q.  I'm going to jump forward to 5:16 into the video.  You

           19   just testified that you recognize this as a body-worn camera,

11:55:57   20   as body-worn camera footage.

           21         Do you recognize specifically what body-worn camera

           22   footage this is?

           23   A.  I recognize this as Officer Warniczek's body-worn camera.

           24   Q.  Have you previously reviewed Officer Warniczek's body-worn

11:56:14   25   camera from that night?
```

Hartmann - direct

60

1    A.  Yes.

2    Q.  Does this body-worn camera footage include true and

3    accurate depictions of some of the events that you observed

4    that night?

11:56:25    5    A.  Yes.

6    Q.  What does it show at 5:16 into the video there?

7    A.  This frame, this shows the entrance/exit doors of the

8    Mariano's and Isaiah Smith.

9    Q.  Where were you located at this point in time?

11:56:48    10    A.  In relation to this view, I was off to the right.

11           MR. SCHIED:  Permission to play the video starting at

12    5:16?

13           THE COURT:  Yes.

14       (Video played.)

11:57:25    15           MR. SCHIED:  I'm sorry, stopping the video at 5:36.

16    And playing again.

17       (Video played.)

18           MR. SCHIED:  Stopping the video at 6 minutes into the

19    video.

20    BY MR. SCHIED:

21    Q.  After arriving and speaking to the loss prevention

22    employee, what happened next as depicted in that portion of

23    the body-worn camera footage?

24    A.  That was the female subject who he had reported to us that

11:58:26    25    he believed to have been shoplifting, Sylyna Ficarella who she

1   was later identified as.  She had just walked out of the

2   store, and he had pointed her out to us as the -- as said

3   female subject.

4   Q.  What was the first thing that the woman later identified

5   as Ficarella said to you and your fellow officers?

11:58:45

6   A.  She asked if we wanted to check her bags.

7   Q.  Were there other people exiting the store before Ficarella

8   did?

9   A.  Yes.

10  Q.  Did any of the other people exiting the store ask if you

11  wanted to check their bags?

11:59:01

12  A.  No.

13  Q.  Did you think it was unusual that Ficarella immediately

14  offered to have the officers look through her bags?

15          MR. KUTNICK:  Objection, relevance.

11:59:14

16          THE COURT:  Overruled.

17          You may answer.

18  BY THE WITNESS:

19  A.  I did find it unusual.

20  BY MR. SCHIED:

11:59:25

21  Q.  Why did you find it unusual?

22  A.  It's not normal behavior of an ordinary customer exiting

23  the store.

24          MR. SCHIED:  I will now play the video beginning at

25  6 minutes in.

11:59:41

1        (Video played.)

2              MR. SCHIED:   Stopping the video at 7 minutes.

3     BY MR. SCHIED:

4     Q.  What was depicted in that portion of the footage?

5     A.  That was Sylyna identifying herself to Officer Guzman.

6     Q.  Did Ms. Ficarella have any shoplifted items in her bag?

7     A.  No.

8     Q.  Going beyond that clip, after learning Ficarella's name,

9     what did Officer Guzman do?

10    A.  He returned to a squad car -- or no, strike that.

11              He, over the air, ran her name to dispatch.

12    Q.  Did information come back from dispatch about a previous

13    report involving Ficarella?

14    A.  Yes.

15    Q.  What did Officers Guzman and Warniczek do after that?

16    A.  They went to the squad car to further look into

17    Ficarella's history or specifically her arrest history with

18    our department.

19    Q.  What did you do while they went to do that?

20    A.  I stood by with her at this location where she's at in the

21    video in this frame.

22    Q.  From your position with Ficarella, could you observe

23    Warniczek and -- Officers Guzman and Warniczek at their police

24    vehicle?

25    A.  Yes.

Hartmann - direct

63

1  Q.  After a period of time, what did you see them do?

2  A.  I saw them walk from the squad car over to a black sedan,

3  which was parked in the parking lot.

4        MR. SCHIED:  I'm going to move ahead in the

12:02:38  5  vehicle -- or in the video to 20 minutes and 16 seconds and

6  play.

7      (Video played.)

8        MR. SCHIED:  Stopping the video at 21:14 into the

9  video.

10  BY MR. SCHIED:

11  Q.  What did that portion of the video show?

12  A.  That showed Officer Warniczek walking back over to me,

13  informing me that Sylyna was going to be -- he intended to

14  place her under arrest.

12:04:20  15  Q.  And just to be clear, were you depicted in that portion of

16  the video?

17  A.  Yes.

18  Q.  After Officer Warniczek said that Ficarella would be

19  placed under arrest, what did you do?

12:04:36  20  A.  I placed her into handcuffs.

21  Q.  How did Ficarella's behavior appear to you at that point

22  in time?

23  A.  At that time, she became very emotional and hysterical.

24        MR. SCHIED:  I'll play the video again from 22:57.

12:05:06  25      (Video played.)

1        MR. SCHIED:  Stopping at 23:17.

2    BY MR. SCHIED:

3    Q.  After saying that Ficarella would be placed under arrest

4    and walking away, did Officer Warniczek return to you while

5    you were handcuffing Ficarella?

6    A.  Yes.

7    Q.  What did you do after Officer Warniczek walked over to

8    you?

9    A.  I could hear from the location of the black sedan where

10   Officer Guzman was standing, I could hear some raising of

11   voices and some aggressive -- aggressive speech.

12   Q.  Could you -- could you see the location of the black sedan

13   from your position near the Mariano's?

14   A.  Yes.

15   Q.  You mentioned you heard a disturbance.  Did you see

16   Officer Guzman near the car?

17   A.  Yes.

18   Q.  Was there anyone else outside of the vehicle?

19   A.  At one point, I did see the passenger, Percy Walker, stand

20   up outside the vehicle.

21   Q.  After seeing this and hearing this disturbance by the

22   vehicle, what did you do next?

23   A.  I walked over to Officer Guzman's location to see if he

24   needed any assistance, as he was by himself and there was two

25   subjects inside of the car.

Hartmann - direct

65

1  Q.  Where, generally speaking, was the car located?

2  A.  It was parked in the parking lot in a parking space.

3  Q.  And you mentioned that there were two occupants in the

4  car.  Did you later learn the identities of those occupants?

12:07:28  5  A.  Yes.

6  Q.  What were they?

7  A.  The passenger was Percy Walker, and the driver seated in

8  the driver's seat was Charles Taylor.

9  Q.  Where was Officer Guzman standing when you walked over to

12:07:42  10  the black sedan?

11  A.  He was standing near the front passenger door.

12  Q.  What part of the car did you walk up to?

13  A.  I approached the front.

14  Q.  What did you observe as you approached the car?

12:07:57  15  A.  As I approached the car, I observed from the driver's

16  waistband, from Charles Taylor's waistband, I observed the

17  handle of a pistol protruding from his -- his -- from his

18  waistband.

19  Q.  How far away from the car were you when you made that

12:08:20  20  observation?

21  A.  Approximately one foot.

22  Q.  And where was the bottom of Mr. Taylor's shirt in relation

23  to the gun that you saw?

24  A.  The bottom of his shirt was raised just above his belt

12:08:41  25  line allowing for the pistol to protrude out uncovered.

1   Q.  At that time, was the gun accessible to Mr. Taylor?

2   A.  Yes.

3   Q.  Did you know if the gun was loaded?

4   A.  No.

12:08:56   5   Q.  Did you know if it had a safety on?

6   A.  No.

7   Q.  Did you know if there was a bullet in the chamber of the

8   gun?

9          MR. KUTNICK:  Objection, relevance.

12:09:07   10          THE COURT:  Overruled.

11          You may answer.

12   BY THE WITNESS:

13   A.  No.

14   BY MR. SCHIED:

12:09:12   15   Q.  From your perspective, was there a need to retrieve the

16   gun immediately?

17   A.  Yes.

18   Q.  Why is that?

19   A.  To prevent serious bodily harm or death to myself and

12:09:27   20   Officer Guzman.

21   Q.  What did you do next after seeing the firearm?

22   A.  I drew my firearm, alerted Officer Guzman of my

23   observation, and ordered Charles Taylor to not move and to

24   keep his hands where they could be seen clearly.

12:09:50   25   Q.  Did you say anything over the radio at that time?

1    A.  I said over the radio to dispatch to hold all other radio

2    traffic for only Evergreen Park.

3    Q.  Did you hear Officer Warniczek on the radio?

4    A.  Yes.

12:10:09    5    Q.  When two officers are on the radio at the same time,

6    what -- what can happen?

7    A.  If two officers try to key up at the same time, you

8    sometimes will get a denial tone.

9    Q.  And why did you ask dispatch to hold other radio traffic?

12:10:38    10   A.  Due to the dire circumstances, I felt that it was

11   necessary to have no other radio traffic.  It was important

12   that the radio remained clear.

13   Q.  After seeing this gun, alerting Officer Guzman and drawing

14   your own firearm, did you order -- did you issue any orders to

12:11:08    15   the occupants of the car?

16   A.  Yes.  The passenger, Percy Walker, was ordered out of the

17   car first, which he complied, and then we ordered Charles to

18   stand up out of the car.

19   Q.  What did he do?

12:11:28    20   A.  He stood up out of the car.  We then ordered him to face

21   away and place his hands on top of the car, and at that point,

22   he faced away from us and ran.

23   Q.  Did he run towards or away from the Mariano's?

24   A.  Away.

12:11:51    25   Q.  What did you do after Mr. Taylor began to run?

1    A.   After he began to run, I chased after him.

2    Q.   What did you observe as you were pursuing Mr. Taylor?

3    A.   As I was in pursuit, I observed him reach into the front

4    of his waistband where I observed the pistol and --

12:12:19    5    Q.   Excuse me, where you had previously observed the pistol?

6    A.   Yes.

7    Q.   Thank you.  Continue.

8    A.   Where I had observed it while he was seated in the car.  I

9    observed him from -- from where I was looking at him from the

12:12:32    10   rear, I observed him reach into his -- the front of his

11   waistband and then retrieve something in his hand, pull his

12   hand back up out of his waistband, and at that time, I

13   observed the handgun drop to the floor, drop to the ground

14   right under -- and fall right underneath his legs.

12:12:51    15   Q.   Did you hear anything at that time?

16   A.   Yes.

17   Q.   What did you hear?

18   A.   I heard a metal object hit the pavement.

19   Q.   How far away from Taylor were you when you saw him drop

12:13:03    20   the gun and heard something hit the pavement?

21   A.   Approximately 6 feet away.

22   Q.   Were there lights in the parking lot that night?

23   A.   Yes.

24   Q.   What did you do after you saw him drop the gun?

12:13:19    25   A.   After I saw him drop the gun, I stood over the gun so that

Hartmann - direct

1   it could be -- so that I could protect it so that it could be

2   later inventoried as evidence.

3   Q.  What did Officer Guzman do?

4   A.  He continued to pursue Charles as he continued to run

12:13:44    5   away.

6   Q.  You said earlier that your body-worn camera recorded some

7   events that night.  Did it record the gun on the ground of the

8   parking lot?

9   A.  Yes.

12:14:04   10           MR. SCHIED:  Permission to show the witness what was

11   submitted in the briefing as Government Exhibit C.

12           THE COURT:  Yes.

13   BY MR. SCHIED:

14   Q.  What is that on your screen, Officer Hartmann?

12:14:19   15   A.  That's a handgun.

16   Q.  Have you seen that image before?

17   A.  Yes.

18   Q.  Where does it come from?

19   A.  That comes from the handgun that I saw that was dropped

12:14:35   20   from Charles Taylor in the Mariano's parking lot.

21   Q.  And is that a true and accurate depiction of what you saw

22   as you were looking down on the gun?

23   A.  Yes.

24           MR. SCHIED:  I would move to admit Government's

12:14:50   25   Exhibit C.

Hartmann - direct

70

|    |    |
|----|----|
| | 1 | THE COURT:  Any objection? |
| | 2 | MR. KUTNICK:  No objection. |
| | 3 | THE COURT:  It's admitted. |
| | 4 | (Government's Exhibit C was received in evidence.) |
| 12:14:58 | 5 | BY MR. SCHIED: |
| | 6 | Q.  Officer Hartmann, is that the same gun that you had seen |
| | 7 | in Charles Taylor's waistband when he was seated in the car? |
| | 8 | A.  Yes. |
| | 9 | Q.  What kind of gun was that? |
| 12:15:07 | 10 | A.  That was a Taurus .40-caliber handgun. |
| | 11 | Q.  Was the gun loaded? |
| | 12 | A.  Yes. |
| | 13 | Q.  Did it have a bullet in the chamber? |
| | 14 | A.  Yes. |
| 12:15:21 | 15 | MR. SCHIED:  One moment, your Honor. |
| | 16 | (Counsel conferring.) |
| | 17 | MR. SCHIED:  Your Honor, just for the record, I |
| | 18 | believe I said a moment ago this was included in the briefing |
| | 19 | as Exhibit C.  It was included in the briefing.  It was not |
| 12:15:48 | 20 | labeled as Exhibit C, but we will admit it as Exhibit C, if it |
| | 21 | pleases the Court. |
| | 22 | THE COURT:  Okay.  Yes, that's fine, so this photo is |
| | 23 | Exhibit C and is admitted. |
| | 24 | MR. SCHIED:  I have no further questions for the |
| 12:16:03 | 25 | witness. |

|    | |
|----|-|
| 1  | THE COURT:  Okay. |
| 2  | MR. KUTNICK:  Thank you, Judge. |
| 3  | CROSS-EXAMINATION |
| 4  | BY MR. KUTNICK: |
| 5  | Q.  Good afternoon, Officer Hartmann. |
| 6  | A.  Good afternoon. |
| 7  | Q.  I think you said that you've been an Evergreen Park police |
| 8  | officer for five years now? |
| 9  | A.  Yes. |
| 10 | Q.  So back in October of 2021, you had been a police officer |
| 11 | there for three years? |
| 12 | A.  Yes. |
| 13 | Q.  Had you ever -- did you have any law enforcement training |
| 14 | or experience prior to working at Evergreen Park? |
| 15 | A.  Just the police academy. |
| 16 | Q.  Okay.  You didn't work for any other law enforcement |
| 17 | agencies? |
| 18 | A.  No. |
| 19 | Q.  You didn't receive any other training than the 12-week |
| 20 | course that you just testified to, correct? |
| 21 | A.  I don't believe so. |
| 22 | Q.  And in that training, you just testified on direct |
| 23 | examination that you have training and experience in firearms, |
| 24 | correct? |
| 25 | A.  Yes. |

12:16:31 (line 5)
12:16:47 (line 10)
12:17:02 (line 15)
12:17:11 (line 20)
12:17:24 (line 25)

Hartmann - cross

1  Q.  And you also have, in your experience of three years as a

2  police officer, experience with encountering individuals who

3  are carrying guns, correct?

4  A.  Yes.

12:17:35   5  Q.  And so you are aware that not all people carrying guns are

6  committing a crime; is that right?

7  A.  Yes.

8  Q.  On October 10, 2021, in the late evening hours, you were

9  called to the Mariano's in Evergreen Park, correct?

12:17:55  10  A.  Yes.

11  Q.  You were with Officer Guzman?

12  A.  Yes.

13  Q.  In a police squad car?

14  A.  We were not in the same car.

12:18:04  15  Q.  You were in two separate cars?

16  A.  Yes.

17  Q.  Did you arrive at the same time?

18  A.  I don't know.

19  Q.  When you arrived, was anybody present on the scene, any

12:18:16  20  police officers present on the scene?

21  A.  I don't remember.

22  Q.  When you got there, you parked your police car, correct?

23  A.  Yes.

24  Q.  Do you know if you arrived before or after Officer Guzman?

12:18:27  25  A.  I don't remember.

Hartmann - cross

1    Q.  After you got out of your police car, you approached the

2    door of the Mariano's, correct?

3    A.  Yes.

4    Q.  You were wearing a body-worn camera that evening; is that

12:18:38    5    right?

6    A.  Yes.

7    Q.  When you -- you're aware of how a body-worn camera

8    operates, correct?

9    A.  Yes.

12:18:44    10    Q.  You use one on a daily basis, correct?

11    A.  Yes.

12    Q.  Even back in October of 2021, you were using a body-worn

13    camera on a daily basis, correct?

14    A.  Yes.

12:18:53    15    Q.  You're aware that -- well, first of all, it's your

16    department policy that when you're making an encounter with a

17    citizen or investigating an incident that you would activate

18    your body-worn camera, correct?

19    A.  Yes.

12:19:07    20    Q.  And, in fact, when you -- you activated your body-worn

21    camera as you were approaching the Mariano's, correct?

22    A.  I believe so.

23    Q.  And you believed it was working, correct?

24    A.  Yes.

12:19:18    25    Q.  And when you activate your body-worn camera, a red light

1   comes on that shows that it's working, correct?

2   A.  Yes.

3   Q.  And on October 10, 2021, your red light came on when you

4   activated your body-worn camera, correct?

12:19:32   5   A.  Yes.

6   Q.  So the first individual that you encountered at the

7   Mariano's was the loss prevention officer; is that right?

8   A.  I believe so.

9   Q.  At that time, Officer Guzman had arrived, correct?

12:19:51   10   A.  Yes.

11   Q.  Also, Officer Warniczek had arrived, correct?

12   A.  Yes.

13   Q.  As a matter of fact, on direct examination, you viewed a

14   body-worn camera video, right?

12:20:02   15   A.  Yes.

16   Q.  And that was Officer Warniczek's body-worn camera,

17   correct?

18   A.  Yes.

19   Q.  You believed that your camera was operating at that time,

12:20:12   20   right?

21   A.  Yes.

22   Q.  But you've now learned that it was not operating at that

23   time, correct?

24   A.  Yes.

12:20:18   25   Q.  And it did not capture the conversation between you, your

Hartmann - cross

1   fellow officers, and Sylyna Ficarella, correct?

2   A.  Yes.

3   Q.  You learned from the loss prevention officer that he

4   believed that Sylyna Ficarella had committed retail theft,

12:20:57   5   correct?

6   A.  He believed she either had or was in the process of

7   committing retail theft, yes.

8   Q.  And that's why you were called to the Mariano's, correct?

9   A.  Yes.

12:21:08   10   Q.  After you had the conversation with the loss prevention

11   officer, eventually Sylyna did exit the store, correct?

12   A.  Yes.

13   Q.  She was identified by the loss prevention officer as the

14   person that he suspected as committing retail theft, correct?

12:21:28   15   A.  Yes.

16   Q.  When you were standing -- when he told you that, you were

17   standing outside of the doors of the store, correct?

18   A.  Yes.

19   Q.  It was you, Officer Warniczek, Officer Guzman, and the

12:21:44   20   loss prevention officer, correct?

21   A.  Yes.

22   Q.  And the loss prevention officer pointed at her and said

23   that's her, right?

24   A.  Yes.

12:21:51   25   Q.  And she then came up to you and said here, you can check

1    my stuff.

2    A.  Yes.

3    Q.  Officer Warniczek asked her her name in your presence,

4    right?

12:22:08    5    A.  Yes.

6    Q.  And she gave her his name, correct?

7    A.  Yes.

8    Q.  You and your fellow officers -- but you found it unusual

9    that, when confronted by three police officers and a loss

12:22:23    10    prevention officer, that she would volunteer to show you that

11    she had not stolen?

12    A.  Found it unusual that she asked -- she initiated contact

13    with us and asked if she -- she wanted -- if we wanted to

14    check her bags.

12:22:41    15    Q.  After the loss prevention officer pointed her out to you.

16    A.  Yes.

17    Q.  At that point, you remained with Sylyna while Officer

18    Warniczek and Officer Guzman went to go run her name in the --

19    or to call her name in something, right?

12:23:12    20    A.  Yes.

21    Q.  Okay.  You had determined that she had not stolen

22    anything, correct?

23    A.  Yes.

24    Q.  And now your fellow officers were going to determine

12:23:24    25    whether she would be arrested for anything else, like

1  trespass, correct?

2  A.  Yes.

3  Q.  In fact, didn't Officer Guzman go into the store with the

4  loss prevention officer to see whether or not there was a no

12:23:44  5  trespass order?

6  A.  I don't know.

7  Q.  Well, you didn't go into the store to see if there was a

8  no trespass order, did you?

9  A.  No.

12:23:56  10  Q.  You remained with Sylyna, correct?

11  A.  Yes.

12  Q.  You saw Officer Guzman go into the store, correct?

13        MR. SCHIED:  Objection, asked and answered.

14        THE COURT:  Overruled.

12:24:07  15        You may answer.

16  BY THE WITNESS:

17  A.  I don't remember if he went into the store.

18  BY MR. KUTNICK:

19  Q.  Do you know if Officer Warniczek went into the store?

12:24:15  20  A.  I don't.

21  Q.  But you saw them both go to the car, correct?

22  A.  Yes.

23  Q.  After -- after you saw Warniczek and Guzman go to the car,

24  you saw them exit the police car and go to the black sedan, is

12:24:44  25  that right?

Hartmann - cross

1    A.  Yes.

2    Q.  They did not communicate any information to you as to why

3    they were going to the black sedan, correct?

4    A.  At that time, no.

12:24:53    5    Q.  Officer Guzman -- well, both of them approached the

6    passenger's side initially; is that right?

7    A.  Yes.

8    Q.  And you observed that, correct?

9    A.  Yes.

12:25:04    10   Q.  Officer Guzman relocated from the passenger's side to the

11   driver's side, correct?

12   A.  Not sure exactly where he was at all times in relation to

13   the vehicle.

14   Q.  At any time prior to the individuals being asked to exit

12:25:31    15   the vehicle, did you see Officer Guzman standing outside of

16   the driver's door?

17   A.  I don't remember.

18   Q.  You don't remember?

19   A.  No.

12:25:40    20   Q.  But you did hear that a conversation was happening over

21   there, right?

22   A.  Yes.

23   Q.  And the distance you were from that black Volkswagen was

24   about a hundred-plus feet; is that correct?

12:25:55    25   A.  I would say approximately 100 feet is probably accurate.

Hartmann - cross

79

1  Q.  You heard voices, correct?

2  A.  Yes.

3  Q.  You could not hear what was being said, could you?

4  A.  No.

12:26:12  5  Q.  You could not hear who was saying what, could you?

6  A.  I could hear -- I could hear the occupants raising their

7  voices toward Officer Guzman.

8  Q.  Okay.  At this point, Officer Warniczek left the black

9  Volkswagen, and he went back to the police car; is that right?

12:26:55  10  A.  Yes.

11  Q.  And after that, he got out of the police car, and he went

12  back to your location where you were with Sylyna, correct?

13  A.  Yes.

14  Q.  And he said she's being put under arrest, didn't he?

12:27:13  15  A.  Yes.

16  Q.  And he said put the cuffs on her, right?

17  A.  Yes.

18  Q.  And you did put the cuffs on her, right?

19  A.  Yes.

12:27:20  20  Q.  And she was scared, wasn't she?

21  A.  I don't know.

22  Q.  Well, she didn't want to be arrested, did she?

23  A.  Probably not.

24  Q.  Okay.  She wasn't told what she was being arrested for,

12:27:35  25  was she?

1  A.  I don't remember.

2  Q.  And after you handcuffed her, she went down onto her

3  knees, right?

4  A.  Yes.

12:27:47  5  Q.  And she was not free to leave at that point, correct?

6  A.  No.

7  Q.  Correct, she was not free to leave at that point?

8  A.  That is correct.

9  Q.  Officer Warniczek remained with Sylyna by the front

12:28:17  10  door -- by the front of the building, correct?

11  A.  Me and him both, yes.

12  Q.  But after that, you then went to the black Volkswagen; is

13  that right?

14  A.  Yes.

12:28:27  15  Q.  Guzman was at the driver's door of the Volkswagen,

16  correct?

17  A.  He was at the passenger door when I approached the

18  Volkswagen.

19  Q.  He was at the passenger door when you approached?

12:28:40  20  A.  Yes.

21  Q.  You believed your body-worn camera was working at that

22  time, correct?

23  A.  Yes.

24  Q.  And you also approached the passenger side of the black

12:28:50  25  Volkswagen, right?

Hartmann - cross

81

1   A.  I approached the -- head on from the front.

2   Q.  From the front.  So you were able to view the occupants of

3   the vehicle through the windshield; is that correct?

4   A.  Yes.

12:29:04   5   Q.  You believed your body-worn camera was working, right?

6   A.  Yes.

7   Q.  And then you observed what you believed to be the butt --

8   the handle or magazine of a gun protruding from the waistband

9   of the driver, correct?

12:29:17   10   A.  Yes.

11   Q.  That's when you radioed dispatch -- well, first, you

12   alerted Guzman, correct?

13   A.  Yes.

14   Q.  How did you do that?

12:29:41   15   A.  I told him that the driver might have a gun in his

16   waistband.

17   Q.  You said the driver might have a gun?

18   A.  Yes.

19   Q.  Okay.  And then the next thing you radioed dispatch to

12:29:56   20   clear radio traffic, correct?

21   A.  Yes.

22   Q.  And you drew your gun, correct?

23   A.  Yes.

24   Q.  You did not hear any signal come over the radio from

12:30:04   25   Warniczek regarding information about a gun, did you?

```
           1   A.  I did.
           2   Q.  You did?
           3   A.  Yes.
           4   Q.  It happened -- you had -- you were radioing out to clear
12:30:14   5   radio traffic, correct?
           6   A.  Yes.
           7   Q.  And you encountered a -- I forgot what you called it, a
           8   block where it didn't let you call, correct?
           9   A.  Yes.
12:30:25  10   Q.  So that means you are not able to hear anything through
          11   your radio either at that time, correct?
          12   A.  Yes.
          13   Q.  So you didn't hear Warniczek through the radio?
          14   A.  I believe it was after -- directly after the denial tone,
12:30:42  15   he came through after he had talked with Sylyna and Sylyna had
          16   told him that the driver had a gun, and that's what he relayed
          17   over the radio.
          18   Q.  While she was cuffed, right?
          19   A.  Yes.
12:30:56  20   Q.  On her knees, right?
          21   A.  Yes.
          22   Q.  Thinking she was being arrested, right?
          23   A.  Yes.
          24   Q.  You ordered Percy Walker out of the car; is that correct?
12:31:14  25   A.  Yes.
```

Hartmann - cross

1  Q.  He complied and he got out of the car, correct?

2  A.  Yes.

3  Q.  Did you or Officer Guzman order Charles Taylor out of the

4  car?

12:31:22  5  A.  Yes.

6  Q.  Which one, you or Guzman?

7  A.  Both of us.

8  Q.  Okay.  And he complied also, right?

9  A.  Yes.

12:31:30  10  Q.  You ordered him to face -- to turn around and face the

11  car, correct?

12  A.  Yes.

13  Q.  But -- and who was closest to him at that point, you or

14  Guzman?

12:31:45  15  A.  I was.

16  Q.  Where was Guzman?

17  A.  To my left.

18  Q.  Where was Percy Walker?

19  A.  He was out of the car.

12:31:58  20  Q.  Was he in custody?

21  A.  I believe he was detained in handcuffs, yes.

22  Q.  So he was detained in handcuffs at the passenger's side of

23  the vehicle, correct?

24  A.  Yes.

12:32:07  25  Q.  You were at the driver's side of the vehicle, correct?

Hartmann - cross

1   A.  Yes.

2   Q.  And Officer Guzman left Percy Walker and came around to

3   the driver's side of the vehicle where you were standing,

4   correct?

12:32:17   5   A.  Yes.

6   Q.  Even though you had just said to Officer Guzman that you

7   thought you saw a gun, right?

8   A.  Yes.

9   Q.  At that point, Charles Taylor ran away; is that right?

12:32:31   10   A.  Yes.

11   Q.  And you gave chase, correct?

12   A.  Yes.

13   Q.  He reached to the front of his waistband was your

14   testimony on direct; is that right?

12:32:47   15   A.  Yes.

16   Q.  But his back was to you, wasn't that true?

17   A.  Yes.

18   Q.  And you saw him pull something out of his waistband,

19   right?

12:33:00   20   A.  Yes.

21   Q.  But you couldn't tell what it was because his back was to

22   you, correct?

23   A.  Yes.

24   Q.  But then the next thing you know, there was a gun dropped

12:33:08   25   to the ground; is that right?

1  A.  Yes.

2  Q.  And by the way, this whole time you thought your body-worn

3  camera was working, correct?

4  A.  Yes.

12:33:15  5  Q.  Now, you said on direct examination that your distance

6  from him was 6 feet when you made these observations, right?

7  A.  Approximately.

8  Q.  You completed a police report in this case, a case

9  supplemental report, didn't you?

12:33:40  10  A.  Yes.

11  Q.  And you reviewed that supplemental report in preparation

12  for your testimony today?

13  A.  Yes.

14  Q.  And nowhere in that report does it say that you were

12:33:49  15  6 feet away from Charles Taylor when you saw him pull and drop

16  a gun, does it?

17  A.  No.

18  Q.  Now, you said that your body-worn camera did record some

19  events that evening; is that right?

12:34:23  20  A.  Yes.

21  Q.  It recorded the retrieval of the gun?

22  A.  I -- I don't know.

23  Q.  Well, Exhibit C, the still that you observed of the weapon

24  on direct examination, is that a still from your body-worn

12:34:46  25  camera?

1  A.  It -- my body-worn camera showed when the gun was lying on

2  the ground and I was standing over it after it had dropped

3  from Charles Taylor.  I don't know if it -- my body-worn

4  camera showed the gun being -- I'm sorry, if it was collected?

12:35:09  5  I don't know if it showed if it was --

6  Q.  Your body-worn camera --

7  A.  -- the gun being collected.

8  Q.  I'm sorry.  I didn't mean to talk over you.

9      Your body-worn camera did not capture anything before

12:35:19  10  you were standing over the gun seeing it on the ground,

11  correct?

12  A.  Correct.

13      MR. KUTNICK:  Can I have one moment, please, your

14  Honor?

12:35:33  15      THE COURT:  Yes.

16    (Pause.)

17  BY MR. KUTNICK:

18  Q.  Backing up a little bit.  At the time that you ordered the

19  individuals out of the black Volkswagen, you had not received

12:36:17  20  any information from Warniczek that Sylna had reported a gun,

21  correct?

22  A.  I believe I had heard Officer Warniczek over the radio say

23  that one of them -- she told him one of the occupants of the

24  vehicle had a gun.

12:36:40  25  Q.  Okay.  But you had already ordered them out of the vehicle

Hartmann - cross

1  because you saw what you thought was a gun, correct?

2  A.  I believe I heard him say that over the radio before they

3  were ordered out of the car.

4  Q.  Before you saw what you thought was a gun?

12:36:58   5  A.  It was around right at the same time that I saw the -- the

6  handle of the gun.

7  Q.  So right at the same time that you hear Warniczek report

8  there may be a gun, you then may have seen a gun, right?

9  A.  Yeah, very -- very close time.  I'm not sure which was --

12:37:19  10  which came first, but it was right around the same time, yes.

11  Q.  And then the individuals were ordered out of the car,

12  correct?

13  A.  Yes.

14       MR. KUTNICK:  One more minute, please, your Honor.

12:37:40  15       THE COURT:  Sure.

16     (Counsel and defendant conferring.)

17  BY MR. KUTNICK:

18  Q.  The portion of your body-worn camera footage that was

19  working, did it record audio and video?

12:38:54  20  A.  I believe so.

21       MR. KUTNICK:  Okay.  Judge, I have no further

22  questions of this witness.  Thank you.

23       THE COURT:  Okay.  Any redirect?

24       MR. SCHIED:  No, your Honor.

12:39:06  25       THE COURT:  Okay.  The government may call its next

1    witness.

2        Oh, and, I'm sorry, sir, you may be excused.  Thanks.

3        THE WITNESS:  Thank you.

4      (Witness excused.)

12:39:28    5        MR. ZENNER:  We'll seek leave to call Officer

6    Rigoberto Guzman.

7        THE COURT:  Okay.

8        MR. ZENNER:  This will be the final witness.

9        THE COURT:  Okay.

12:40:02    10      (Witness sworn.)

11      RIGOBERTO GUZMAN, GOVERNMENT'S WITNESS, DULY SWORN,

12                  DIRECT EXAMINATION

13    BY MR. ZENNER:

14    Q.  Good afternoon, Officer.  Can you please state and spell

12:40:20    15    your name for the record.

16    A.  Good afternoon.  First name Rigoberto, R-I-G-O-B-E-R-T-O.

17    Last name Guzman, G-U-Z-M-A-N.

18    Q.  Where are you employed, Officer Guzman?

19    A.  Evergreen Park Police Department.

12:40:32    20    Q.  And what's your position with the Evergreen Park Police

21    Department?

22    A.  Patrol officer.

23    Q.  What are your general duties as a patrol officer?

24    A.  Routine patrol, responding to calls of service, things of

12:40:50    25    that sort.

1  Q.  And how long have you been with the Evergreen Park Police
2  Department?
3  A.  Eight years.
4  Q.  Can you describe the initial training you had to become a
5  police officer?
6  A.  It was a 12-week academy followed by an FTO program.
7  Q.  As part of that training and any other training you've
8  received, have you been trained regarding the identification
9  of individuals that are armed in public?
10  A.  Yes.
11  Q.  Have you also received training regarding how to approach
12  individuals that are armed in public?
13  A.  Yes.
14  Q.  Have you also received training about identifying
15  firearms?
16  A.  That's correct.
17  Q.  In the course of your job as a police officer,
18  approximately how many times have you encountered individuals
19  armed with firearms?
20  A.  Numerous times.
21  Q.  I want to turn to the night of October 10th, 2021.
22     Were you on duty that night?
23  A.  Yes, I was.
24  Q.  Were you dispatched to respond to an incident at a
25  Mariano's?

Guzman - direct

90

1   A.  That's correct.

2   Q.  What was the call about?

3   A.  The nature of the call was a retail theft in progress that

4   loss prevention was reporting.

12:42:00   5   Q.  Did you respond to that Mariano's?

6   A.  Yes, I did.

7   Q.  Did any other officers respond?

8   A.  Yes.

9   Q.  Who?

12:42:05   10   A.  Officer Warniczek and Officer Hartmann.

11   Q.  What happened when you arrived at the Mariano's?

12   A.  We were met outside by a loss prevention employee.

13   Q.  And what did that person tell you?

14   A.  He related there was a female white inside the business

12:42:23   15   actively attempting to commit a retail theft.

16   Q.  Did the loss prevention employee want to pursue a

17   complaint against the suspected shoplifter?

18   A.  Yes.

19   Q.  Were you wearing body camera that night, Officer Guzman?

12:42:40   20   A.  Yes, I was.

21   Q.  Did your body-worn camera record any footage that day?

22   A.  No, it did not.

23   Q.  Do you know why?

24   A.  I am unsure.

12:42:46   25   Q.  Did you believe at the time that your body-worn camera was

Guzman - direct

91

1    recording?

2    A.  Yes.  At the time, I did.

3    Q.  Did Officer Warniczek have body-worn camera on on

4    October 10th, 2021?

12:42:58    5    A.  Yes, he did.

6            MR. ZENNER:  Permission to play what's previously

7    been admitted as Exhibit B.

8            THE COURT:  Yes.

9        (Video played.)

12:43:18    10    BY MR. ZENNER:

11    Q.  Are you familiar with this video?

12    A.  Yes, I am.

13    Q.  What is it?

14    A.  It's Officer Warniczek's body-cam footage from that day.

12:43:27    15            MR. ZENNER:  Okay.  I'm going to move forward on the

16    Exhibit B to about 5:09, start at 5:08, and I'm going to play

17    until 5:49.

18        (Video played.)

19    BY MR. ZENNER:

12:44:26    20    Q.  As shown on that portion of the video, what happened next?

21    A.  As shown in this portion of the video, we proceeded to

22    identify this female.

23    Q.  Did the loss prevention employee identify her as the

24    suspected shoplifter?

12:44:39    25    A.  Yes.

1    Q.  What was the first thing she said when she exited the

2    store?

3    A.  "Do you guys want to check my stuff?"

4    Q.  Did you think that was unusual?

5    A.  Yes, I did.

6    Q.  Why?

7    A.  Particularly if you're not suspicious of anything or have

8    a guilty conscience of anything, you typically wouldn't come

9    out of a grocery store and say that.

10        MR. ZENNER:  I'm now going to play on this exhibit

11   from 5:49 until 7 minutes.

12        (Video played.)

13   BY MR. ZENNER:

14   Q.  As shown on the video, what happened during the next

15   portion of your encounter?

16   A.  Well, she provided receipt for items that she had

17   purchased, and then we proceeded to identify her, make sure

18   she was clear of any warrants or anything like that before --

19   Q.  Did she identify herself?

20   A.  She provided a name and date of birth.

21   Q.  What name did she provide?

22   A.  First name was Sylyna.  I can't pronounce her last name.

23   Q.  Does Ficarella sound right?

24   A.  That's correct.

25   Q.  When you learned about the previous reports, what did

12:44:46
12:44:59
12:46:19
12:46:35
12:46:50

1    you -- excuse me.

2         What did you do next?

3    A.  I ran her name by our central dispatch over radio.

4    Q.  And what did you learn?

12:47:02   5    A.  I learned that she had a previous arrest at the same

6    location for a retail theft.

7    Q.  What did you do when you learned about that previous

8    arrest?

9    A.  I proceeded to Officer Warniczek's patrol vehicle to

12:47:13   10   further learn about the incident.

11   Q.  Did anyone stay with Ms. Ficarella?

12   A.  Officer Hartmann.

13        MR. ZENNER:  Okay.  I'm going to move ahead in the

14   video to 14:30.

12:47:23   15        It's actually going to be 14:28.  I'll start playing

16   Exhibit B.

17      (Video played.)

18        MR. ZENNER:  I'm stopping the video at 15:42.

19   BY MR. ZENNER:

12:48:52   20   Q.  What did you learn from the previous reports?

21   A.  I learned that the female, Sylyna, had been arrested on

22   that occasion.  At the time, she was accompanied by a male by

23   the name of Percy Walker, and there was also a black

24   Volkswagen Jetta involved.

12:49:08   25   Q.  What did you do next?

```
 1    A.  I scanned the parking lot to see if the same vehicle was
 2    in the lot.
 3    Q.  Did you see that vehicle in the lot?
 4    A.  Yes, I did.
 5    Q.  After you spotted the Jetta in the parking lot, what did
 6    you do?
 7    A.  We approached the vehicle, which was occupied by two
 8    males.
 9    Q.  Did you ask the males any questions?
10    A.  Yes.
11    Q.  Why did you want to question the occupants of the vehicle?
12    A.  We were just investigating the reports of the crime, just
13    the furtherance of it, their involvement with the female who
14    had exited the store.
15    Q.  Did you believe based on the reports you'd read and the
16    facts from those reports that the occupants of the vehicle
17    might be connected to criminal activity?
18    A.  Yes.
19            MR. ZENNER:  I'm now going to play from 16 minutes to
20    16:28.
21        (Video played.)
22    BY MR. ZENNER:
23    Q.  As shown on the video, what happened next?
24    A.  We proceeded to question the males regarding their
25    whereabouts, why they were in the parking lot, and the
```

12:49:15
12:49:27
12:49:42
12:49:58
12:50:37

                1   relation to the female.
                2   Q.  When you approached the car, was the car on?
                3   A.  Yes, it was.
                4   Q.  Was it parked or moving?
    12:50:48    5   A.  It was parked.
                6   Q.  Where was it parked?
                7   A.  It was parked in the parking lot.
                8   Q.  When you walked up, did you have your gun drawn?
                9   A.  No.
    12:50:58   10   Q.  Was anyone else with you when you walked up?
               11   A.  Officer Warniczek.
               12   Q.  Anyone else besides Officer Warniczek?
               13   A.  At the time, it was just us two.
               14   Q.  How many people were in the car?
    12:51:07   15   A.  Two people.
               16   Q.  Where were the two people sitting?
               17   A.  Front driver's seat, front passenger's seat.
               18   Q.  Was the person in the driver's seat later identified as
               19   Charles Taylor?
    12:51:20   20   A.  Yes.
               21   Q.  And was the person in the front passenger's seat later
               22   identified as Percy Walker?
               23   A.  Yes.
               24   Q.  What was the first question that you or Officer Warniczek
    12:51:29   25   asked?

1  A.  "Which one of you guys is Percy?"

2  Q.  How did the front passenger respond?

3  A.  Was very evasive with the questioning.

4  Q.  During this initial questioning period, where were you

5  standing?

6  A.  I was standing to the left of Officer Warniczek.

7  Q.  Could you observe the occupants of the vehicle at that

8  time?

9  A.  Yes.

10 Q.  Could you observe the driver, Charles Taylor?

11 A.  Yes.

12 Q.  Could you see the top of Charles Taylor's waistband at

13 that time?

14 A.  No.

15 Q.  Did you observe a gun at that time?

16 A.  I did -- I did not.

17      MR. ZENNER:  I'm now going to play from 16:28 to

18 18:32.

19    (Video played.)

20      MR. ZENNER:  I've paused it at 18:32.

21 BY MR. ZENNER:

22 Q.  What were some of the questions you initially -- you and

23 Officer Warniczek initially asked the occupants of the

24 vehicle?

25 A.  His relation to the female in the store, his identity, his

12:51:43 (line 5)
12:51:49 (line 10)
12:52:01 (line 15)
12:54:15 (line 20)
12:54:23 (line 25)

Guzman - direct

97

1   name.

2   Q.  Why did you ask these questions?

3   A.  We identify every encounter we have, especially when we're

4   investigating a crime.

12:54:39   5   Q.  How would you describe their responses?

6   A.  Evasive.

7   Q.  Did they identify themselves immediately?

8   A.  Not immediately, no.

9   Q.  And what was the driver, later identified as Charles

12:54:50   10   Taylor, doing when you began questioning the occupants?

11   A.  He appeared to be pretending to be sleeping.

12   Q.  And during this initial questioning period, did you state

13   that the occupants were under arrest at any time?

14   A.  No.

12:55:02   15   Q.  Did you eventually obtain identification for the two

16   occupants?

17   A.  That's correct, yes.

18   Q.  And you testified earlier that Charles Taylor was the

19   driver, and Percy Walker was the front seat passenger,

12:55:14   20   correct?

21   A.  Correct.

22   Q.  You also testified earlier that Percy Walker was

23   previously involved in a retail theft incident with

24   Ms. Ficarella, correct?

12:55:25   25   A.  Correct.

Guzman - direct

98

1  Q.  After you and Officer Warniczek obtained their names, what

2  happened next?

3  A.  I remained at the vehicle, next to the vehicle.  Officer

4  Warniczek returned to his patrol vehicle to run their

12:55:40  5  identifiers.

6  Q.  While you remained by the vehicle, what did Mr. Walker do?

7  A.  I shook him awake because he pretended to be sleeping.

8  Q.  Excuse me.  To clarify, I asked what Mr. Walker did.

9  A.  Oh, I'm sorry.  Mr. Walker abruptly exited the vehicle.

12:55:59  10  Q.  What did you do?

11  A.  I directed my attention towards him, and I approached him,

12  demanding him to get back in the car.

13  Q.  At some point during that interaction, did you tell him

14  that he could not leave?

12:56:10  15  A.  Yes.

16  Q.  Why did you say that at that time?

17  A.  We're still investigating the actual crime, and we have to

18  make sure anybody's clear of any warrants or anything like

19  that typically before we clear them from the scene.

12:56:27  20  Q.  And how had Mr. Walker's and Mr. Taylor's behavior

21  appeared to you up until that point?

22  A.  Suspicious.

23  Q.  Can you specifically lay out all the facts that you were

24  aware of at the time that you told Mr. Walker that he was not

12:56:40  25  free to leave?

Guzman - direct

99

1    A.  Yes.

2    Q.  Please tell me what facts you're aware of from that night.

3    A.  From that night, I know that he had previously accompanied

4    the female we had detained outside of Mariano's, he had

12:56:53    5    previously accompanied her on that incident where there was an

6    arrest made.

7            At this point, I learned that he was an occupant in

8    the vehicle, same vehicle that was used in the commission of

9    the initial crime.

12:57:06    10    Q.  And had you also received a report from a loss prevention

11    employee?

12    A.  That's correct.

13    Q.  And what was that report?

14    A.  The report was that there was a female inside the store

12:57:15    15    who was actively attempting to shoplift liquor bottles.

16    Q.  After you told Mr. Walker that he wasn't free to leave,

17    did he say anything to you?

18    A.  He said, "You can check me.  I don't have anything on me."

19    Q.  What did you do next?

12:57:30    20    A.  I conducted an officer safety patdown for weapons.

21    Q.  Did you find anything on Mr. Walker?

22    A.  No.

23    Q.  At the time that you searched Mr. Walker, where was

24    Officer Hartmann?

12:57:41    25    A.  Officer Hartmann was still with Sylyna.

Guzman - direct

100

1  Q.  Did Walker get back in the car?

2  A.  Yes.

3  Q.  Did Officer Hartmann at any point walk towards the car?

4  A.  Yes, he did.

12:57:55  5  Q.  What happened as Officer Hartmann walked towards the car?

6  A.  He directed my attention to Charles Taylor and asked me,

7  "What is that in his waistband?"

8  Q.  Where was Officer Hartmann standing when he made that

9  statement?

12:58:10  10  A.  I would say he was front windshield, if not corner of the

11  front passenger side of the vehicle.

12  Q.  About how many feet, estimate, approximate feet was he

13  from the car?

14  A.  I would say five.

12:58:23  15  Q.  What did you do when he made that statement to you?

16  A.  I turned and directed my attention towards Mr. Taylor.

17  Q.  What did you observe when you looked at Mr. Taylor?

18  A.  I observed an end of a gun protruding from his front

19  waistband.

12:58:42  20  Q.  And where were you standing when you made that

21  observation?

22  A.  Front windshield.

23  Q.  About how far from the car?

24  A.  Five feet also.

12:58:50  25  Q.  What were the lighting conditions like in the parking lot?

Guzman - direct

101

1   A.  It was a lighted parking lot.

2   Q.  You testified earlier that you'd questioned Mr. Taylor and

3   Mr. Walker for a few minutes but that you never observed a

4   gun; is that correct?

12:59:05   5   A.  That's correct.

6   Q.  Why couldn't you see the gun before this moment?

7   A.  His shirt was over his belt line.

8   Q.  At the time that you saw that gun, was it accessible to

9   Mr. Taylor?

12:59:15   10   A.  Yes.

11   Q.  Did you know if the gun was loaded?

12   A.  I did not.

13   Q.  Did you know if it had a safety on?

14   A.  I did not.

12:59:23   15   Q.  Did you know if there was a bullet in the chamber of the

16   gun?

17   A.  I did not.

18   Q.  From your perspective, was there a need to retrieve that

19   gun immediately?

12:59:29   20   A.  Yes.

21   Q.  Why?

22   A.  Officer and public safety both.

23   Q.  What did you do next?

24   A.  We directed both occupants to raise their hands above

12:59:42   25   their head where we can see them.

Guzman - direct

102

1    Q.  What happened after that?

2    A.  Officer Hartmann requested additional units and radio

3    priority.

4    Q.  What happened next?

12:59:53    5    A.  Respond -- assisting officers arrived on scene.  We

6    instructed front seat passenger Percy Walker to exit the

7    vehicle.

8    Q.  Did he exit?

9    A.  Yes.

01:00:06    10    Q.  Was he placed into custody?

11    A.  That's correct.

12    Q.  Did you issue any instructions or orders to the driver?

13    A.  Yes.  We provided him with the same instructions that we

14    provided Walker.  We instructed him to keep his hands where we

01:00:25    15    could see them, raise them above his head, and exit the

16    vehicle.

17    Q.  What did he do?

18    A.  He complied initially.  He exited the vehicle.

19    Q.  And you said he complied initially.  What happened next?

01:00:35    20    A.  He took two or three steps, turned around and began to run

21    away.

22    Q.  Did he run towards the Mariano's or away from the

23    Mariano's?

24    A.  Away.

01:00:44    25    Q.  What did you do when Taylor ran away?

Guzman - direct

103

1   A.  I pursued on foot.

2   Q.  While you were pursuing Taylor, did you say anything?

3   A.  "Stop running."

4   Q.  Did Taylor do anything in response to that?

01:00:59  5   A.  He continued running.

6   Q.  While you were pursuing Taylor, did you observe him do

7   anything else?

8   A.  Yes.  I observed him to reach into his front waistband, at

9   which time I observed him to access the firearm, which then

01:01:17  10  abruptly fell on the ground.

11  Q.  You said -- you testified earlier that when he was sitting

12  in the car, you observed a gun in his waistband.

13       When you saw him reach into his waistband while he

14  was running, was that in the same location that you'd seen the

01:01:30  15  gun in his waistband earlier?

16  A.  Yes.

17  Q.  Did you hear any -- did you hear anything when you saw the

18  gun drop to the ground?

19  A.  A loud clunk noise.

01:01:41  20  Q.  And how far away from Taylor were you, about, when you saw

21  him drop the gun to the ground?

22  A.  Maybe three feet.

23  Q.  And, again, what were the lighting conditions in the

24  parking lot?

01:01:53  25  A.  It was a lighted parking lot.

Guzman - cross

104

| | |
|---|---|
| 1 | Q.  What did you do after you saw Mr. Taylor drop the gun? |
| 2 | A.  He continued running; I continued chase. |
| 3 | Q.  Did anyone stay near the gun? |
| 4 | A.  Officer Hartmann did. |
| 01:02:03  5 | Q.  What happened next? |
| 6 | A.  I was eventually able to catch up to Mr. Taylor and place |
| 7 | him into custody. |
| 8 | MR. ZENNER:  No further questions. |
| 9 | MR. KUTNICK:  One second, please, your Honor. |
| 01:02:16  10 | THE COURT:  Sure. |
| 11 | (Pause.) |
| 12 | CROSS-EXAMINATION |
| 13 | BY MR. KUTNICK: |
| 14 | Q.  Good afternoon, Officer Guzman. |
| 01:02:46  15 | A.  Good afternoon. |
| 16 | Q.  How long did you say that you've been an Evergreen Park |
| 17 | police officer? |
| 18 | A.  Eight years. |
| 19 | Q.  So six years back in October of 2022? |
| 01:02:57  20 | A.  Correct. |
| 21 | Q.  Have you always worked with the Evergreen Park Police |
| 22 | Department? |
| 23 | A.  Yes. |
| 24 | Q.  So you didn't have any law enforcement jobs before that? |
| 01:03:05  25 | A.  No, I did not. |

Guzman - cross

105

1   Q.  You had had no law enforcement training other than the

2   police academy for Evergreen Park?

3   A.  Correct.

4   Q.  And on November 10th, 2021, you responded to the Mariano's

01:03:22   5   because you received a call of a --

6           THE DEFENDANT:  October.

7   BY MR. KUTNICK:

8   Q.  I'm sorry, October 10 --

9           MR. KUTNICK:  Thank you, Charles.

10  BY MR. KUTNICK:

11  Q.  October 10th, 2021, you received a call of a retail theft

12  at the Mariano's there in Evergreen Park, correct?

13  A.  Yes.

14  Q.  Were you working with a partner?

01:03:37   15  A.  No, by myself.

16  Q.  And were you assigned to a police vehicle?

17  A.  Yes, I was.

18  Q.  Did that police -- was that police vehicle equipped with a

19  dash camera?

01:03:48   20  A.  Yes.

21  Q.  Was that dash camera operating properly on the night of

22  October 10th, 2021?

23  A.  It should have been, yes.

24  Q.  And was it running?

01:03:57   25  A.  I'm not sure.

Guzman - cross

106

1    Q.  You have not reviewed any footage from that dash camera

2    for your testimony today?

3    A.  No.

4    Q.  Were you assigned a body-worn camera that day?

01:04:09    5    A.  Yes.

6    Q.  Were you wearing it?

7    A.  Yes, I was.

8    Q.  Was it operable?  Let me -- strike that.

9           Did you believe it was operable?

01:04:15    10    A.  Yes.

11    Q.  As you sit here now, have you learned that, in fact, your

12    body-worn camera was not operable that night?

13    A.  That's correct.

14    Q.  And it did not record any of the events that you observed

01:04:30    15    on October 10th, 2021?

16    A.  It did not, no.

17    Q.  So when you arrived at the Mariano's, were you the first

18    officer to arrive, or was -- were any other officers there at

19    that point?

01:04:54    20    A.  There -- I believe Officer Warniczek was already on scene.

21    Q.  Okay.  Officer Hartmann was not there yet?

22    A.  No.

23    Q.  Where was Officer Warniczek when you arrived?

24    A.  He was speaking with Sylyna.

01:05:05    25    Q.  He was speaking with Sylyna?

Guzman - cross

107

1  A.  And loss prevention initially.

2  Q.  Where was that?

3  A.  In front of the business.

4  Q.  Who else was present?

01:05:16  5  A.  Officer Warniczek, loss prevention.

6  Q.  And Sylyna?

7  A.  Yeah, upon exiting, yes.

8  Q.  And nobody else?

9  A.  I arrived on scene.

01:05:27  10  Q.  What about Officer Hartmann?

11  A.  Eventually he did, too.

12  Q.  Okay.  So you didn't hear any conversation between loss

13  prevention, Officer Warniczek, and Sylyna prior to your

14  arrival, did you?

01:05:44  15  A.  Sylyna exited.  I was already on scene when she exited.

16  Q.  You were already outside the door, right?

17  A.  Yes.

18  Q.  As shown on Warniczek's body cam, correct?

19  A.  Correct.

01:05:56  20  Q.  Officer Hartmann was already outside the door, too, wasn't

21  he?

22  A.  Sure.

23  Q.  Okay.  You watched Officer Warniczek's body cam, right?

24  A.  Yes.

01:06:04  25  Q.  And you are depicted in that body-worn camera outside the

Guzman - cross

1    door of the Mariano's, correct?

2    A.  Yes.

3    Q.  And you can actually see that the red light on your

4    body-worn camera is illuminated, correct?

01:06:15    5    A.  Yes.

6    Q.  And that means that it's working, right?

7    A.  Yes.

8    Q.  The loss prevention officer pointed to Sylyna and said

9    that's the person who I suspect of retail theft, correct?

01:06:27    10    A.  Yes.

11    Q.  And when he did that, you were standing there with

12    yourself, Officer Warniczek, and Officer Hartmann, correct?

13    A.  Uh-huh, yes.

14    Q.  Sylyna approached you officers, right, all of you,

01:06:41    15    correct?

16        You have to say yes or no for the court reporter.

17    A.  Yes, yes.

18    Q.  Thank you, Officer.

19        And she said -- she volunteered to show you her

01:06:50    20    receipt, right?

21    A.  Correct.

22    Q.  And she volunteered to show you the items that she had

23    purchased, correct?

24    A.  Correct.

01:06:56    25    Q.  That was after the loss prevention officer pointed her out

Guzman - cross

109

1    to you, correct?

2    A.  Yes.

3    Q.  One of you, you or your fellow officers, I think it might

4    have been Warniczek, asked her her name; is that right?

01:07:18    5    A.  Yes.

6    Q.  And she provided her name, correct?

7    A.  Yes.

8    Q.  But she didn't have any identification, right?

9    A.  Correct.

01:07:23    10   Q.  But she gave her first and last name and date of birth;

11   isn't that right?

12   A.  Yes.

13   Q.  You took her first and last name and date of birth, and

14   you went back to your police car, correct?

01:07:32    15   A.  I did not.

16   Q.  You did not?  What did you do?

17   A.  I ran her name over radio.

18   Q.  Oh, you just ran it over the radio?

19   A.  Uh-huh.

01:07:39    20   Q.  Okay.  And what did you learn?

21   A.  I learned there was a previous reported incident of retail

22   theft at the same location.

23   Q.  Okay.  So did you ever review any police report regarding

24   that previous retail theft?

01:07:51    25   A.  At a later time, yes.

Guzman - cross

110

1    Q.  Okay.  Did you observe whether Warniczek had -- did any of

2    you have a police report regarding the Mariano's incident from

3    four months earlier in your possession on October 10, 2021?

4    A.  Officer Warniczek accessed it via his in-squad laptop.

01:08:12    5    Q.  Okay.  That's after you received the information over the

6    radio?

7    A.  Yes.

8    Q.  So you received the information about Sylyna over the

9    radio, correct?

01:08:20    10    A.  Yes.

11    Q.  You learned that she had been involved in a previous

12    incident four months earlier, correct?

13    A.  Yes.

14    Q.  And then Warniczek went to the police car so he could

01:08:29    15    retrieve a police report, right?

16    A.  Yes.

17    Q.  Until he retrieved the police report, you and your fellow

18    officers did not have any other information regarding the

19    Mariano's incident from four months earlier, correct?

01:08:41    20    A.  That's correct.

21    Q.  After he received the police report, you -- well, you went

22    to the police car with him, didn't you?

23    A.  Yes.

24    Q.  At that time, did you review the police report?

01:08:55    25    A.  I did not.

Guzman - cross

111

```
            1          MR. KUTNICK:  Hold on one second, please, Judge.
            2          (Counsel and defendant conferring.)
            3   BY MR. KUTNICK:
            4   Q.  After you received that information, did you go inside the
01:09:29    5   Mariano's to determine whether or not she had had a trespass
            6   order against her?
            7   A.  Not immediately, no.
            8   Q.  When did you?
            9   A.  I would say after the fact.
01:09:40   10   Q.  Okay.  And she didn't have a trespass order from that
           11   Mariano's, did she?
           12   A.  I was unsure.  Oftentimes we complete field contact cards.
           13   Oftentimes we do not.  Sometimes we do verbal warnings, which
           14   are required on camera.
01:09:56   15   Q.  Okay.  But you did not learn that she had a no trespass
           16   order for that Mariano's, did you?
           17   A.  I was investigating that.
           18   Q.  Okay.  You did not learn and confirm that she did, did
           19   you?
01:10:04   20   A.  Correct.
           21   Q.  After you and Officer Warniczek were in the police car and
           22   you reviewed the police report, you looked around the parking
           23   lot; is that right?
           24   A.  Yes.
01:10:16   25   Q.  You observed a black Volkswagen Jetta, correct?
```

Guzman - cross

112

1  A.  Yes.

2  Q.  There was a black Volkswagen Jetta that had been named in

3  the police report, right?

4  A.  Yes.

01:10:26  5  Q.  By the way, you didn't have any other information from the

6  loss prevention officer about a black Volkswagen Jetta being

7  involved, did you?

8  A.  Not from the loss prevention officer, no.

9  Q.  The only source of information for a black Jetta was the

01:10:41  10  police report from four months earlier, right?

11  A.  Yes.

12  Q.  At that point, you did not have any information that

13  Sylyna was connected to the black Jetta until you saw that

14  police report, correct?

01:10:56  15  A.  Correct.

16  Q.  You -- well, Officer Warniczek went back to Sylyna; is

17  that right, in the front of the store, and then you and

18  Officer Hartmann went to the police car?

19  A.  That is incorrect.

01:11:19  20  Q.  You and Warniczek went to the police car?

21  A.  Yes.

22  Q.  Okay.  And you both stood on the passenger's side?

23  A.  Yes.

24  Q.  Hartmann was still over with Sylyna?

01:11:28  25  A.  Correct.

Guzman - cross

113

1    Q.  You didn't have any information about weapons at this

2    point, did you?

3    A.  No.

4    Q.  You were looking inside of the black Jetta, correct?

01:11:44    5    A.  Yes.

6    Q.  And you were engaging the passenger with conversation; is

7    that right?

8    A.  Yes.

9    Q.  And the driver of the vehicle appeared to be asleep,

01:11:53    10   correct?

11   A.  Correct.

12   Q.  But you were able to observe the interior of the vehicle,

13   right?

14   A.  I could see the driver and passenger interior.

01:12:05    15   Q.  You were able to see the front passenger compartment,

16   which included the driver and passenger, correct?

17   A.  Yes.

18   Q.  And you had that area illuminated with your flashlight,

19   correct?

01:12:16    20   A.  Yes.

21   Q.  You believed your body camera was working at this time,

22   right?

23   A.  Correct.

24   Q.  But you later learned it was not, correct?

01:12:23    25   A.  That's correct.

Guzman - cross

114

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | Q.  As you stood on the passenger's side, you were able to         |
|          | 2  | look into the car and see both occupants, correct?                 |
|          | 3  | A.  Yes.                                                           |
|          | 4  | Q.  You were paying attention to both occupants, correct?          |
| 01:12:35 | 5  | A.  My attention was initially more focused on the front           |
|          | 6  | passenger.                                                          |
|          | 7  | Q.  Okay.  Where was Hartmann at that time?                        |
|          | 8  | A.  He's still standing by with Sylyna.                            |
|          | 9  | Q.  Oh, I'm sorry.  I meant to say where was Warniczek at that     |
| 01:12:53 | 10 | time?                                                               |
|          | 11 | A.  He was standing next to me.                                    |
|          | 12 | Q.  Right next to you?                                             |
|          | 13 | A.  Yes.                                                           |
|          | 14 | Q.  At some point, did you move around to the driver's side of     |
| 01:12:59 | 15 | the vehicle?                                                        |
|          | 16 | A.  Yes.                                                           |
|          | 17 | Q.  Okay.  And when did you do that?                               |
|          | 18 | A.  As Officer Warniczek was talking to Percy Walker.              |
|          | 19 | Q.  You asked the driver for identification, right?               |
| 01:13:14 | 20 | A.  Yes.                                                           |
|          | 21 | Q.  You actually woke him up.  You poked him and woke him up,      |
|          | 22 | right?                                                              |
|          | 23 | A.  Yes.                                                           |
|          | 24 | Q.  Okay.  And then you asked him for identification?             |
| 01:13:21 | 25 | A.  Correct.                                                        |

Guzman - cross

115

1  Q.  And he gave you identification.

2  A.  Yes.

3  Q.  Officer Warniczek took Percy Walker's identification and

4  Charles Taylor's identification, and he went back to the car

01:13:31  5  to run their names, right?

6  A.  Yes.

7  Q.  He didn't run them over the radio, did he?

8  A.  No.

9  Q.  Is there anything that would stop them from running it

01:13:38  10  over the radio?

11  A.  I'm not sure.

12  Q.  Then after Officer Warniczek went to his police car, he

13  went back to the location where Officer Hartmann and Sylyna

14  were, right?

01:13:59  15  A.  I believe so, yes.

16  Q.  Okay.  So -- but you really weren't watching what was

17  going over there because you were paying attention to what was

18  going on in the car, correct?

19  A.  Yes.

01:14:09  20  Q.  Did you see Officer Hartmann place Sylyna in handcuffs?

21  A.  I did not see that.

22  Q.  Okay.  At some point after Officer Warniczek went to the

23  area where Sylyna and Hartmann were, did Hartmann then come to

24  the black Volkswagen where you were?

01:14:29  25  A.  Yes.

Guzman - cross

116

1    Q.  And where did he go?

2    A.  To the passenger's side.

3    Q.  He was on the passenger's side?

4    A.  Initially, yes.

01:14:37    5    Q.  All right.  Was he wearing a body-worn camera?

6    A.  Yes.

7    Q.  Do you know if his red light was illuminated?

8    A.  I believe so, yes.

9    Q.  Okay.  While you were on the driver's side, you had a

01:14:52    10    better view of the driver at that point, correct?

11    A.  That's correct.

12    Q.  You did not see any objects in his waistband as you stood

13    there at that time, correct?

14    A.  At that time, I did not.

01:15:05    15    Q.  You did not see any bulge in his shirt or his pants area,

16    correct?

17    A.  No.

18    Q.  He did not make any furtive movements at that time,

19    correct?

01:15:16    20    A.  No.

21    Q.  You never saw him try to hide anything inside of the car

22    while he was in there, did you?

23    A.  No.

24    Q.  As a matter of fact, the driver was remaining perfectly

01:15:37    25    still and had his hands on his legs, didn't he?

Guzman - cross

117

1    A.  Yes.

2    Q.  At this point, the individuals in the car were not free to

3    leave; isn't that true?

4    A.  That's true.

01:16:02    5    Q.  You heard Hartmann say he might have a gun, right?

6    A.  He initially said, "What is that in his waistband?"  And

7    he looked again and said, "He has a gun."

8    Q.  Okay.  He said what -- you did not see a gun at that

9    point, did you?

01:16:49    10    A.  My attention was with the passenger of the vehicle who had

11    exited.

12    Q.  Oh, the passenger had exited at that point, right?

13    A.  Correct.

14    Q.  Because he said he had to go to the bathroom, correct?

01:17:01    15    A.  Correct.

16    Q.  But you did not see a gun at that point, correct?

17    A.  Upon Officer Hartmann pointing it out, I did.

18    Q.  Okay.  And that was when Mr. Taylor was still seated in

19    the vehicle?

01:17:14    20    A.  Yes.

21    Q.  Walker got back in the vehicle after he was directed to do

22    so, correct?

23    A.  Yes.

24    Q.  But then after the gun was seen, both occupants were

01:17:33    25    ordered out, right?

Guzman - cross

118

1   A.  One at a time.

2   Q.  First Percy was ordered out, right?

3   A.  Yes.

4   Q.  And he did get out, correct?

01:17:40   5   A.  Correct.

6   Q.  And then Mr. Taylor was ordered out, right?

7   A.  Yes.

8   Q.  And he did get out, correct?

9   A.  Yes.

01:17:45   10   Q.  At this point, you had not heard Warniczek make any

11   announcements over the radio, correct?

12   A.  It occurred simultaneously.

13   Q.  Okay.

14   A.  Officer Hartmann called for radio priority at the same

01:18:03   15   time that Officer Warniczek was attempting to relate to us

16   that there was a firearm inside the car.

17   Q.  So then what did you hear through your radio when those

18   two officers were trying to talk at the same time?

19   A.  I heard what Officer Hartmann said because he was standing

01:18:19   20   next to me.

21   Q.  But you did not hear what Officer Warniczek said?

22   A.  No.

23   Q.  When Taylor ran away, you gave chase, correct?

24   A.  Yes.

01:18:45   25   Q.  You thought your body camera was working, right?

Guzman - cross

119

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  And as Taylor was running away, you say that he reached to |
| 3 | his front waistband with his right hand? |
| 4 | A.  I'm unsure which hand, but he reached in his waistband. |
| 5 | Q.  Okay.  But you couldn't see his front waistband because |
| 6 | his back was to you, correct? |
| 7 | A.  He was running at an angle. |
| 8 | Q.  He was running at an angle? |
| 9 | A.  Correct. |
| 10 | Q.  But you don't know which hand he used. |
| 11 | A.  I believe it was his right.  I'm not sure. |
| 12 | Q.  Okay.  And then an object fell to the ground, correct? |
| 13 | A.  Correct. |
| 14 | Q.  And that object turned out to be a gun, right? |
| 15 | A.  Yes. |
| 16 | Q.  And that's the gun that the government is using to |
| 17 | prosecute Mr. Taylor in this case, correct? |
| 18 | A.  That's correct. |
| 19 | Q.  You said that you were three feet away from him when you |
| 20 | made that observation; is that right? |
| 21 | A.  Approximately, yes. |
| 22 | Q.  And you completed a police report in this case, didn't |
| 23 | you? |
| 24 | A.  Yes. |
| 25 | Q.  And you reviewed that police report prior to coming to |

01:19:06 (line 5)
01:19:14 (line 10)
01:19:25 (line 15)
01:19:42 (line 20)
01:19:47 (line 25)

Guzman - cross

120

1    court today?

2    A.  Yes.

3    Q.  And nowhere in that -- in your police report does it say

4    that you were three feet away when you made this observation,

01:19:58    5    does it?

6    A.  It does not.

7              MR. KUTNICK:  One moment, please, your Honor.

8              THE COURT:  Sure.

9         (Counsel and defendant conferring.)

01:21:06    10             MR. KUTNICK:  Judge, thanks to the officer.  I have

11   no further questions.

12             THE COURT:  Okay.  Any redirect?

13             MR. ZENNER:  No, your Honor.

14             THE COURT:  Okay.  Thank you, sir.  You may be

01:21:26    15   excused.

16             THE WITNESS:  Thank you, Judge.

17        (Witness excused.)

18             THE COURT:  Okay.  At this point, is there any more

19   evidence?

01:21:46    20             MR. ZENNER:  No more witnesses, no more evidence.

21             THE COURT:  Should we then turn to the closing

22   arguments?

23             MR. KUTNICK:  Your Honor, can I have just a couple

24   moments to talk to Mr. Taylor?  I may want to present some

01:22:04    25   non-testimonial evidence, like video evidence.

1      THE COURT:  Sure.

2      MR. KUTNICK:  But I need a couple minutes to talk to

3  Mr. Taylor first.

4      THE COURT:  Okay.  In the meantime, I just may step

01:22:12  5  out for a second.

6      MR. KUTNICK:  That's absolutely fine with me, your

7  Honor.

8      MR. ZENNER:  I'm going to go to the bathroom as well,

9  your Honor.

01:22:18  10      THE COURT:  Okay.  How long do you need

11  approximately?

12      MR. KUTNICK:  A few minutes.

13      THE COURT:  Okay.

14      MR. KUTNICK:  Five minutes or less.

01:22:24  15      THE COURT:  Okay.  Sounds good.  Thanks.

16      MR. KUTNICK:  Thank you.

17     (Recess from 1:22 to 1:35 p.m.)

18      THE COURT:  Everyone can have a seat.

19      MR. ZENNER:  Sorry?

01:36:46  20      THE COURT:  Oh, no.  I was just letting everyone in

21  the gallery know they can have a seat.  I know you are still

22  discussing, so whatever time you need, feel free.

23      MR. ZENNER:  So I think -- can we go on the record,

24  your Honor?

01:37:00  25      THE COURT:  I guess we are already, but we are.

1    MR. ZENNER:  I believe Mr. Kutnick would like to

2  introduce a portion of the dash cam video from Officer

3  Hartmann's patrol car.  I think -- I'd like to hear the

4  relevance first before deciding whether we object to that

01:37:26  5  video being admitted.

6    THE COURT:  Okay.

7    MR. KUTNICK:  The relevance of it, your Honor, is

8  that the police were operating -- at least there's kind of two

9  pieces of information that the police were operating on.  One

01:37:41  10  is the alleged observation of a weapon or a handle, which is

11  not depicted on any body-worn camera, and the other is

12  information received from Sylyna that a weapon would be in the

13  car.

14    Now, the body-worn camera -- I mean, sorry, the dash

01:38:03  15  camera of Officer Hartmann depicts the entire conversation

16  where at first Sylyna is asked:  Are there any guns in the

17  car?

18    And she says:  No.

19    And they said:  Swear to it, swear that there's no

01:38:19  20  guns in the car.

21    She says:  No.

22    And it's only after she's being treated the way the

23  video shows she's being treated, that -- does she then say the

24  driver has a gun.  That's the relevance.

01:38:36  25    THE COURT:  Okay.  And so what's the government's

1    response?

2          MR. ZENNER:  The government's primary problem is that

3    this video, to the extent it was going to be introduced,

4    should have been introduced when Officer Hartmann was here on

01:38:52    5    the stand and able to respond to and potentially in rebuttal

6    answer questions about this interaction.

7          My concern is that, and it sounds like Mr. Kutnick

8    agrees, that part of the purpose here is to make Officer

9    Hartmann look bad or as if he treated Ms. Ficarella poorly,

01:39:14    10   and he's not here to respond to that.

11         The government would -- is willing to stipulate that

12   Officer Hartmann asked her about a gun.  I think that's part

13   of what Mr. Kutnick wants to accomplish through this is that

14   she had previously been asked about a gun.

01:39:31    15         We have no problem stipulating to that fact, but to

16   the extent there's going to be an effort here to depict

17   Officer Hartmann's actions in a certain light and he's not

18   here to answer rebuttal questions explaining his actions, I

19   don't think that's fair.

01:39:53    20         THE COURT:  I mean, I think it would be preferable --

21   I mean, even just -- well, maybe you will stipulate that this

22   is his dash cam, but also I think if there are questions about

23   what was going on on it, it would be -- it would be good for

24   him to be here.

01:40:09    25         I don't know whether there are other officers also

1  captured on that same dash cam.  If so, I would say they need
2  to be here.
3       I just -- because we've already had officers
4  discussing other videos, it's odd to have the one video
5  without the ability to have, you know, questions to the
6  officers about it.
7       So I guess in light of that, do you -- do you -- I
8  mean, how should we proceed?
9       Should we -- should we bring the officers back to go
10 through it?
11      MR. KUTNICK:  Can I have one second to talk to
12 counsel?
13      THE COURT:  Sure.
14    (Counsel conferring.)
15      MR. KUTNICK:  Judge, I'm sorry, one more moment,
16 please.
17      THE COURT:  No.  No problem at all.
18    (Counsel conferring.)
19      MR. ZENNER:  I think we're going to withdraw our
20 objection to playing the video, partially for the sake of
21 hopefully being able to complete this today, and we will
22 stipulate to the foundation for the video.
23      This video is from Officer Hartmann's body -- excuse
24 me -- dash cam, and I think we're going to play about
25 2 minutes of the video or less.

1        THE COURT:  Okay.

2        MR. KUTNICK:  That's correct.  With thanks to the

3   government, that's correct.

4        THE COURT:  Okay.

01:46:09    5        MR. KUTNICK:  So I guess technically, your Honor,

6   this will be my case-in-chief.

7        THE COURT:  Okay.

8        MR. ZENNER:  This video was not submitted as part of

9   the briefing in this case previously, although it was

01:46:26    10   obviously produced in discovery, so I think Mr. Kutnick will

11   have to produce this to the Court after this hearing.

12        MR. KUTNICK:  And I will do so as an exhibit, your

13   Honor.

14        THE COURT:  Okay, great.  Thanks.

01:46:37    15        If you could please use the digital exhibit website

16   if that's feasible, that would be helpful.  It's just a way to

17   put it on the docket, as opposed to having a separate CD or

18   flash drive.

19        MR. KUTNICK:  I will do that, your Honor.

01:46:54    20        THE COURT:  Okay.  Great.

21        MR. KUTNICK:  So, your Honor, as counsel stated, this

22   is a portion of Officer Hartmann's dash cam video.  The

23   government has stipulated to the foundation, and I'm going to

24   begin playing it at 22:01, and I'm going to play it for about

01:47:11    25   2 minutes.

1    THE COURT:  Okay.

2        (Video played.)

3        MR. KUTNICK:  I'm stopping it at 23:08.

4        THE DEFENDANT:  Yes.

01:48:28    5        MR. KUTNICK:  That's all, your Honor.

6        THE COURT:  Okay.  Is -- so this is from Hartmann's

7    car?

8        MR. KUTNICK:  Correct.

9        THE COURT:  And where is the conversation?  Is it,

01:48:38   10    like, you can see down by the stop sign?

11        MR. KUTNICK:  Correct.

12        THE COURT:  How is the video able to pick up audio

13    from that distance?  The recorder is on the police?

14        MR. ZENNER:  That's why Hartmann's voice is so clear.

01:48:51   15        MR. KUTNICK:  The mic is on their body, correct.

16        THE COURT:  Okay.  Even though the camera is on the

17    car.

18        MR. ZENNER:  Correct.

19        THE COURT:  Okay.

01:49:00   20        MR. KUTNICK:  With that --

21        THE COURT:  Also, what -- I mean, are you able to

22    stipulate to who was talking -- obviously, it was Sylyna, but

23    then was the police officer on there, was it --

24        MR. ZENNER:  It was Officer Hartmann.  We'll

01:49:15   25    stipulate to that.

1          THE COURT:  Okay.

2          MR. ZENNER:  And just to connect the dots for your

3   Honor, the person seen walking up towards Hartmann at the end

4   is Warniczek, who then has the conversation with

01:49:32   5   Ms. Ficarella.

6          THE COURT:  Okay.

7          MR. ZENNER:  That we've seen a couple times.

8          THE COURT:  Right, okay.

9          MR. KUTNICK:  With that, we would rest.

01:49:44  10          THE COURT:  All right.  Any rebuttal?

11          MR. ZENNER:  No.  I think your Honor's already seen

12   the video that shows everything that happened next.

13          THE COURT:  Okay.  So I know we talked about having

14   closing arguments.  Would you like to do that?

01:50:04  15          MR. KUTNICK:  I'm ready.

16          MR. ZENNER:  Yeah, I'm ready -- I'll keep it brief.

17          THE COURT:  Okay.

18          MR. ZENNER:  I guess the government will go first.

19          MR. KUTNICK:  Yes, and I'll just reserve for rebuttal

01:50:15  20   argument.  Thank you.

21          THE COURT:  Okay.

22          MR. ZENNER:  Are you ready, your Honor?

23          THE COURT:  Yes, whenever you're ready.

24     CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT BY MR. ZENNER

01:50:18  25          MR. ZENNER:  So, your Honor, as you know, the touch

closing - government

128

1    stone of the Fourth Amendment is that it requires that

2    officers take reasonable steps when investigating criminal

3    activity.  The testimony and evidence that you heard today

4    shows that every single action that the officers took on

01:50:33    5    October 10th, 2021, was reasonably taken to investigate

6    legitimate and rational suspicion of criminal activity.

7        I want to briefly summarize the evidence that you

8    heard today just step-by-step because I think it highlights

9    how reasonable the officers' actions were.

01:50:50    10    First, you heard about how they got a credible report

11    of retail theft.  They responded.  They talked to the

12    employee.  He identified Ms. Ficarella.  When they ran her

13    name, they learned that she had recent retail thefts that were

14    almost identical to this one.  They also learned that Walker

01:51:08    15    and Taylor's names were mentioned in those police reports, and

16    Walker was arrested with her.

17        They learned that a vehicle, a Volkswagen Jetta, had

18    been used in those incidents.  They looked around the parking

19    lot, and they saw the Jetta.  That's good police work.  That's

01:51:25    20    attentive police work.

21        At that point, the officers already had reasonable

22    suspicion to conduct a *Terry* stop on the Jetta.  They knew

23    Ficarella had been observed by a loss prevention employee

24    committing retail theft or appearing to commit retail theft.

01:51:41    25    They knew there had been previous similar crimes committed by

1    Ficarella involving that vehicle.

2            So they had reasonable suspicion at that time, but

3    even though they did, their initial interaction, which you saw

4    on camera a few times, was completely consensual.  At one

5    point, they even said that the occupants of the car would be

6    able to leave.

7            They simply walked up to a parked car, and the

8    Seventh Circuit has said in these circumstances, that's not a

9    stop when the car is parked and a consensual conversation

10   ensues, and asked a few basic questions:  What's your name?

11   Are you Percy Walker?  What are you doing here?  They didn't

12   draw their weapons, they didn't use forceful language, they

13   didn't touch the men in any way, they didn't surround the car.

14           And the Seventh Circuit has held that that's not a

15   stop.  If it had been a stop, they had reasonable suspicion,

16   but the government's position is that that is not a stop at

17   that point.

18           Now, as they continued to question Mr. Taylor and

19   Mr. Walker and Mr. Taylor and Mr. Walker responded evasively,

20   suspiciously, eventually this did mature into a *Terry* stop.

21   At one point, Officer Guzman told them that they were not

22   allowed to leave until they finished investigating.

23           But at that time, officers had very good reason to

24   conduct a *Terry* stop.  They'd received a credible report of a

25   crime.  The suspect, Ms. Ficarella, had acted very

1  suspiciously.  She acted as if she was tipped off.  They found

2  prior reports of similar crimes.  They identified a vehicle

3  and two people that were involved in those crimes, and then

4  they found those people in that car.

01:53:21

5  Those two people, Taylor and Walker, acted evasively.

6  And when I say act evasively, you know, the first thing out of

7  the officers' mouth is which one of you is Percy Walker, and

8  Percy Walker said who's that, and spent a minute or two acting

9  as if he had no idea who Percy Walker was.  That's suspicious.

01:53:42

10  And Mr. Taylor, meanwhile, with the keys in the ignition, was

11  feigning sleep.

12  That added to their reasonable suspicion.

13  So based on that, on these facts, at that time,

14  officers had a particularized and objective basis to conduct a

01:53:57

15  stop.  And their next steps in the investigation they

16  conducted was not unnecessarily lengthy.  They were asking

17  exact to the questions that you would want any good police

18  officer to ask.

19  They're trying to figure out who's who, what people

01:54:14

20  are doing there, trying to make sure everyone's safe and a

21  crime is not being committed.

22  From the moment Guzman said that Walker was not free

23  to leave until Hartmann observed the gun was four minutes.  It

24  was a four-minute *Terry* stop.  That's an appropriately limited

01:54:29

25  time period for the officers to investigate, and during that

1   time, they were taking, as I said, all the steps you'd expect

2   them to take, running their names through the databases,

3   trying to figure out if they had active warrants.

4              And when Officer Hartmann and Officer Guzman observed

01:54:43    5   that gun, they then had reasonable suspicion, of course, to

6   order Taylor out of the car and to frisk him and try and

7   retrieve that gun.

8              Indeed, as we said in our brief, during any *Terry*

9   stop, officers can order an occupant from the vehicle and

01:54:59    10  conduct a frisk if they believe that he might have a gun.  And

11  here, Taylor had been acting suspiciously.  They had seen the

12  gun.  It makes total sense that they would order him out of

13  the car and frisk him.

14             I want to talk briefly for a moment about the fact

01:55:13    15  that the officers' observation was not captured on body-worn

16  camera.  This does not undercut reasonable suspicion.  Officer

17  observations are regularly not captured on camera.  It's often

18  an officer sitting in a car, he turns, he sees something on

19  the street that's not captured on his camera.  That doesn't

01:55:32    20  mean that it's untrue.

21             And as you heard today, the officers were very, very

22  credible, and every single fact corroborates their

23  observation.  You heard Officer Warniczek's body camera in

24  which you hear Hartmann make the statement over the radio

01:55:46    25  about thinking he sees a gun in real time.  It's not something

1    that he made up after the fact.  In real time, he's saying I

2    think I saw a gun.

3           You heard Officer Guzman also observed the gun from

4    the same vantage point.  And, of course, you heard that Taylor

01:56:02    5    quickly fled and dropped the gun from his waistband and that

6    that dropping of the gun was observed by both officers.

7           All of this corroborates their observation and shows

8    that they were credible in their testimony today.

9           The fact that officers, after observing the gun, drew

01:56:18    10   their weapons and ordered Taylor from the car doesn't

11   transform the interaction immediately to an arrest, as the

12   Seventh Circuit has held that a *Terry* stop can include such

13   actions as ordering someone with guns drawn from the car to

14   conduct a frisk.

01:56:35    15          Taylor had a loaded gun at that point.  He was

16   rightly considered by the officers to be dangerous, and it was

17   reasonable of them to order him from the car.

18          Even if it was an arrest or an attempted arrest, it

19   never matured into an arrest because Taylor never submitted to

01:56:50    20   the officers' authority.  Taylor fled as soon as he exited the

21   car.  The officers never laid hands on him, so this did not

22   become an arrest until after the officers chased Taylor, saw

23   him drop a gun, and eventually tackled him against the fence.

24          And at that point, officers had probable cause to

01:57:07    25   arrest.  I've already listed all the facts leading up to their

1  observation of the gun, but at that point, they'd seen him

2  with a gun in his waistband, he had gotten out of the car and

3  immediately fled and dropped the gun, and minutes later, he

4  refused to provide a FOID card when asked.

01:57:21  5  So officers at that point had probable cause to

6  arrest Taylor, and his arrest can't be quashed based on those

7  facts.

8  The gun also can't be suppressed because they had

9  probable cause to arrest, and all their actions were

01:57:33  10  reasonable.  And even if some of their actions weren't

11  reasonable, the gun still cannot be suppressed because

12  Mr. Taylor abandoned the gun, and the Seventh Circuit has

13  clearly held that once you toss a weapon or other contraband,

14  you abandon your privacy interest in that object.

01:57:50  15  So in sum, every single action the officers took here

16  was reasonable.  This was good police work from start to

17  finish, and they took sensible steps to investigate a reported

18  crime, and ultimately they observed and recovered a firearm

19  from the defendant that he had abandoned.

01:58:06  20  The Court should deny defense's motion.

21  THE COURT:  Okay.  Thank you.

22  From the defense.

23  CLOSING ARGUMENT ON BEHALF OF DEFENDANT BY MR. KUTNICK

24  MR. KUTNICK:  Your Honor, what starts out as perhaps

01:58:18  25  reasonable police work very quickly escalated out of control

closing - defendant

134

1    to unreasonable police work.

2         The officers arrived at the scene.  They received

3    information from the loss prevention officer.  They

4    investigated based on the information that they had received.

01:58:35    5    Their investigation revealed that the crime of retail theft

6    had not occurred.

7         Their investigation further revealed that there were

8    no trespass orders on Sylyna.  They did not receive any

9    information about any trespass orders from the loss prevention

01:58:52    10   officer himself, and they did not receive any trespass orders

11   when they called her name in to the police station.

12        So then they received this police report.  At that

13   point, there is no connection between Sylyna and the car,

14   none, and I submit to the Court that their continuing their

01:59:23    15   investigation against Sylyna after they had already determined

16   that no crime had been committed was unreasonable.

17        Then, just because they received a police report that

18   a car matching that description was in that lot from a crime

19   that occurred four months earlier does not give them the right

01:59:46    20   to seize that car and to stop that car.  And that is, in fact,

21   what they did.

22        The officers can call it whatever they want, but when

23   two officers come and approach a vehicle that you're sitting

24   in, that the people are sitting in with lights shining in and

02:00:04    25   questions being asked, a reasonable person would not feel free

1    to leave.

2         And that's what happened here.  You have two men

3    sitting in a car.  Charles Taylor is actually either resting

4    his eyes or sleeping.  Percy Walker, at first reluctant to

02:00:23    5    answer any questions, then openly gives his identity and says

6    who he is.

7         Charles Taylor, when asked for his identification,

8    provides it, is cooperating, no furtive movements, no attempt

9    to hide anything, nothing of that nature.

02:00:43    10        It's now that Officer Warniczek goes back to his car,

11   runs their names, and this is when things start getting more

12   out of control.

13        Warniczek, as it shows -- I'm sorry, Hartmann, as it

14   shows in the video that we introduced in our case, initially

02:01:09    15   asks Sylyna:  Are there any guns in the car?  No.  Are there

16   any guns in the car?  No.  Do you swear there are no guns in

17   the car?  Yes.

18        And mind you, your Honor, at this point, she is in

19   handcuffs.  She is on her knees surrounded by at least one

02:01:29    20   police officer over her and another one approaching her,

21   saying arrest her, arrest her.  For what?

22        So it's after that coercive conduct on the part of

23   the officers that she then says the driver has a gun.

24        So at the same time seemingly, Guzman, who had not

02:01:56    25   seen a gun before, even when he was in a position to have seen

closing - defendant

1  the gun, now gets an indication from Hartmann he might have a

2  gun.

3  　　　　Now, your Honor, this is where I want to talk a

4  little bit about the body-worn camera and the fact that it's

02:02:15  5  not here.

6  　　　　It goes to their credibility, your Honor.  If the one

7  fact that would give them reasonable suspicion or probable

8  cause is the viewing of the part of the weapon, then that is

9  not captured on any camera anywhere, even though so many other

02:02:34  10  parts are.

11  　　　　Your Honor, even the recovery is captured on camera

12  after the incident.  So why is it that the camera -- the video

13  is just not here for us to view that would have corroborated

14  that they actually saw a part of a gun?

02:02:52  15  　　　　And I just wanted to note that the officer never

16  asked the defendant whether or not he had a FOID prior to

17  asking him exiting the vehicle.

18  　　　　The ordering -- I argue that they were seized -- the

19  occupants of the vehicle were seized at the time that the

02:03:08  20  officers, for lack of a better term -- well, I'll just be

21  specific -- were on each side of the car.  If they saw a gun

22  at that point, knowing that it's legal for many people to

23  carry a gun, then they could have asked, hey, do you have a

24  FOID before ordering him out of the car.  But they didn't do

02:03:32  25  that, and that actually backs up the fact that they did not

1    see the gun until it's dropped.

2         So the ordering out of the car is the additional

3    seizure.  And it's based on that seizure that then Taylor

4    runs, and then the allegation is that he drops and then that's

02:03:55    5    the gun that they intend to use against him.

6         Your Honor, everything should have stopped after they

7    determined that Sylyna had not committed a crime.  Everybody

8    would have gone home.  Nobody -- and it would not have

9    escalated to a point of a violation of Mr. Taylor's Fourth

02:04:18    10    Amendment rights.

11         We ask you to find that the officers' conduct in this

12    matter was not reasonable, that they did act in violation of

13    the Fourth Amendment, and we ask you to suppress the weapon.

14         THE COURT:  Okay.  Thanks, everyone.

02:04:44    15         Just bear with me one second.  I'm just trying to --

16    I just need one second to determine next steps.

17       (Pause.)

18         THE COURT:  Okay.  So I think what I would like to do

19    is just -- I would like to set another time to rule on this.

02:08:21    20    I was just trying to determine whether I could rule now or

21    whether I need a little bit of time, and I think it would be a

22    little -- it would be helpful to have a little bit of time.

23         I could set a ruling relatively soon.  I could do

24    it -- I'll need to do it on a Friday because I'm in trial

02:08:47    25    Monday through Thursday for the next stretch here, so -- and

1    next Friday is a federal holiday, so I would say the earliest

2    I could do it would be November 17th.  We could hold that in

3    person or over the telephone, and it will just be to give you

4    a ruling on the motion.

5              MR. KUTNICK:  We'd like it in person, please, your

6    Honor, if that's possible.

7              THE COURT:  That works fine.

8              On the 17th, which is the Friday after next Friday,

9    I'm just looking to see --

10             MR. ZENNER:  Is the morning possible, your Honor?

11             THE COURT:  It is possible.  I'm just looking to see

12   when that morning.  So I do have some other hearings that day,

13   but I could do it --

14             MR. KUTNICK:  Not to interrupt, I'm sorry, your

15   Honor, but I am in the building -- I have a status at 12:30 in

16   another courtroom, so somewhere around that time would be

17   helpful to me.

18             THE COURT:  Okay.

19             MR. ZENNER:  If it's possible before, I just know I

20   have a conflict in the afternoon that day.

21             THE COURT:  Okay.  So ideally later in the morning?

22             MR. KUTNICK:  Or first thing.  Either one.

23             THE COURT:  Okay.  So I could either do it -- right

24   now, I have some statuses at 9:00 and 9:30, but those will be

25   fast.  So I could do it sometime in that range, kind of in

02:09:12

02:09:26

02:09:39

02:09:54

02:10:17

1  between the statuses, or I could do it -- it looks like I have

2  a preliminary revocation hearing at 11:15.  That may go some

3  time, and so I have an 11:00 a.m. status, but I could do it

4  before the 11:00 a.m.

02:10:45  5  MR. ZENNER:  If possible, the government would prefer

6  the earlier time.

7  THE COURT:  The earlier?

8  MR. ZENNER:  Yes.

9  THE COURT:  Okay.  I mean, I could also do it at,

02:10:54  10  like, 8:30, but I think the problem there is that the marshals

11  typically do not -- it is not feasible to start before -- let

12  me ask what time, is it 9:00 or 9:30?

13  THE CLERK:  9:00.

14  THE COURT:  9:00?

02:11:08  15  Okay.  So why don't we -- I do have another status at

16  9:00, but I could just set this -- that one I think should be

17  quite short, and it's just by telephone at 9:00.  So if I just

18  set this also at 9:00, then I could just deal with the

19  telephone status quickly and then move on to this.

02:11:30  20  MR. ZENNER:  That works for the government.  Thank

21  you, your Honor.

22  THE COURT:  Does that work?

23  MR. KUTNICK:  9:00?

24  THE COURT:  Yeah.

02:11:34  25  MR. KUTNICK:  I'll make it.  I'll come here twice,

1    but that's fine.  I'm happy to, Judge.

2         THE COURT:  Okay.  Thank you very much for

3    accommodating.

4         So that's 9:00 a.m. on November 17th for an in-person

02:11:46   5    ruling on the motion to suppress.

6         Let me just check.  Okay, is there anything else we

7    should address?

8         MR. ZENNER:  We would just move to exclude time until

9    that date, your Honor.

02:12:09  10         MR. KUTNICK:  Without objection.

11         THE COURT:  Okay.  Sorry, just one second.

12         Okay.  So I am going to grant the motion to exclude

13   time through the next hearing, which is the ruling on the

14   motion to suppress.  That hearing is on November 17th, 2023,

02:12:52  15   so I'm excluding time through November 17, 2023, under 18

16   U.S.C. 3161(h)(7) to serve the ends of justice without

17   objection.  Excluding time will allow the parties the

18   reasonable time necessary for effective preparation, which

19   includes time for the parties to consult with their respective

02:13:12  20   clients, time to review discovery materials, and it also

21   includes time for me to complete the ruling on the motion to

22   suppress.  That delay outweighs the interests of the public

23   and the defendant in a speedy trial.

24         Time is also excluded through the date that the

02:13:32  25   motion to suppress has been adjudicated under 18 U.S.C. 3161

1    (h)(1)(D), and that also I'm planning to do on November 17,

2    2023.

3            Okay.  So anything else we should address at this

4    point?

5            MR. ZENNER:  Nothing from the government.  Thank you,

6    your Honor.

7            MR. KUTNICK:  Nothing from defense.

8            THE COURT:  All right, thank you, everyone.

9       (Which were all the proceedings heard.)

10                         CERTIFICATE

11      I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13   */s/Kathleen M. Fennell*              *December 3, 2023*

14   _____        _____
     Kathleen M. Fennell                Date
     Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

02:13:47

1

I N D E X

2
PAGE
OPENING STATEMENT

3

4

By Mr. Schied                                          4
By Mr. Kutnick                                         8

5

ARTUR WARNICZEK

6

7

Direct Examination By Mr. Zenner                      10
Cross-Examination  By Mr. Kutnick                     29
Redirect Examination By Mr. Zenner                    54
Recross Examination By Mr. Kutnick                    55

8

RYAN HARTMANN

9

10

Direct Examination By Mr. Schied                      56
Cross-Examination By Mr. Kutnick                      71

11

RIGOBERTO GUZMAN

12

Direct Examination By Mr. Zenner                      88
Cross-Examination By Mr. Kutnick                     104

13

CLOSING ARGUMENT

14

15

By Mr. Zenner                                        127
By Mr. Kutnick                                       133

16

INDEX TO EXHIBITS

17

18

GOVERNMENT EXHIBIT                               RECEIVED

19

20

Exhibit B                                            13
Exhibit D                                            28
Exhibit C                                            70

21

DEFENDANT'S EXHIBIT                             RECEIVED

22

23

24

25