```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3    UNITED STATES OF AMERICA,          )
                                         )
 4                     Plaintiff,        )  Case No. 22 CR 158
                                         )
      -vs-                               )
 5                                       )  Chicago, Illinois
      CHARLES TAYLOR,                    )  November 17, 2023
 6                                       )  9:06 a.m.
                       Defendant.        )
 7
                  TRANSCRIPT OF PROCEEDINGS - RULING
 8            BEFORE THE HONORABLE MARTHA M. PACOLD

 9    APPEARANCES:

10    For the Plaintiff:     MR. ELIE THOMAS ZENNER
                             Assistant U.S. Attorneys
11                           219 S. Dearborn St.
                             Chicago, IL 60604
12                           (312) 697-4032
                             Elie.Zenner@usdoj.gov
13
      For the Defendant:     MR. JOSHUA BATEMAN KUTNICK
14                           Joshua B. Kutnick, Attorney at Law
                             900 W. Jackson Blvd, Suite 7E
15                           Chicago, IL 60607
                             (312)441-0211
16                           jkutnick@gmail.com

17    Court Reporter:

18              KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                       Official Court Reporter
19                   United States District Court
                219 South Dearborn Street, Suite 2328A
20                      Chicago, Illinois  60604
                    Telephone:  (312) 435-5569
21              Kathleen_Fennell@ilnd.uscourts.gov

22           * * * * * * * * * * * * * * * * *

23        PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
              TRANSCRIPT PRODUCED WITH A COMPUTER

24

25
```

1    (Proceedings heard in open court:)

2         THE CLERK:  22 CR 158, United States versus Charles

3    Taylor.  If you can state your name for the record, we'll

4    start with government counsel.

09:06:25    5         MR. ZENNER:  Good morning.  Elie Zenner on behalf of

6    the United States.

7         MR. KUTNICK:  Good morning, your Honor.  Joshua

8    Kutnick on behalf of Charles Taylor who's present here in

9    custody.

09:06:34    10         THE DEFENDANT:  Good morning, your Honor.

11         THE COURT:  Good morning, everyone.

12         We're here for a ruling on the defendant's motion to

13    quash arrest and suppress evidence, which is docket 52.  If

14    you'll just bear with me one second.

09:06:52    15         And before I turn to the ruling, obviously we had the

16    evidentiary hearing on this motion last week and I am prepared

17    to give the ruling, but does anyone have any other comments or

18    updates or anything that you'd like to say before I just turn

19    to the ruling?

09:07:19    20         MR. ZENNER:  Nothing from the government, your Honor.

21         MR. KUTNICK:  Nothing from the defense, your Honor.

22         THE COURT:  Okay.  It will take me a few minutes to

23    walk through this because I'm going to -- in the interests of

24    time, I can get you a ruling faster in a format where I just

09:07:39    25    give the ruling from the bench, as opposed to a written ruling

1     with the reasoning in the written order.  So I am going to do

2     a ruling from the bench, but that means that I am going to

3     give all my reasoning on the record here, which also means

4     that it's going to take some time.  So if you'd like to have a

09:07:58    5     seat, feel free to do that.

6           I don't think it will take too terribly long, but

7     it's going to take just a little bit of time to walk through

8     the ruling and the reasoning.

9           Also, just in terms of clarification, as I said, I'm

09:08:18   10     going to give the ruling and the reasoning here from the

11     bench.  I'll follow up with a minute entry that just gives the

12     bottom line, but I am not going to do a written order with all

13     the reasoning, but, again, I am going to give all the

14     reasoning here today on the record.

09:08:35   15           Okay.  So I am going to -- just to give the bottom

16     line up front, I am going to deny the motion and for the

17     reasons I'll explain.  I've concluded that the police officers

18     had reasonable suspicion of criminal activity justifying their

19     investigative *Terry* stop and they had probable cause to arrest

09:09:01   20     the defendant.

21           Beginning with the legal standards, the Fourth

22     Amendment protects individuals from unreasonable searches and

23     seizures.  And then there's a couple different legal standards

24     that are relevant here.  One is the legal standard for a

09:09:26   25     motion to quash.

1          In general, "when police conduct an unreasonable
2    search or seizure, the exclusionary rule usually vindicates
3    the Fourth Amendment's protections by kicking out the
4    unlawfully obtained evidence." *United States v. Slone*, 636
5    F.3d 845, 848 (7th Cir. 2011).  "Evidence which is obtained as
6    a result of an illegal arrest is fruit of the poisonous tree
7    and it must be excluded unless the government can show that it
8    was obtained as a result not of the illegality, but rather by
9    means sufficiently distinguishable to be purged of the primary
10   taint." *Id.,* and I'm going to omit the citation and internal
11   quotation marks.
12          So that's the legal standard for a motion to quash.
13   There's a separate legal standard for a valid investigatory
14   stop, and let me just walk through that standard now.
15          The Fourth Amendment permits an officer to initiate a
16   brief investigative stop when the officer has a particularized
17   and objective basis for suspecting the particular person
18   stopped of criminal activity.  *Kansas v. Glover*, 140 S. Ct.
19   1183, 1187 (2020).
20          The question of reasonable suspicion is assessed
21   based on the totality of the circumstances.  *Navarette v.*
22   *California*, 572 U.S. 393, 397 (2014).
23          Although a mere hunch does not create reasonable
24   suspicion, the level of suspicion the standard requires is
25   considerably less than proof of wrongdoing by a preponderance

1   of the evidence, and obviously less than is necessary for

2   probable cause.  *Id.*

3        Turning to the application of those standards here,

4   my first conclusion is that the officers conducted a valid

5   *Terry* stop.  The officers had reasonable suspicion to justify

6   their brief investigation of Taylor.  Under *United States v.*

7   *Ruiz*, 785 F.3d 1134 (7th Cir. 2015), the officers initiating

8   the investigatory stop must be able to point to specific and

9   articulable facts which, taken together with rational

10  inferences from those facts, suggests criminal activity.

11  Again, that's from *Ruiz* at 1141, 785 F.3d at 1141.

12       Here the officers reported to the scene after a

13  Mariano's loss prevention employee called the police reporting

14  his suspicion that a particular woman in the store was

15  stealing liquor.

16       The woman emerged from the store, and upon seeing the

17  officers, she acted suspiciously, immediately asking if the

18  officers wanted to search her belongings and preparing to show

19  them her receipt.

20       Then the woman, Sylyna Ficarella, provided her name

21  to officers.  After running her name through databases, first

22  over the radio and then in Officer Warniczek's squad car, the

23  officers learned that Ficarella had a previous shoplifting

24  arrest from the same location involving an individual named

25  Percy Walker and a black Volkswagen Jetta.  The defendant,

1   Charles Taylor, was also mentioned in the police report for

2   that incident, though Taylor was not arrested as part of that

3   incident.

4          Shortly after running Ficarella's name through

09:13:12   5   databases and learning about the prior incident, the officers

6   saw a black Jetta car in the Mariano's parking lot which bore

7   the same license plate as the black Jetta involved in

8   Ficarella's prior arrest.

9          The Jetta, which was parked in the Mariano's lot with

09:13:33   10  its engine running, contained two men.  Those men were later

11  identified to be Taylor and Percy Walker.

12         At the time the officers approached the vehicle,

13  Officer Warniczek asked the men which one was Percy Walker.

14  The man in the passenger's seat, who in fact was Percy Walker,

09:13:51   15  initially pretended not to recognize the name.  Taylor,

16  meanwhile, was sitting in the driver's seat apparently

17  pretending to be asleep.  Taylor continued to sit still with

18  his eyes closed even as the officers shined their flashlights

19  directly into the car and carried on a loud conversation with

09:14:09   20  Walker.

21         This suspicious behavior, taken together with the

22  prior arrest report describing a crime almost identical to the

23  one the Mariano's employee alleged Ficarella was attempting to

24  commit, provided the officers with reasonable suspicion that

09:14:27   25  the men in the vehicle may have been attempting to shoplift.

1       Next, the *Terry* stop was not prolonged beyond the

2  point where the officers' reasonable suspicion dissipated.

3       Even assuming the police officers' interaction with

4  defendant and Walker constituted a stop for Fourth Amendment

09:14:47   5  purposes as soon as the police approached, as opposed to

6  beginning as a voluntary interaction, it was less than five

7  minutes from the time that the officers approached the vehicle

8  until the point that defendant disobeyed police orders and

9  fled on foot.  See docket 58-2, which is body-worn camera

09:15:14  10  footage at 21 minutes 52 seconds to 25 minutes and 2 seconds.

11       During that brief period, the officers were asking

12  basic questions about Taylor's and Walker's identities, their

13  reasons for being in the parking lot, their relationship to

14  Ficarella, and their sobriety.

09:15:35  15       The questions as to their sobriety were particularly

16  relevant to Taylor, who appeared to be in an exceptionally

17  deep, and likely feigned, slumber despite sitting in the

18  driver's seat of a running car.

19       Additionally, the officers spent those few minutes

09:15:53  20  running Walker's and Taylor's names through databases to check

21  for warrants or relevant trespass notices.

22       These actions were reasonable and appropriate means

23  of investigating that were likely to confirm or dispel

24  officers' suspicions of criminal activity.  *United States v.*

09:16:10  25  *Adamson*, 441 F.3d 513, 521 (7th Cir. 2006); *see also United*

1  *States v. Govan*, 365 F. App'x 693, 697 (7th Cir. 2010).

2          The officers' stop permissibly continued while they

3  took these steps to investigate their reasonable suspicions.

4          And so for all those reasons, the officers conducted

09:16:38  5  a valid *Terry* stop.

6          Next, the officers permissibly sought to frisk Taylor

7  after learning from Officer Hartmann's personal observation

8  and Officer Warniczek's report over the radio that Taylor

9  might have a gun.

09:17:00  10          And so let me now give some more detail on this last

11  point.

12          First of all, in terms of the legal standard, during

13  a *Terry* stop, officers may order a driver out of his vehicle

14  and then proceed to pat him down for weapons if the officer

09:17:19  15  reasonably concludes that the driver might be armed and

16  presently dangerous based on specific and articulable facts.

17  *Mwangangi v. Nielsen*, 48 F.3d 816, 824 (7th Cir. 2022), and

18  I'm omitting the internal quotations.

19          Additionally, officers are entitled to take

09:17:41  20  reasonable steps to ensure their own safety, and therefore may

21  order a detainee to exit a vehicle and may conduct a patdown

22  search of the detainee's outer clothing.  *United States v.*

23  *Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003).

24          The officers' choice to frisk Taylor was permissible

09:18:05  25  under this standard.  At the time Officers Hartmann and Guzman

1    ordered Taylor out of the car to frisk him, Officer Hartmann
2    had spotted what he believed to be a firearm in Taylor's
3    waistband and had informed Officer Guzman of this fact.

4            The officers testified credibly and consistently that
5    they were then able to see what appeared to be a part of a
6    firearm protruding from Taylor's waistband after the bottom of
7    his shirt had shifted up slightly to reveal Taylor's belt
8    line.

9            Additionally, Officer Hartmann testified that at
10   approximately the same time he spotted the firearm, he heard
11   Officer Warniczek issue a warning over the radio that Taylor
12   might have a firearm.

13           Officer Warniczek made this report after Ficarella,
14   in an obvious state of fear and distress, informed him that
15   Taylor had a gun and that she was afraid Taylor would hurt or
16   kill her.

17           Here, Ficarella's report undoubtedly allowed the
18   officers to conclude based on specific and articulable facts,
19   see *Mwangangi,* 48 F.4th at 824, that Taylor might be armed and
20   presently dangerous.

21           At this time, the officers had specific and
22   articulable reasons to believe that Taylor had a firearm on
23   his person, and nothing suggested that the firearm was not
24   loaded or was otherwise inoperable.

25           In sum, at the time Officers Hartmann and Guzman

ordered Taylor out of the car to frisk him, they reasonably suspected Taylor of criminal activity, had observed Taylor's and Walker's abnormal, evasive behavior, had just been surprised to discovering what looked to be a firearm on Taylor's person that Taylor had not disclosed, and had just been warned over the radio that Taylor might have a firearm.

These specific and articulable facts supported the officers' reasonable conclusion that Taylor might be armed and presently dangerous. The officers' decision to frisk Taylor therefore did not violate the Fourth Amendment. *See Mwangangi* 48 F.4th at 824; *see also Hendricks*, 319 F.3d at 1004.

Turning to the next topic, probable cause had developed by the time the officers arrested Taylor.

Beginning with the legal standard, probable cause exists when a reasonable person, knowing all of the facts and circumstances known to the officer, would believe that the individual in question has committed or is committing a crime. *United States v. Cherry*, 920 F.3d, 1126, 1133 (7th Cir. 2019). Probable cause requires only that a probability or substantial chance of criminal activity exists. It does not require the existence of criminal activity to be more likely true than not true. *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011).

Because Taylor did not submit to the officers' authority, Taylor was not arrested at least until the time the

1    officers subdued him.  *United States v. Griffin*, 652 F.3d 793,

2    800 (7th Cir. 2011), which says that the seizure does not

3    occur until the suspect submits to the show of authority or

4    the pursuing officer resorts to force to stop the suspect's

09:21:38    5    flight.

6           At that time, based on the officers' encounter with

7    Taylor, the officers had probable cause to believe Taylor had

8    committed or was committing a crime.

9           As soon as Taylor stepped out of the car, and only a

09:21:51    10    few minutes after the officers first approached the car,

11    Taylor took off on foot in an attempt to escape from the

12    officers.

13          As Officers Hartmann and Guzman gave chase and while

14    they were close behind Taylor, both saw Taylor reach toward

09:22:05    15    his waistband and drop a metal object, which they believed to

16    be a firearm.

17          Officer Hartmann stayed with the object, which turned

18    out to be a pistol, while Officer Guzman maintained his

19    pursuit of Taylor.

09:22:17    20          After a brief chase, Officers Guzman and Warniczek

21    caught up to Taylor, subdued him, and handcuffed him.

22          In addition to the facts already known to the police

23    officers before Taylor stepped out of the car, Taylor's choice

24    to flee from the officers was highly suggestive of wrongdoing

09:22:34    25    and supported probable cause.  *Illinois v. Wardlow*, 528 U.S.

1　119, 124 (2000), which says, "Headlong flight, wherever it

2　occurs, is the consummate act of evasion:  It is not

3　necessarily indicative of wrongdoing, but it is certainly

4　suggestive of such."

09:22:54　5　　　　And *United States v. Wilson*, 963 F.3d 701, 704 (7th

6　Cir. 2020), which says, "Wilson's unprovoked headlong flight

7　from police in a high-crime area put any lingering doubt to

8　rest."

9　　　　And so on this -- to summarize this last point, the

09:23:15　10　officers' arrest of Taylor was supported by probable cause.

11　　　　And just to summarize and conclude overall, because

12　the officers' attempt to frisk Taylor and Taylor's subsequent

13　arrest were both lawful, there is no basis to suppress the

14　firearm, and the motion to quash arrest and suppress evidence,

09:23:40　15　which, again, is docket 52, is denied.

16　　　　Okay.  So that concludes the ruling on the motion.

17　Can we just discuss the schedule and how to proceed from here.

18　　　　MR. KUTNICK:  Your Honor, the defense intends to file

19　at least one motion additional, potentially two, and I would

09:24:13　20　ask for a status date in December for the allow -- to allow me

21　to file one or both of those motions.

22　　　　THE COURT:  Okay.  And any comments from the

23　government?

24　　　　MR. ZENNER:  No.  That makes sense to the government

09:24:36　25　as well.

1          THE COURT:  Okay.  Would you like to hold a status in
2     person, by telephone, or through a written report?

3          MR. KUTNICK:  I could do it by written report, your
4     Honor.

09:24:57     5          THE COURT:  Okay.  And, sorry, would you suggest that
6     we actually set a pretrial motions deadline for the same day
7     as a written report or --

8          MR. KUTNICK:  I would ask if the Court refrain from
9     setting that deadline now only because I have yet to make a
09:25:19    10     decision about filing both motions at the same time or one
11     subsequent to the other, so I'm still discussing that with
12     Mr. Taylor.

13          And I would just -- if you would just -- if the Court
14     would refrain from setting that deadline just yet, I think
09:25:35    15     that we'll be at a point to have all those in soon, and it is
16     possible for me to potentially have everything filed by
17     mid-December.

18          THE COURT:  Okay.  So when would make sense then
19     for -- I guess if we're now just talking about a status report
09:25:53    20     then, which is just for an update on the status of the case
21     and whether you're in a position to set a pretrial motions
22     deadline, when would make sense for --

23          MR. KUTNICK:  I was going to ask for December 15th,
24     please.

09:26:11    25          THE COURT:  Okay.  That works fine.  And, sorry, just

1    one second.

2         Okay.  So please do include, as in prior status

3    reports, please just include an update on the status of the

4    case and if you are requesting any further status hearing or

09:26:43    5    any other type of hearing or trial, please let me know that

6    and also please include a summary of the defense position on

7    the status of the case, including whether the defense intends

8    to file pretrial motions and objects to the exclusion of time

9    under the Speedy Trial Act.

09:27:04    10        And is there a motion to exclude time for this next

11   period of time through the next status report?

12        MR. ZENNER:  There is, your Honor.  To allow for

13   defense to consult with his client and consider additional

14   pretrial motions.

09:27:22    15        THE COURT:  Okay.  Any objection?

16        MR. KUTNICK:  No objection.

17        THE COURT:  Okay.  And also usually when we're

18   proceeding through a written report as opposed to a telephone

19   or in-person hearing, I'll exclude time a couple days past the

09:27:39    20   written report deadline just so I can see the report and

21   respond to it with a scheduling order.

22        So if the report is coming in on December 15th, I

23   would intend to exclude time through December 20th, which is

24   three business days after the report.  Any issue with that?

09:27:58    25        MR. KUTNICK:  No objection.

09:28:15

1    THE COURT:  Okay.  So I'll grant the motion to

2    exclude time, and I will exclude time through December 20,

3    2023 under 18 U.S.C. 3161(h)(7) to serve the ends of justice

4    without objection.  Excluding time will allow the parties the

5    reasonable time necessary for effective preparation, which

6    includes time to continue reviewing discovery materials and

7    time to consider and prepare pretrial motions and time for the

8    government to consult internally and time for the defense to

9    consult with the client, and that delay outweighs the

09:28:35

10   interests of the public and the defendant in a speedy trial.

11   And then finally, if at any point anyone would prefer

12   to hold a status hearing instead of or in addition to that

13   written report, please just let me know, and I can arrange

14   that pretty promptly.

09:28:53

15   Okay.  Is there anything else we should address at

16   this point?

17   MR. ZENNER:  Nothing from the government, your Honor.

18   MR. KUTNICK:  Not from the defense, your Honor.

19   Thank you, your Honor.

09:29:22

20   THE COURT:  Thank you everyone.

21   (Which were all the proceedings heard.)

CERTIFICATE

22

23   I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.
/s/Kathleen M. Fennell              December 3, 2023

24   _____          _____

25   Kathleen M. Fennell                        Date
Official Court Reporter