IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 22 CR 158 |
| v. | ) | |
| | ) | |
| CHARLES TAYLOR | ) | Judge Martha Pacold |
| | ) | |

**REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS THE
INDICTMENT OR ALTERNATIVELY, FOR A NEGATIVE INFERENCE
INSTRUCTION**

Defendant, Charles Taylor, by and through his attorney, Joshua B. Kutnick,
files this reply to government's response to Defendant's motion to dismiss the
indictment based on violations of *Arizona v. Youngblood* and *Brady v. Maryland*, or
in the alternative, for a negative inference instruction.

ARGUMENT

I.  **Defendant Should Prevail Under All Three Prongs of *Youngblood***

A. Bad Faith is Inferred because of the Officers' Subsequent Lack of Action in
Light of Departmental Policy and the Unlikelihood of Coincidence

The government cites *Unites States v. Cherry* to support that bad faith
"requires proof of an 'offical anumus' … and necessarily turns on an official's
subjective knowledge that the evidence in question had exculpatory value at the
time it was lost or destroyed." Gov.'s Resp. at 6 (citing *U.S. v. Cherry*, 920 F.3d
1126, 1140 (7th Cir. 2019)). The government relies on the officers' own testimony to
show that the officers did not act in bad faith. However, the officers' testimony is
not proof of lack of bad faith in and of itself but simply another factor this Court
must weigh together with other evidence in determining whether or not there was

bad faith.

Here, both Officer Hartmann and Officer Guzman failed to record the incident even though they both testified that they thought their cameras were recording. Bad faith can be inferred from circumstantial evidence. One important factor in assessing the credibility of the officers' testimony is to determine how (un)likely it was that both officers thought they turned on their cameras, but both cameras somehow failed to record at the same time. Especially when both officers' cameras were cleared for quality control just ten days prior to the incident, during the "60-day review." Gov. Resp. at 4.

The government argues that the officers likely did not report their cameras' failure to activate because they believed their cameras were working during the incident. However, this does not explain why the officers did not report that their body worn cameras malfunctioned after the event? There are no reports explaining why the BWCs malfunctioned during the incident. Per departmental policy, these reports are supposed to be submitted after police officers realize that the camera is not working.[1]

Defense counsel subpoenaed Officer Hartman and Guzman's interdepartmental memoranda and neither Officer Guzman nor Officer Hartman reported any problems with BWCs in writing of the materials immediately before or

---

[1] The policy specifically dictates that if the BWC is not recording during a citizen contact or event, the officer shall notify his/her immediate supervisor as soon as possible that the event was not recorded and include reasons why. The notification to the supervisor shall be in writing. Evergreen Park Police Department Policy 432 Manual at 452.5(i) (previously included as an exhibit with the defendant's motion).

after the event. Again, the only record provided by the police department regarding Officer Hartman's camera was from June 2019, a year and a half before this incident. Therefore, aside from Officer Hartmann's oral report during the arrest, and only after the gun was already on the ground, did he report that his BWC was not working there was no other explanation on the record as to why Officer Hartmann's or Officer Guzman's cameras were not working.

The government also claims that Officer Warniczek's camera, which was working and recording, corroborates the events as testified by Officers Hartman and Guzman. But Officer Warniczek's camera does not show the gun in the defendant's waist and therefore does not support their version of the events.

In addition, the government also argues that an officer, who is trying to cover up evidence in bad faith, would not self-report body camera malfunction over the radio. Gov.'s Resp. at 7. However, the government conveniently fails to point out when Officer Hartmann reported his camera was not working – when the arrest was already over, and the gun was on the ground, without any evidence as to how that gun came to be on the ground.

Finally, the government claims that the defendant failed to cite any cases in which failing to activate BWC constitutes a due-process violation. *Id*. The government further adds that the courts have consistently held that a mere policy violation does not constitute a due process violation. *Id*. This is correct, but it misstates the defendant's argument. The defendant argues that the existence of policies as well as any violation of such policies, taken together with other evidence,

3

was another factor in the balancing of the scales that ultimately tips the scale towards the inference that the police officers acted in bad faith. When considered together with the (un)likelihood that both, *not just one*, cameras malfunctioned at the same time; that both, *rather than just one*, officers thought he turned the camera on; that both, *rather than just one*, failed to file a written report about their BWCs after the incident as required by the policy, that both, *not just one*, cameras passed the quality control just ten days prior – the scales are tipped towards the inference of bad faith.

This is unlikely to be a coincidence. Courts look at the facts of each case to determine if the police acted in "good faith and in accord with their normal practice," *Youngblood*, 488 U.S. at 56 (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). While neither Evergreen Park Police Department BWC policies nor Illinois State Laws create binding obligations on this Court, they are relevant here to demonstrate bad faith.

### B. The Exculpatory Nature of the Evidence that the Police Failed to Preserve Was Apparent

The government's argument that the defendant offers only "speculative exculpatory value" fails in light of the evidence. Evidence lacks apparent exculpatory value when analysis of that evidence would have offered "simply an avenue of investigation that might have led in any number of directions." *Youngblood*, 488 U.S. at 57. The BWC footage that is missing here would not be simply "another avenue of investigation that might have led in various directions". The footage would have either corroborated Defendant's position or the Officers'.

4

Therefore, it could be either inculpatory or exculpatory and nothing else. Since the two officers failed to record (or lost what they recorded) and their version of the events is not corroborated by the only existing footage (Officer Warniczek's camera), coupled with the fact that one of the cameras miraculously started working only once the gun was already on the ground, the inference of the exculpatory value of the missing recordings is inescapable.

Defendant's position that he never possessed the gun during the incident is corroborated by Officer Warniczek's camera and the fact that both officers testified that during their initial questioning they did not observe the gun on the defendant. Gov.'s Resp. at 2. Additionally, the defendant's position that he never possessed a gun that day is further strengthened by the fact that the defendant asked Officer Hartmann if his camera was on, only moments after Officer Hartmann radioed his alleged suspicion that the defendant might have a gun. Gov.'s Resp. at 7. This indicates that the defendant suspected something nefarious was taking place – a potentially false accusation. Why else would the defendant insist on the camera being on?

The government's argument presupposes the honesty of the police officers and disregards how unlikely it was that two officers would have cameras that were malfunctioning at the same time and that it would be exactly those two officers who would witness the gun on the defendant and the alleged dropping of the gun.

*Youngblood* said that due process clause does not impose any "undifferentiated and absolute" duty to preserve everything that "might be of

conceivable evidentiary significance." 488 U.S. at 58. The constitutional duty "must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta,* 467 U.S. at 488. (1984). That is of key importance here. The BWC footage, had it been preserved, would play the most critical part of the defendant's defense. Its exculpatory nature is not simply speculative. The facts surrounding the incident all point to the officers' knowledge of the exculpatory nature of the footage: that the two cameras malfunctioned at the same time, that the presence of the gun was not corroborated by the footage of the one remaining camera, that Officer Hartmann's camera somehow miraculously started to record only once the gun was already on the floor (but not before), that the officers' failed to submit a written report about the cameras after the incident, and that the gun was not seen at first.

All the cases the government cites are easily distinguishable. In *U.S. v Sanders*, the officer's testimony was corroborated by the security video showing one of the officers finding the knife in the defendant's shoe (defendant was convicted of possessing a prohibited object in prison). 207 F. App'x 651, 654 (7th Cir. 2006) Unlike in that case, here there is no video that shows the gun anywhere on Taylor or in his actual or constructive possession. In another case the government cites, *Hubanks v. Franks*, the evidence was destroyed *pursuant to the departmental policy* fifteen months *after* the defendant plead guilty (emphasis added). 392 F.3d 926, 930 (7th Cir. 2004).

Here, the evidence was not collected or retained, or was destroyed in direct contradiction to the departmental policy.

C. Defendant Cannot Obtain the Evidence Elsewhere

Again, the government's argument rests on an assumption that the officers told the truth on cross-examination during the suppression hearing and that the defendant can obtain evidence through additional cross-examination of the Officers or Ficarella at trial. The defendant cannot obtain evidence that would be objective and unbiased. When Ficarella allegedly said the defendant had a gun, it is likely she wanted to offer the Officers something to detract the attention from her own shoplifting attempt. Therefore, the defendant cannot obtain the equivalent of the objective evidence that the BWC footage would contain, elsewhere.

Again, even here, all the cases the government cites are distinguishable. In *U.S. v. Caudle*, the camera in question did not go directly to questions of innocence but as to whether the traffic stop was justified. The defendant in *Caudle* could certainly have developed such evidence on cross, but that is irrelevant here because here the evidence goes directly to the question of guilt or innocence, rather than some collateral issue. Since it is already clear that the officers in this case would testify that the defendant had a gun, the only way for the defendant to disprove the officers' testimony is to have the BWC footage. Naturally, the defendant could testify himself, but he has a constitutional right not to do so. The defendant's ability to obtain evidence elsewhere should not go against his constitutional right not to

testify, if there is a remedy for the missing evidence – either through dismissal or through a negative inference.

## II.     In the Alternative, the Footage was Destroyed and the Defendant Satisfied all the Prongs of *Brady* Test

The government contends that the *Brady* test does not apply here as the footage was never recorded. Again, the government's argument relies on the testimony of the police officers. Alternatively to the footage not being recorded or preserved, the Defendant also contends that the footage was destroyed or otherwise suppressed.

*Brady v. Maryland* makes the good or bad faith of the government irrelevant when it fails to disclose material exculpatory evidence to the defendant. 48 U.S. 51, 58 (1988).  The fact that Officer Hartmann indicated, in his own words, that his camera was on, as well as the fact that the event log shows that it was reported to be off during the chase, but then somehow, all of a sudden, it worked again after the chase, implies that the camera was functioning or was deliberately turned off by the officer. It is certainly possible that it was fully functioning and that the footage was subsequently destroyed or suppressed. Under *Brady*, whether it was destroyed in bad faith or not is irrelevant.

All that the defendant needs to show is that the evidence is material and exculpatory and that the police failed to disclose it. That the evidence is material is unquestionable. It goes directly to the question of guilt or innocence. It is exculpatory for the same reasons already mentioned. Its exculpatory nature can be inferred by the officers' behavior and explanations after the event. Finally, despite

8

receiving subpoenas on several different occasions from the defendant, the police department failed to disclose the footage.

## III.    <u>Negative Inference is Warranted Here</u>

A negative inference is warranted here even if bad faith is not shown. As the government indicated there are no Seven Circuit cases applying the standard for a negative inference instruction. But the Ninth Circuit, for example, applies the balancing test. In *U.S. v. Sivilla*, the Ninth Circuit said that bad faith is the wrong legal standard for a remedial jury instruction and that the rule governing sanctions for destruction of evidence is "whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification." 714 F.3d 1168. 1173 (9th 2013) (citing *U.S. v. Loud Hawk*, 628 F.2d. 1139 (9th Cir. 1979)).

Here, like in *Sivilla*, the police acted if not in bad faith, then in "negligent[ly] failing to adhere to established and reasonable standards of care" but failing to preserve evidence not once but twice. It is precisely because, contrary to chance and unlikely random, two cameras by two different police officers malfunctioned at the same time, that at least negligence, if not bad faith, can be inferred. This deserves at least a negative inference instruction.

Finally, as stated before, according to at least one case in this district, "a negative inference is justified if the government destroyed or failed to preserve

'apparently exculpatory' evidence, even if the government did not act deliberately or knowingly." *U.S. v. West*, 790 F. Supp. 2d 673, 685 (N.D. Ill. 2011)

Thus, this Court should dismiss the charges against the defendant or in the alternative, allow a negative inference instruction as a sanction.

Respectfully submitted,

*/s/ Joshua B. Kutnick*
Attorney for Defendant

**Joshua B. Kutnick**
**Attorney-at-Law**
**900 W. Jackson Blvd, Ste 7E**
**Chicago, IL 60607**
**312-441-0211**
**joshua@kutnicklaw.com**

## CERTIFICATE OF SERVICE

I, Joshua Kutnick, an attorney, do hereby certify that I caused a copy of the foregoing motion to be served upon:

Elie Zenner
U.S. Attorney's Office, Fifth Floor
219 South Dearborn Street
Chicago, IL 60604

pursuant to Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing of the United States District Court for the Northern District of Illinois, Eastern Division on April 22, 2024.

*s/ Joshua Kutnick*
Attorney for Defendant